

**FILED**

MAR 0 1 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| JERRY N. JONES, MARY FRANCES JONES, and OLGA MENYHART, | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 1:04-cv-08305 CPK |
| vs. | ) ) | Judge Charles P. Kocoras |
| HARRIS ASSOCIATES L.P., | ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM IN SUPPORT OF
## DEFENDANT'S MOTION TO DISMISS

Gordon B. Nash, Jr.
Ngozi C. Okorafor-Johns
GARDNER CARTON & DOUGLAS LLP
191 North Wacker Drive
Suite 3700
Chicago, IL 60606-1698
Telephone: (312) 569-1421
Facsimile: (312) 569-3421

John D. Donovan, Jr.
Robert A. Skinner
Rosanne E. Felicello
ROPES & GRAY, LLP
One International Place
Boston, Massachusetts 02110
Telephone: (617) 951-7000
Facsimile: (617) 951-7050

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND ...............................................................................................................4

1. The Parties ....................................................................................................................4

2. The Investment Advisory Services and Fees...............................................................5

3. Procedural Background.................................................................................................6

ARGUMENT.....................................................................................................................7

I. THE COMPLAINT FAILS TO ALLEGE FACTS SPECIFIC TO HARRIS AND THE
OAKMARK FUNDS THAT MEET THE PLEADING STANDARD FOR A CLAIM OF
EXCESSIVE FEES UNDER SECTION 36(b) OF THE ICA.........................................7

   A. The Pleading Standard For Section 36(b) Actions................................................7

   B. Allegations Regarding The Industry as a Whole Are Insufficient to Establish
      Disproportionality Between Fees Charged and Services Rendered by *This* Adviser........13

   C. The Complaint's Few Allegations Specific to Harris Are Insufficient to Raise an
      Inference of "Disproportionality" or The Absence of Arm's-Length Bargaining.............14

      1. Comparison of 1993 Fees and 2003 Fees ...............................................15

      2. Comparison of Advisory Fees to Sub-Advisory Fees...............................19

   D. Pleading Legal Conclusions or Legal Standards is Insufficient to Make Out a Cognizable
      Case Under Section 36(b) .......................................................................19

      1. Conclusory Allegations of Excessiveness or Disproportionality Are Insufficient ...20

      2. Recitation of The *Gartenberg* "Factors" is Insufficient ...........................20

II. THE COMPLAINT'S  CLAIM TO AN "EXCESS PROFITS" REMEDY AND TO
RESCISSION OF THE CONTRACT SHOULD BE STRICKEN BECAUSE THEY ARE NOT
PROVIDED FOR BY SECTION 36(b) ...............................................................24

CONCLUSION....................................................................................................25

## TABLE OF AUTHORITIES

### FEDERAL CASES

*In re Abbott Laboratories Derivative Shareholders Litigation,*
325 F.3d 795 (7th Cir. 2003) ...........................................................................10

*American Top English, Inc. v. Lexicon Marketing (USA), Inc.,* No. 03C7021,
2004 WL 1403695 (N.D. Ill. June 21, 2004) ....................................................4

*Anderson v. Cooper,* No. 92 C 5949,
1994 WL 46675 (N.D. Ill. Feb. 14, 1994) ......................................................21

*Anderson v. Simon,* 217 F.3d 472 (7th Cir. 2000) ...............................................4

*Bankers Trust Co. v. Old Republic Insurance Co.,* 959 F.2d 677 (7th Cir. 1992)....... 15-16

*Batteast Consruction. Co., Inc. v. Public Building Commission of Chicago,*
195 F. Supp. 2d 1045 (N.D. Ill. 2001) ...............................................................4

*Briscoe v. Hue,* 663 F.2d 713 (7th Cir. 1981)....................................................20

*Burks v. Lasker,* 441 U.S. 471 (1979)..................................................................1

*DM Research Inc. v. College of American Pathologists,*
170 F.3d 53 (1st Cir. 1999)...............................................................................20

*DiLeo v. Ernst &Young,* 901 F.2d 624 (7th Cir. 1990)......................................18

*Florida State Board of Admin. v. Green Tree Finance Corp.,*
270 F.3d 645 (8th Cir. 2001) ........................................................................ 4-5

*Gallagher v. Kopera,* 789 F. Supp. 277 (N.D. Ill. 1992)...................................21

*Gartenberg v. Merrill Lynch Asset Management, Inc.,*
694 F.2d 923 (2d Cir. 1982)..................................................................... *passim*

*General Electric Capital Corp. v. Lease Resolution Corp.,*
128 F.3d 1074 (7th Cir. 1997) ...........................................................................4

*Grafman v. Century Broadcasting Corp.,* 762 F. Supp. 215 (N.D. Ill. 1991) ...................10

*Green v. Fund Asset Management, L.P.* 286 F.3d 682 (3d Cir. 2002) .........................9, 25

*Green v. Nuveen Advisory Corp.,*
No. 97-CV-5255, 2001 WL 1035652 (N.D. Ill. Sept. 10, 2001) ................................ *passim*

*Green v. Nuveen Advisory Corp.,* 293 F.3d 738 (7th Cir. 2002) ............................... *passim*

*Herdrich v. Pegram,* 154 F.3d 362 (7th Cir. 1998) ...........................................................12

*Herdrich v. Pegram,* 530 U.S. 211 (2000)................................................................. 12-13

*I. Meyer Pincus & Associates v. Oppenheimer & Co.,*
936 F.2d 759 (2d Cir. 1991)........................................................................................5

*Kamen v. Kemper Financial Services, Inc.,* 659 F. Supp. 1153 (N.D. Ill. 1987) ............1, 8

*Kamen v. Kemper Financial Services, Inc.,* 908 F. 2d 1338 (7th Cir. 1990)...................1, 8

*Krantz v. Prudential Investment Fund Management LLC,*
305 F.3d 140 (3rd Cir. 2002) .................................................................................9, 12, 20

*Lawline v. American Bar Association,*
738 F. Supp. 288 (N.D. Ill. 1990) ...............................................................................9

*Looper Maintenance Service, Inc. v. City of Indianapolis,*
197 F.3d 908 (7th Cir. 1999) ....................................................................................12

*Mattes v. ABC Plastics, Inc.,* 323 F.3d 695 (8th Cir. 2003) ...............................................13

*Migdal v. Rowe Price-Fleming International, Inc.,*
248 F.3d 321 (4th Cir. 2001) ................................................................................12, 20

*Multi-M International v. Paige Medical Supply Co., Inc.,*
142 F.R.D. 150 (N.D. Ill. 1992)................................................................................21

*Murphy v. White Hen Pantry Co.,* 691 F.2d 350 (7th Cir.1982) ..................................13, 20

*Nootens v. Madison Gas & Electric Co.,* No. 97 C 4442, 1999 WL 966294
(N.D. Ill. Oct. 12, 1999)........................................................................................13, 20

*In re Nuveen Fund Litigation,* No. 94-CV-360, 1996 WL 328006
(N.D. Ill. June 11, 1996) ...........................................................................................8

*Palay v. United States,* 349 F.3d 418 (7th Cir. 2003)...........................................................4

*Strougo v. BEA Associates,* 188 F. Supp. 2d 373 (S.D.N.Y. 2002)....................................19

*Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002).........................................................12

*Uni\*Quality, Inc. v. Infotronx, Inc.,* 974 F.2d 918 (7th Cir. 1992)....................................21

*Walker v. Thompson,* 288 F.3d 1005 (7th Cir. 2002) .........................................................12

*Wiles v. Capital Indemnity Corp.,*280 F.3d 868 (8th Cir. 2002)........................................19

*Yampolsky v. Morgan Stanley Investment Advisers, Inc.,*
No. 03 Civ. 5710 (RO) & No. 03 Civ. 5896 (RO),
2004 WL 1065533 (S.D.N.Y. May 12, 2004) ........................................................... *passim*

## STATE CASES

*Gagliardi v. TriFoods International, Inc.,* 683 A.2d 1049, 1996 WL 422330
(Del. Ch. 1996) ...........................................................................................................10

*Kaufman v. Beal,* No. 6485, 1983 WL 20295 (Del. Ch. 1983).................................... 10-11

*Millenco L.P. v. Meve Advisors, Inc.,* No. CIV. 02-142-JJF, 2002 WL 31051604
(D. Del. Aug. 21, 2002) .........................................................................................11, 12, 21

*Spillyards v. Abboud,* 278 Ill. App. 3d 663, 662 N.E.2d 1358 (1996)...............................10

## DOCKETED CASES

*Gallus et al. v. American Express Financial Corp., et al,* No. 0:04-cv-4498
(D. Minn.)(Frank, J.)(motion argued February 4, 2005) ......................................................7

*Wicks et al. v. Putnam Investment Management, LLC, et al.,* No. 1:04-CV-10988-
GAO (D. Mass.)(O'Toole, J.) (motion argued December 9, 2004)......................................7

## FEDERAL STATUTES

Fed. R. Civ. P. 8(a) .........................................................................................................12

Fed. R. Civ. P. 11 ...........................................................................................................15

Fed. R. Civ. P. 12(b)(6)............................................................................................ *passim*

Investment Company Act of 1940,
15 U.S.C. § 80a-10(a)-(b) ........................................................................................1, 8
15 U.S.C. § 80a-15(a)-(c) ........................................................................................1, 8
15 U.S.C. § 80a-35(b) ........................................................................................ *passim*

28 U.S.C. § 1404(a) ...........................................................................................................6

## OTHER AUTHORITIES

5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure
§ 1215 (3d ed. 2004) ...............................................................................................13
§ 1224 (3d ed. 2004) ...............................................................................................16
§ 1357 (2d ed. 1990) ........................................................................................... 9-10, 12

## PRELIMINARY STATEMENT

This is an action under Section 36(b) of the Investment Company Act of 1940 ("ICA"),

15 U.S.C. §§ 80a-35(b), to recover allegedly "excessive" fees paid by four mutual funds to their

investment adviser.[1]   The plaintiff shareholders in four Oakmark Funds contend that the

investment advisory fees paid by those funds to Harris Associates L.P. ("Harris") are too high,

that the "excess" portion should be returned to the funds, and that the advisory contracts should

be rescinded.

By its terms, Section 36(b) imposes a "fiduciary duty" upon a mutual fund's investment

adviser "with respect to the receipt of compensation" from the mutual fund, and authorizes a

shareholder to recover excess fees on behalf of the fund.   As a legal matter, established by

precedent upon which both parties agree, that means that an advisory fee may be not "so

disproportionately large that it bears no reasonable relationship to the services rendered and

could not have been the product of arm's-length bargaining." *Gartenberg v. Merrill Lynch Asset*

*Mgmt., Inc.*, 694 F.2d 923, 928 (2d Cir. 1982) (emphasis added); *accord Kamen v. Kemper Fin.*

*Servs., Inc.*, 659 F .Supp. 1153, 1158 (N.D. Ill. 1987) (citing *Gartenberg*), *aff'd in part, rev'd on*

*other grounds,* 908 F.2d 1338 (7th Cir. 1990).   As a practical matter, it means that a judicial

factfinder[2] must second-guess the business judgment of fund trustees who negotiated the fee, and

---

[1]  As a matter of industry practice and as recognized as a matter of law, the management and operations of a mutual fund are externalized and contractually delegated to its investment adviser.  Since the enactment of the Investment Company Act of 1940 and the Investment Advisers Act of 1940, the Supreme Court and the lower federal courts have recognized the legal separation of a mutual fund and its adviser, and have acknowledged this distinction as one of the principal purposes of the 1940 Acts.  The statutes protect mutual fund investors by maintaining a fund's independence from its adviser. *See Burks v. Lasker*, 441 U.S. 471, 480-87 (1979); Investment Company Act, 15 U.S.C. §§ 80a-10(a)-(b), 80a-15(a)-(c).

[2]  Because a Section 36(b) breach of fiduciary duty claim is equitable in character, there exists no entitlement to a jury and the claim must be tried to the court. *See Kamen,* 908 F.2d at 1350-51.

who are legally obliged to be independent of the adviser.[3]   Accordingly, to state a cognizable claim under Section 36(b), a pleading must advance facts sufficient to justify that *post hoc* scrutiny. Stated differently, a Rule 12(b)(6) motion in a Section 36(b) case does not ask whether advisory fees are high – or even whether (in the plaintiff's subjective view) they are *too* high. Rather, it inquires whether the plaintiff's factual allegations raise an inference of such disproportionality between fees and the value of services rendered that a conclusion that arm's-length bargaining did not occur is justified, and the court can conclude that the fees are "unreasonably unreasonable."

Here, that factual predicate is absent. The complaint invokes the "factors" that the *Gartenberg* decision suggests are useful as an analytical framework for considering the ultimate question, and baldly asserts – on "information and belief" – that they are not met. But it conspicuously omits any factual allegation upon which to measure disproportionality, or the absence of arm's-length bargaining (despite the independent trustees' approval), whether under the *Gartenberg* "factors" or otherwise. The Complaint is silent about the value of the services that Harris provides to the Oakmark Funds, and it never mentions the relationship between those services and the fees the funds pay to Harris for them. Factually empty *conclusions* about *Gartenberg's* "factors" do not substitute for fund- or adviser-specific *facts* upon which to draw the required inference of such substantial disproportionality between fees and services that the advisory contract *could not* have been fairly bargained.

---

[3] The approval of mutual fund fee arrangements by the independent trustees renders the fee negotiations presumptively arm's-length and "militates strongly against the contention that the advisors have breached their duty to the funds or their shareholders." *Green v. Nuveen Advisory Corp.*, No. 97-CV-5255, 2001 WL 1035652 at *6 (N.D. Ill. Sept. 10, 2001) (quotation omitted), *aff'd* 295 F.3d 738 (7th Cir. 2002), *cert. denied* 537 U.S. 1088 (2002).

- 2 -

Instead, the Complaint grounds its conclusion of "excessive" fees paid by the Oakmark Funds on three self-evidently insufficient bases.

First, the pleading criticizes as too high the advisory fees charged generally in the mutual fund industry. But broad assertions about what *competitors* of Harris and the Oakmark Funds do says nothing about the relationship between Harris and the Oakmark Funds, just as it says nothing about the value of the services rendered for these specific funds by this specific adviser.

Second, the Complaint compares the Funds' asset base and advisory fees in 2003 to the asset base and fee charged in 1993. Upon the allegation that the "nature" of the services did not change over time, while Harris' marginal expenses decreased due to supposed economies of scale, plaintiffs claim that the fees *must* reflect non-arm's-length bargaining because the fees did not shrink over this period. In addition to ignoring key undisputed facts – that (i) Harris' fee schedules *do* contain "breakpoints" reflecting economies of scale, and (ii) between 1993 and 2003, the Oakmark fund complex grew from two funds to six, with significant widening of investment focus – this inference is an economic *non-sequitur*. It does not follow as a logical matter from the Complaint's snapshot comparison that the fees negotiated between Harris and the independent trustees were "so disproportionately large" that they "could not" have been agreed at arm's length. Plaintiffs cannot simply assume away all the other factors under consideration by the independent trustees (*e.g.*, the quality and volume of Harris' services) in approving the fees. Such negotiations are presumptively arm's-length, and plaintiffs have not alleged sufficient facts to overcome that presumption.

Third, the Complaint compares investment advisory fees charged to the Oakmark Funds by Harris to fees charged by Harris to other clients for other services. That too is a non-starter under Section 36(b)'s pleading standards. Absent factual allegations that apples are really

- 3 -

oranges, no logical conclusion of "disproportionality" in fees can be drawn by inapt comparisons. One simply cannot conclude that fees charged to these funds are too high for the services rendered to these funds simply because the Complaint alleges that different fees are charged to different clients for – from all that the Complaint alleges – different services.

For these reasons, the Complaint does not set forth a cognizable claim against Harris under Section 36(b). As set forth below, the Complaint should be dismissed.

## BACKGROUND

### 1.    The Parties

The plaintiffs bring this action derivatively on behalf of four mutual funds – the Oakmark Fund, the Oakmark Equity and Income Fund, the Oakmark Global Fund, and the Oakmark International Fund (collectively, the "Oakmark Funds"), which are a subset of the The Oakmark Family of Funds advised by defendant Harris Associates L.P. ("Harris"). Each of the funds in The Oakmark Family of Funds is a series of Harris Associates Investment Trust, a Massachusetts business trust (the "Trust"). *See* Complaint ¶ 21. Defendant Harris is registered as an investment adviser under the Investment Advisers Act of 1940. *See* Complaint ¶ 22. Harris serves as an investment adviser to each of the Oakmark Funds pursuant to separate investment advisory agreements with each Fund. *See* Felicello Decl. Exh. B, p. 19.[4]

---

[4] In addition to the facts alleged in the Complaint, defendant relies on the Statement of Additional Information ("SAI") for the Oakmark Family of Funds, dated January 31, 2004 and updated February 11, 2004, relevant pages of which are attached to the Declaration of Rosanne E. Felicello, dated February 28, 2005 ("Felicello Decl." or "Felicello Declaration"), as Exhibit B. The SAI is the publicly available document setting forth the fees that plaintiffs challenge. In considering a motion to dismiss for failure to state a claim, the initial pleading is deemed to include any exhibits attached to it, as well as referenced documents that are central to the plaintiff's claim. *See e.g., American Top English, Inc. v. Lexicon Mktg. (USA), Inc.,* No. 03C7021, 2004 WL 1403695, *2 (N.D. Ill. June 21, 2004); Batteast Const. Co., Inc. v. Public Bldg. Comm'n of Chicago,* 195 F. Supp.2d 1045, 1051 (N.D. Ill. 2001). The Court may also take judicial notice of matters in the public record. *See e.g., Palay v. United States,* 349 F.3d 418, 425, n.5 (7th Cir. 2003); *Anderson v. Simon,* 217 F.3d 472, 474-475 (7th Cir. 2000); *General Electric Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1080-1081 (7th Cir. 1997) ("This exception has allowed courts to avoid unnecessary proceedings when an undisputed fact in the public record establishes that the plaintiff cannot satisfy the 12(b)(6) standard.") (collecting cases) (citations omitted). *See also Florida State Bd. of Admin. v. Green*

Plaintiffs Jerry N. Jones and Mary Frances Jones are shareholders of the Oakmark Equity and Income Fund and the Oakmark Global Fund. *See* Complaint ¶ 19. Plaintiff Olga Menyhart is a shareholder of the Oakmark Fund and the Oakmark International Fund. *See* Complaint ¶ 20.

## 2. The Investment Advisory Services and Fees

As investment adviser, Harris provides continuing investment supervision to the Oakmark Funds and overall management of the Funds' business affairs. *See* Felicello Decl. Exh. B, p. 19. In addition to providing investment advice, Harris provides office space, equipment and personnel to the Oakmark Funds and assumes the expenses of printing and distributing the prospectus, profiles and reports to prospective investors. *Id.*

For its services as investment adviser, Harris receives a fee from each Fund, calculated as a percentage of that Fund's net assets at the end of the preceding month. The fee structure features "break points" – that is, the marginal percentage fee declines as the net assets of the Fund increase, pursuant to a publicly available schedule for each Fund, which is attached hereto as Schedule A. *See* SAI at 19-20 (Felicello Decl. Exh. B).

The advisory services and fees are set forth in the investment advisory agreement between Harris and each of the funds. As required by the ICA, each advisory agreement is reviewed and approved at least annually by the board of trustees of the Trust. As described in the SAI for the Oakmark Funds, a meeting of the board of trustees was held on October 21, 2003, called in part for the purpose of voting on the renewal of the advisory agreements. The trustees considered information about, among other things:

---

*Tree Fin. Corp.*, 270 F.3d 645, 663 (8th Cir. 2001) (considering executives' stock transactions on a motion to dismiss since they appear in required public filings with the SEC); *I. Meyer Pincus & Assocs. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991) (declining "to close our eyes to the contents of the prospectus and to create a rule permitting a plaintiff to evade a properly argued motion to dismiss simply because plaintiff has chosen not to attach the prospectus to the complaint or to incorporate it by reference").

- Harris and its personnel (including particularly those personnel with responsibilities for providing services to the funds), resources and investment processes;
- the terms of each agreement;
- the scope and quality of services that Harris has been providing to the funds;
- the investment performance of each fund and of comparable funds managed by others over various periods;
- the advisory fee rates payable by each fund to Harris and by comparable funds managed by others;
- the total expense ratio of each fund and of comparable funds managed by others;
- the compensation payable by the funds to affiliates of Harris for other services;
- the profitability of Harris and its affiliates from their relationships with the funds; and
- Harris' use of the funds' portfolio brokerage transactions to obtain research benefiting the funds or other clients of Harris at a cost that may be in excess of the amount other brokers would charge.

SAI at 20-21 (Felicello Decl. Exh. B).[5]

## 3.   Procedural Background

This action was originally filed in the Western District of Missouri. Harris moved pursuant to 28 U.S.C. § 1404(a) to transfer the action to this Court, which motion was granted by Judge Nanette K. Laughrey on December 22, 2004. During the pendency of Harris' motion to dismiss in the Western District of Missouri, Harris originally filed this Motion to Dismiss pursuant to Judge Laughrey's scheduling order and the Missouri court's local rules governing motion practice. Following transfer, this Court granted the parties leave to file revised briefs, *see* Order of February 8, 2005, and granted Harris leave to file a brief of up to 25 pages, *see* Order of February 22, 2005.

---

[5]   Since the filing of this action, the Oakmark Family of Funds has issued a new SAI, dated January 28, 2005, which can be found on the funds' web site and is attached as Exhibit C to the Felicello Declaration. The current SAI notes that effective December 31, 2004, the funds have a nine-member board of trustees, as opposed to a ten-member board. A new fee schedule has been implemented, with additional break points for some of the funds at issue. The description of the most recent advisory contract renewal has also been modified. None of these changes alters the substance of Harris' arguments in support of dismissal. The prior SAI, attached as Exhibit B to the Felicello Declaration was the operative document at the time of the filing of the Complaint.

This action is one of a series of virtually identical cases brought under Section 36(b) in various courts by the same consortium of plaintiffs' counsel against the managers of various mutual fund families. Harris is aware of two of these actions in which motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) are pending: *Gallus et al. v. American Express Fin. Corp., et al*, No. 0:04-cv-4498 (D. Minn.) (Frank, J.) (motion argued February 4, 2005); and *Wicks et al. v. Putnam Inv. Mgmt., LLC, et al.*, No. 1:04-CV-10988-GAO (D. Mass.) (O'Toole, J.) (motion argued December 9, 2004).

## ARGUMENT

### I. THE COMPLAINT FAILS TO ALLEGE FACTS SPECIFIC TO HARRIS AND THE OAKMARK FUNDS THAT MEET THE PLEADING STANDARD FOR A CLAIM OF EXCESSIVE FEES UNDER SECTION 36(b) OF THE ICA

#### A. The Pleading Standard For Section 36(b) Actions

Section 36(b) of the ICA imposes a fiduciary duty on investment advisers in connection with the receipt of fees from the mutual funds they manage: "the investment adviser of a registered investment company [*i.e.*, a mutual fund] shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services . . . paid by such registered investment company." ICA § 36(b). The statute further provides the funds' shareholders a right to bring a derivative action against the adviser, on behalf of the funds, for alleged breaches of that fiduciary duty in connection with the receipt of compensation.[6]

---

[6] In pertinent part, Section 36(b) provides:

> An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment adviser . . . for breach of fiduciary duty in respect of such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person.

The ICA also requires that mutual funds be supervised by a board of directors or trustees, no fewer than 60% of whom are independent of the adviser and its affiliates. *See* ICA § 10(a). At all relevant times, the operations of the Oakmark Funds were overseen by a ten-member board of trustees, eight of whom (or 80%) were independent of the Harris and its affiliates. The ICA further requires that the advisory fees between the adviser and the funds be set forth in a written contract, and that the trustees approve the contract annually. *See* ICA § 15(a). The Complaint does not dispute that the trustees approved the advisory fees now being challenged by plaintiffs as excessive. *See* Complaint ¶ 10.

Section 36(b)'s jurisprudence is well developed. As the Complaint recognizes, the seminal case on Section 36(b) is the Second Circuit's decision in *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923 (2d Cir. 1982). *See* Complaint ¶ 23. *Gartenberg* and its progeny apply the following test to assess liability under the statute: "To be guilty of a violation of § 36(b), therefore, the advisor-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Gartenberg*, 694 F.2d at 928 (emphasis added); *see also* Complaint ¶ 23 (quoting the *Gartenberg* test). The same standard has been recognized in this district. *See Kamen v. Kemper Fin. Servs.*, 659 F. Supp. 1153, 1158 (N.D. Ill. 1987) (quoting above language from *Gartenberg*), *rev'd on other grounds,* 908 F.2d 1338 (7th Cir. 1990). *See also In re Nuveen Fund Litigation*, No. 94-CV-360, 1996 WL 328006 at *14 (N.D. Ill. June 11, 1996) ("[E]very court addressing a § 36(b) claim has required the plaintiff to demonstrate that the compensation or payment received by the investment adviser was disproportionate to the services rendered.")

- 8 -

The requirements of the *Gartenberg* test for Section 36(b) liability reflect the fact that any fee challenged under the statute will by definition have been approved by the independent trustees. This safeguard will generally not be present in the case of fiduciary relationships in other contexts, which might be challenged in common law fiduciary claims. As a result, the Seventh Circuit has recognized that "Congress enacted § 36(b) to provide a narrow federal remedy that 'is significantly more circumscribed than common law fiduciary duty doctrines.'" *Green v. Nuveen Advisory Corp.*, 295 F.3d 738, 743 (7th Cir. 2002) (quoting *Green v. Fund Asset Mgmt., L.P.*, 286 F.3d 682 (3d Cir. 2002)), *cert. denied* 537 U.S. 1088 (2002). Indeed, negotiations between the mutual fund adviser and independent trustees acting on behalf of the fund are presumptively arm's-length. As Judge Guzman of this Court ruled in another Section 36(b) case where trustee approval of the fees was conceded, "such undisputed approval militates strongly against the contention that the advisors have breached their fiduciary duty to the funds or their shareholders." *Green v. Nuveen Advisory Corp.*, No. 97-CV-5255, 2001 WL 1035652 at *6 (N.D. Ill. Sept. 10, 2001) (quotation omitted), *aff'd* 295 F.3d 738 (7th Cir. 2002), *cert. denied* 537 U.S. 1088 (2002). A Section 36(b) claim asks the Court to step in and second-guess the business judgment of the independent trustees who were directly involved in the negotiations being challenged. The bar set by the *Gartenberg* test – a showing of such disproportionately large fees that the negotiations <u>could not have been</u> the product of arm's-length bargaining" – underscores that a court should not engage in such *post hoc* scrutiny absent factual allegations sufficient to justify it.[7]

---

[7] *See also Lawline v. American Bar Ass'n*, 738 F. Supp. 288, 295 n.7 (N.D. Ill. 1990) ("[P]laintiffs cannot file a complaint merely to gain access to discovery with the hopes of later finding facts to support their otherwise insufficient allegations."); *Krantz v. Prudential Inv. Fund Mgmt. LLC*, 305 F.3d 140, 142-43 (3rd Cir. 2002), (quoting 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 at 318

Indeed, since Section 36(b) grounds its basis for "excessive fee" liability in the concept of "fiduciary duty," reference to the pleading standards that courts use to test such pleadings at common law are instructive. In cases challenging business decisions by corporate boards, plaintiffs may proceed on behalf of the corporation absent directors' approval after demand only "'where facts are alleged with particularity which create a reasonable doubt that the directors' action was entitled to the protections of the business judgment rule.'" *In re Abbott Labs. Derivative S'holders Litig.*, 325 F.3d 795, 807 (7th Cir. 2003) (quoting *Spillyards v. Abboud*, 278 Ill.App.3d. 663, 662 N.E.2d 1358, 1366 (1996)). In *Abbott Labs.*, the court required that "the alleged particularized facts raise a reasonable doubt that either (1) the directors are disinterested or independent or (2) the challenged transaction was the product of a valid exercise of the directors' business judgment." *Id.* (citation omitted). As explained by another court:

> There are good reasons for applying the business judgment rule to cases where the board of directors of a corporation, untainted with self interest, makes an ordinary business decision. Courts are in the business of interpreting law, not deciding whether a board made the correct business decision. This court would be out of its element if it were to tell Chrysler that it should have not built an additional plant. Such issues are best left unlitigated or at least entitled to some degree of deference by the courts.

*Grafman v. Century Broad. Corp.*, 762 F. Supp. 215, 217 (N.D. Ill. 1991). [8]

---

(2d ed. 1990)) ("Although the pleading requirements . . . are very liberal, more detail is often required than the bald statement by plaintiff that he has a valid claim of some type against defendant.").

[8] *See also, Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1996 WL 422330 at *2 (Del. Ch. 1996) (dismissing plaintiffs' derivative claims in the absence of facts from which it could be inferred that the board committee "lacked independence" or "lacked good faith (i.e., lacked an actual intention to advance corporate welfare)"; *Kaufman v. Beal*, No. 6485, 1983 WL 20295 at *7 (Del. Ch. 1983) (dismissing plaintiffs' derivative claims "because there is no allegation of facts showing with particularity that there was any such domination and control – nor do the complained of levels of compensation fall within the category of such a gross disparity of consideration as to make Board approval to be of the type that no reasonable businessman could approve") The Delaware Chancery Court further noted as follows:

> In the absence of facts casting a legitimate shadow over the exercise of business judgment reflected in compensation decisions, a court, acting responsibly, ought not to subject a corporation to the risk, expense and delay of derivative litigations, simply because a shareholder asserts, even

While *Gartenberg* sets disproportionality between fees paid and the value of services rendered as the touchstone for liability under Section 36(b), the decision does not articulate a pleading standard for Section 36(b) complaints. Rather, *Gartenberg* supplies a rubric for analyzing the disproportionality issue. The *Gartenberg* court described six "factors" that could be considered in determining whether a fee is so large that it bears no reasonable relationship to the services rendered: (i) the nature and quality of the services provided by the adviser to the shareholders; (ii) the profitability of the mutual fund to the adviser; (iii) fall-out benefits; (iv) economies of scale realized by the adviser; (v) comparative fee structures with similar funds; and (vi) the independence and conscientiousness of the independent trustees. *Gartenberg*, 694 F.2d at 928-931. But these *Gartenberg* factors are not a pleading standard; they are an analytical tool for examining and testing well-pled facts. *Millenco L.P. v. Mevc Advisors, Inc.*, No. CIV. 02-142-JJF, 2002 WL 31051604, at *3, n.3 (D. Del. Aug. 21, 2002) (stating that *Gartenberg* is not a pleading standard). The mere invocation of the *Gartenberg* factors cannot substitute for the required factual allegations comparing specific fees for specific services. Otherwise there is no factual predicate for the required inference of disproportionality, nor is there a basis to infer an absence of good faith bargaining. *Yampolsky v. Morgan Stanley Inv. Advisers, Inc.*, No. 03 Civ. 5710(RO) & No. 03 Civ. 5896(RO), 2004 WL 1065533, at *1-2 (S.D.N.Y. May 12, 2004) (dismissing Section 36(b) claims where plaintiffs "crafted their complaints" to track the *Gartenberg* factors).

---

sincerely, the belief and judgment that the corporation wasted corporate funds by paying far too much.

*Id.*

Instead, the decisional law recognizes that, when it comes to pleading, disproportionality or the absence of arm's-length bargaining cannot exist in a vacuum. To make out a cognizable claim under section 36(b), then, plaintiffs must allege facts *specific* to Harris and the Oakmark Funds that establish that the advisory fees are so large that the link between Harris' fees and its services to the Funds is broken. Indeed, the disproportionality between fees and services must be so great that it compels the inference that the contractual arrangement *"could not"* have been the product of arm's-length bargaining; but that inference also depends upon fund- or adviser-specific facts. *See Millenco*, 2002 WL 31051604, at *3; *Migdal v. Rowe Price-Fleming Int'l., Inc.*, 248 F.3d 321, 327 (4th Cir. 2001) ("[A] plaintiff must allege facts that, if true, would support a claim that the fees at issue are excessive."); *Krantz v. Prudential Inv. Fund Mgmt. LLC*, 305 F.3d 140, 143 (3rd Cir. 2002) (finding dismissal under Rule 12(b)(6) appropriate where plaintiff "failed to allege any facts indicating that the fees received were disproportionate to services rendered"); *Yampolsky*, 2004 WL 1065533, at *2 (dismissing two similar complaints based on Section 36(b) that lack "any factual allegations as to the *actual* fee negotiations or management and distribution services rendered by *these* defendants").[9]

---

[9]    The ICA's jurisprudence requiring plaintiffs to allege facts "indicating that the fees received were disproportionate to services rendered," *Krantz*, 305 F.3d at 143, is fully consistent with the notice-pleading jurisprudence of the Supreme Court and the Seventh Circuit. *See, e.g., Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002); *Walker v. Thompson*, 288 F.3d 1005 (7th Cir. 2002). *Swierkiewicz* merely held that in an employment discrimination case, Fed. R. Civ. P. 8(a)'s "notice pleading" standard did not oblige a plaintiff to plead the *proof* that would establish each element of a prima facie case under the *McDonnell Douglas* burden-shifting regime. *Swierkiewicz*, 534 U.S. at 508, 510-511. *Walker* held that a claim of conspiracy to violate civil rights could not be dismissed for failure to allege an "overt act." *Walker*, 288 F.3d at 1007. But these cases do not change the requirement of the pleading rules – *i.e.*, Rule 8(a)'s "short and plain statement" amounting to a "*showing* that the pleader is *entitled to relief.*" Fed. R. Civ. P. 8(a) (emphases added). ICA cases well recognize the parameters of Rule 8(a), and simply reiterate the well-settled principle that – even under Rule 8(a) – more detail is required than a "bald statement by plaintiff that he has a valid claim of some type against defendant." *See, e.g., Migdal*, 248 F.3d at 326 (quoting 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROC. § 1357 at 318 (2d ed. 1990)); *Looper Maint. Serv., Inc. v. City of Indianapolis*, 197 F.3d 908, 911 (7th Cir. 1999) ("[A] complaint must allege facts bearing on all material elements necessary to sustain a recovery under some viable legal theory.") (quoting *Herdrich v. Pegram*, 154 F.3d 362, 369 (7th Cir. 1998) (holding that plaintiff had stated a cause of action under ERISA for breach of fiduciary duties), *rev'd by Pegram v. Herdrich*, 530 U.S. 211, 237 (2000) (holding that

**B.**    **Allegations Regarding The Industry as a Whole Are Insufficient to Establish Disproportionality Between Fees Charged and Services Rendered by *This* Adviser**

The Complaint in this action cannot begin to satisfy this pleading standard, as it alleges virtually nothing about either (i) the services that Harris provided to the Oakmark Funds or (ii) the relationship between the value of services and the fees paid to Harris for them. Without such facts, the plaintiffs cannot hope to establish the disproportionality between fees and services that is the touchstone of a Section 36(b) claim, and they cannot conceive of persuading a factfinder that the fees were not bargained for at arm's length.

Indeed, most of the Complaint's factual allegations do not relate specifically to Harris and the Oakmark Funds at all. Instead, the pleading advances a broad critique of fees charged broadly in the mutual fund industry as a whole. *See* Complaint ¶¶ 15, 28, 30, 31, 32, 33, 36, 37, 46, 48, & *passim*. But generalized allegations about industry practices – untied as they are to any alleged conduct of *this* adviser defendant – cannot form the foundation for a claim against Harris. *See Yampolsky*, 2004 WL 1065533, at *2 (dismissing complaints based on Section 36(b) where the "pleadings rely heavily on generalities about deficiencies in the securities industry, and statements made by industry critics and insiders").

Without specific allegations about Harris, there is no basis to conclude that, whatever infirmities ostensibly plague the mutual fund industry as a whole, those same problems actually

---

plaintiff had failed to state a claim because mixed eligibility decisions by HMO physicians are not fiduciary decisions under ERISA )). "Although the Federal Rules allow liberal notice pleading, they do not 'allow a plaintiff to abdicate the responsibility of alleging the basic facts demonstrating his entitlement to relief.'" *Nootens v. Madison Gas & Electric Co.*, No. 97 C 4442, 1999 WL 966294 at *5 (N.D. Ill. Oct. 12, 1999) (Kocoras, J.) (quoting *Murphy v. White Hen Pantry Co.*, 691 F.2d 350, 353 (7th Cir.1982)); *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 698 (8th Cir. 2003) ("well-pleaded facts, not legal theories or conclusions, determine adequacy of complaint") (quotation omitted). "[T]he rules do contemplate a statement of circumstances, occurrences, and events in support of the claim being presented...." 5 CHARLES A. WRIGHT & ARTHUR R. MILLER FEDERAL PRACTICE & PROCEDURE § 1215 (3d ed. 2004).

infect Harris and the Oakmark Funds. If *some* investment advisers have generated economies of scale that they have not passed on to their funds, or have derived "fall-out" benefits from advising multiple funds, that does not tend to establish that anything similar has occurred at Harris and the Oakmark Funds. Mere participation *in* the mutual fund industry does not prove anything about Harris' *conduct* as an industry participant.

At root, the Complaint's allegations about industry-wide behavior betray a subjective view about investment advisers and the fees they charge. It is evident that the plaintiffs view the industry's fees to be too large. But such subjective opinions self-evidently are not predicated upon the objective facts that are essential to a claim about Harris and the Oakmark Funds. And it is objective information – warranting an inference of disproportionality or bad faith bargaining in connection with Harris' fees to the Oakmark Funds – that are the essential ingredients of a Section 36(b) claim.

## C. The Complaint's Few Allegations Specific to Harris Are Insufficient to Raise an Inference of "Disproportionality" or The Absence of Arm's-Length Bargaining

The few facts alleged in the Complaint that do relate directly to Harris and the Oakmark Funds do not come close to satisfying the pleading standard for a 36(b) action, as they allege nothing about the services provided or the relationship between the value of those services and the fees paid by the Funds. The sum total of the Complaint's factual allegations specific to the fees charged by Harris are the following:

- The amount of the fee as a percentage of assets for the entire "Oakmark Complex" was slightly higher in 2003 (0.91%) than in 1993 (0.83%), although the asset base for the funds comprising the Complex had increased and "the nature of the services rendered by Defendant has changed little, if at all," *see* Complaint ¶¶ 11-12, 34; and

- The amount Harris charged the Oakmark Funds for its services as the Funds' adviser was more than the amount it charged other mutual funds for services rendered as those funds' *sub-adviser, see* Complaint ¶ 38.

- 14 -

Taking these allegations as true for present purposes, none of them supports an inference of such disproportionality that the negotiations "could not" have been arm's-length.

### 1.   Comparison of 1993 Fees and 2003 Fees

With respect to the first of these allegations, a snapshot comparison of the results of two separate negotiations conducted a decade apart cannot lead to the conclusion that the more recent negotiation (the only one conceivably relevant under the statute[10]) was not conducted at arm's-length. As an initial matter, the 1993 vs. 2003 fee comparison constructed by plaintiffs is an apples-to-oranges exercise. The "Oakmark Complex" that is the subject of the fee comparison in Paragraphs 11 and 34 of the Complaint includes the four Oakmark Funds that are the subject of this suit, but two others advised by Harris as well. *See* Complaint ¶ 5; SAI at 1. But only two of these six funds existed in 1993, and the four funds created between 1993 and 2003 feature investment strategies differing from the original two funds – including greater emphasis on international securities, debt instruments, and companies with smaller capitalization. *See* SAI at 2-4. Thus, a comparison of the fee structure in 1993 and 2003 is meaningless given the fundamentally different scope and focus of Oakmark Complex on these two dates. Indeed, the Complaint's unsupported allegation in Paragraph 12 that "the nature of services rendered by Defendant has changed little, if at all" during this period is flatly contradicted by these publicly available and undisputed facts.[11]

---

[10]   A claim under Section 36(b) is limited in scope to the fees paid by the fund for the one-year period preceding initiation of the action. *See* ICA § 36(b)(3); *cf. Nuveen Advisory Corp.*, 295 F.3d at 477 (refusing to credit evidence in Section 36(b) case of alleged conduct occurring "before the [ICA's] recoverable one-year period began").

[11]   Plaintiffs may not, consistent with their obligations under Fed. R. Civ. P. 11, simply ignore publicly available information regarding the Funds and aver to the contrary based on "information and belief." Rule 11 imposes "a duty of precomplaint inquiry not satisfied by humor or hunch." *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir. 1992). Where the allegation concerns a fact that is a matter of public record, if the allegation

Even aside from this factual disconnect, the comparison does not yield the required inference of disproportionality. An increase over time in the *absolute* size of the fee as a percentage of the fund assets under management, while the "nature" of the services remains unchanged, says nothing about whether those fees were out of proportion to the value of the services being compensated. The "nature" of services may or may not have anything to do with the size of the assets managed; but the "volume" of services – how *much* defendants must do to manage increased assets at different points in time – does. On that key point, the Complaint is silent. Taking the Complaint's scant factual allegations as true, one cannot tell whether the burden on Harris has grown or not to manage a larger asset base with a more varied investment strategy, under current market and regulatory conditions; whether the level and amount of service they provide is the same or different than when the asset base was smaller and the investment strategies narrower; or whether the value of competitive services – what the funds could pay others to managed the increased size – is the same or different than what Harris charges now, or once charged for a smaller asset pool under different conditions. The allegations say nothing about how the *value* of Harris' services compares to the fees charged for those services, much less that a comparison is so disproportionate that it "could not have been" bargained at arm's length.

The plaintiffs conclude that an increase in the size of fees as a percentage of assets by itself *must* indicate that Harris is failing to pass along supposed economies of scale that arise as funds grow in size. *See* Complaint ¶¶ 11, 35. But that inference is illogical without factual

is pled an "information and belief" it must be disregarded. *See id.* at 684. "[M]atters of public record or matters generally known in the community should not be alleged on information and belief inasmuch as everyone is held to be conversant with them." 5 Charles A. Wright & Arthur R. Miller Federal Practice & Procedure §. 1224 (3d. 2004).

illumination of what Harris is doing with the additional assets. And as importantly, it ignores as well the fee schedule that Harris *actually* charges the Oakmark Funds, and the differences in that fee schedule negotiated since 1993. Among other things, the current schedule reflects economies of scale by including "break points" at which the percentage fee *decreases* as fund assets *increase*. The fee schedules for the Oarkmark Funds – which are publicly available yet nowhere mentioned in the Complaint – are reflected in the attached Schedule A. The Complaint neither acknowledges this fact nor makes any allegations as to why these diminishing fee schedules do not adequately account for any alleged economies of scale when considered in relation to the services provided. *Cf. Nuveen Advisory Corp.*, 295 F.3d at 741 ("To account for economies of scale, the percentage of the daily net asset value that [the adviser] receives decreases as that value increases."). Simply put, even if the average fee charged in 2003 compared to 1993 is higher, in light of the "break point" schedule, the adverse inference that the plaintiffs attempt to invoke is flatly contradicted by the fees actually charged. The plaintiffs' comparison is simply inapt.

Even taking as true plaintiffs' allegations that Harris' fees have increased while its expenses have decreased and its services have remained the same, such allegations do not form the basis for an inference that the negotiations leading to this arrangement "could not" have been conducted at arm's length. Consider a simple example that illustrates the point. If a trucker agrees to haul a manufacturer's merchandise for $500 per load, but after a year of prompt and reliable service, informs the manufacturer that the next year's rate will be $550 per load and the parties agree, no inference of "disproportionate" fees compared to value arises. Indeed, no such inference would arise even if , say, gasoline prices decrease and the trucker's cost of service declines. Any number of rational economic reasons could induce the bargain at the new rate –

-17-

and no inference of "disproportionality" – much less the absence of arm's-length negotiation – conceivably arises. In the same vein, here the plaintiffs cannot make the inferential leap that investment advisory fees *must* be "disproportionately" high merely because they appear higher than a decade ago – much less that they "could not" have been fairly negotiated. To do so merely assumes away the myriad other considerations that factor into a business judgment such as this.[12]

The Complaint focuses heavily on trends and statistics from the mutual fund industry generally. In addition to the fact that industry-wide allegations cannot state a claim against Harris, the existence of this highly-developed marketplace for investment advisory services in fact underscores the absence of disproportionality between the fees and services in this case. There is no allegation in the Complaint that the marketplace for investment advisers prices these services differently. To the contrary, insofar as one can tell from the Complaint, other mutual funds complexes charge similar (and some higher) fees than Harris charges the Oakmark Funds. Moreover, these fees are completely transparent in the market that exists at the investor level as well. If the fees charged to the Oakmark Funds were "so" disproportionate that they "could not

---

[12] The Seventh Circuit's analysis in upholding the dismissal of a securities class action complaint in *DiLeo v. Ernst & Young*, 901 F.2d 624 (7th Cir. 1990), is instructive to assess the plaintiffs' logic:

> The story in this complaint is familiar in securities litigation. At one time the firm bathes itself in a favorable light. Later the firm discloses that things are less rosy. The plaintiff contends that the difference must be attributable to fraud. "Must be" is the critical phrase, for the complaint offers *no information other than the differences between the two statements of the firm's condition.* Because only a fraction of financial deteriorations reflects fraud, plaintiffs may not proffer the different financial statements and rest. Investors must point to some facts suggesting that the difference is attributable to fraud.

*Id.* at 627-28 (emphasis added; citations omitted). By the same token, plaintiffs in this case cannot point to Harris' fees at two different points in time and under different conditions and assert that the differences "must be" due to a breach of fiduciary duty. Plaintiffs must point to some facts suggesting that the difference is attributable to self-dealing – that the fees "could not" have resulted from arm's-length bargaining.

- 18 -

have been" bargained for at arm's length, one would have expected investor flight from Oakmark to other fund complexes that charged transparently lower fees. The Complaint's allegations regarding the growth of the Oakmark Funds' asset base in recent years demonstrates that the opposite is true.

### 2. Comparison of Advisory Fees to Sub-Advisory Fees

The plaintiffs' allegations that Harris charges less for its services as a *sub-adviser* pose another inapt comparison. *See* Complaint ¶¶ 25-26, 38(a)-(c). Plaintiffs do not allege that the services provided by Harris as a sub-adviser are the same services that Harris provides as an investment adviser to the Oakmark Funds, nor can they. Indeed, the Fund document on which plaintiffs rely demonstrates clearly that Harris's role as the Funds' adviser involves general business management services extending well beyond pure investment management. With no basis to allege that the services under the sub-advisory arrangements match the breadth of the services provided to the Funds, the proffered comparison of advisory fees to sub-advisory fees is an apples-to-oranges comparison and legally irrelevant. *See Strougo v. BEA Assocs.*, 188 F. Supp. 2d. 373, 384 (S.D.N.Y. 2002) (granting summary judgment, holding "relevant comparison must be to other mutual funds, not to non-mutual fund institutional clients").

### D. Pleading Legal Conclusions or Legal Standards is Insufficient to Make Out a Cognizable Case Under Section 36(b)

Short on facts about Harris, the plaintiffs fill the Complaint with legal conclusions posing as facts about Harris. It is well settled that in analyzing the sufficiency of a Complaint, the Court should ignore "legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations." *Wiles v. Capital Indem. Corp.*, 280 F.3d 868, 870 (8th Cir. 2002). "Although the Federal Rules allow liberal notice pleading, they do not 'allow a plaintiff to abdicate the responsibility of alleging the basic facts

demonstrating his entitlement to relief.'" *Nootens.*, No. 97 C 4442, 1999 WL 966294, at *5 (quoting *Murphy v. White Hen Pantry Co.*, 691 F.2d 350, 353 (7th Cir.1982)). "[C]onclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Briscoe v. Hue*, 663 F.2d 713, 723 (7th Cir. 1981). *See also DM Research Inc. v. College of Am. Pathologists*, 170 F.3d 53, 55 (1st Cir. 1999) ("Conclusory allegations in a complaint, if they stand alone, are a danger sign that the plaintiff is engaged in a fishing expedition.").

## 1. Conclusory Allegations of Excessiveness or Disproportionality Are Insufficient

The Section 36(b) case law is clear that the conclusory "facts" stated by the plaintiffs are inadequate to support a claim for liability. *See, e.g., Migdal*, 248 F.3d at 327; *Krantz*, 305 F.3d at 143 (finding dismissal under Rule 12(b)(6) appropriate where plaintiff "failed to allege any facts indicating that the fees received were disproportionate to services rendered"); *Yampolsky*, 2004 WL 1065533, at *2 (dismissing Section 36(b) complaints lacking "any factual allegations as to the *actual* fee negotiations or management and distribution services rendered by *these* defendants"). Accordingly, plaintiffs' general averments of excessive fees are insufficient.

## 2. Recitation of The *Gartenberg* "Factors" is Insufficient

Much of the Complaint is devoted to a recitation of six "factors" that the *Gartenberg* court said could be considered in determining whether a fee is so disproportionately large that it bears no reasonable relationship to the services rendered. But mere invocation of the *Gartenberg* factors is legally insufficient to state a claim under Section 36(b). *See Yampolsky*, 2004 WL 1065533, at *2 ("While both complaints track the *Gartenberg* factors, nowhere does either complaint, in sum or substance, indicate how or why the fees are 'so disproportionately large that [they] bear[] no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining.'"). The *Gartenberg* factors are not a pleading standard;

- 20 -

they are an analytical framework for analyzing well-pled facts. *See Millenco*, 2002 WL 31051604, at *3, n.3 (stating that *Gartenberg* is not a pleading standard).

Here, the Complaint's architecture is predicated upon *Gartenberg*. The pleading recites the *Gartenberg* factors and advances a series of assumptions, all asserted upon "information and belief," regarding how Harris *must* have acted if the document's pre-ordained conclusion of disproportionality is to be accepted. For example, under the heading "The Nature and Quality of the Services Provided to the Funds," the plaintiffs allege "[o]n information and belief . . . the nature of these services has remained unchanged despite dramatic growth in the assets of the Funds." Complaint ¶ 25. The plaintiffs do not identify any basis – much less the required reasonable basis – for their "information and belief." Rather, they simply *assume* the services have remained unchanged because that assumption is consistent with the pleading's pre-ordained conclusion. But that logic is suspiciously circular, and is disfavored in this Court. *See, e.g.,* *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 924 (7th Cir. 1992) ("[A]llegations made upon information and belief are insufficient, even if the facts are inaccessible to the plaintiff, unless the plaintiff states the grounds for his suspicions."); *Anderson v. Cooper*, No. 92 C 5949, 1994 WL 46675 at *1 (N.D. Ill. Feb. 14, 1994) (finding that allegations made on "information and belief" violate the requirements of Rule 11 and striking and dismissing the offending allegations as an appropriate sanction); *Multi-M Int'l v. Paige Medical Supply Co., Inc.*, 142 F.R.D. 150, 152 (N.D. Ill. 1992) (ignoring all allegations contained in the complaint pled upon "information and belief"); *Gallagher v. Kopera*, 789 F. Supp. 277, 278 (N.D. Ill. 1992) (disregarding "improperly made" allegations made on "information and belief" and imposing sanctions on plaintiff's attorney).

Similarly, under the heading "The Profitability of the Fund to the Adviser/Manager" the Complaint states "upon information and belief, Defendant's reporting of its revenues and costs is intended to, and does obfuscate Defendant's true profitability. For instance, upon information and belief, Defendant employs inaccurate accounting practices in its financial reporting, including arbitrary and unreasonable cost allocations." Complaint ¶ 28. But that is the meretricious posing as the meritorious. The Complaint does not say how or why revenues and costs are misreported; it supplies no basis for the defamatory allegation of "intention[al] . . . obfuscat[ion]." The pleading does not deign to describe any "inaccura[cy] in Harris' accounting practices," and it does not set forth the details of any cost allocations that would make them out as unreasonable, much less arbitrary. The plaintiffs have not alleged any facts regarding how Harris allegedly misstated its profits. The absence of factual underpinning to these unsubstantiated charges unmasks them as hollow attempts to shoehorn a conclusion into a *Gartenberg* factor, rather than *facts* upon which to employ *Gartenberg's* "factors" to test the reasonableness of the funds' compensation to Harris.

The plaintiffs repeat the same ploy with other *Gartenberg* "factors." Regarding the "Fallout Benefits" *Gartenberg* factor, plaintiffs allege "on information and belief" that Harris has received "fall-out" benefits and then describes four categories of common "fall out" benefits, which it conclusorily alleges Harris received: "soft dollars," "kickbacks," benefits from securities lending arrangements, and the ability to sell investment advisory services paid by the Oakmark Funds at virtually no additional cost. *See* Complaint ¶¶ 40-43. But the pleading conspicuously omits any details about "soft dollar" arrangements between Harris and any third party, much less the background or circumstances of any "kickbacks." As with "intention[al] . . . obfuscate[ion]" of reported revenues and costs, one would imagine that if the plaintiffs truly had

- 22 -

a good faith basis to accuse Harris of "kickbacks" or "improper accounting," the plaintiffs would not merely advance the conclusion under the veil of "information and belief," but would paint the factual bases for these allegations in neon colors. Their failure even to hint at the "information" that supports their "belief" speaks volumes about the Complaint's effort to invoke the *Gartenberg* factors, and suggests instead that these allegations are hip-shooting of the worst sort. The Complaint simply fails miserably to do anything other than invoke the "factors" emptily – without facts that would justify using them as analytical tools to scrutinize Harris' fees to the Oakmark Funds.

The plaintiffs' allegations about the Oakmark Funds' trustees who negotiated the advisory contract with Harris are equally devoid of factual underpinning. Notwithstanding the statutory definition of "disinterested" and the ICA's presumption that disinterested directors are in fact independent, plaintiffs make the broad allegation "on information and belief" that "[a]s part of their scheme to receive excessive fees, Defendant did not keep the directors fully informed regarding all material facts and aspects of its fees and other compensation, and the directors failed to insist upon adequate information." Complaint ¶ 49. Plaintiffs do not plead any basis for their assertions that Harris misled the board and that the board was not conscientious in its duties; their "facts" are derived solely from their hypothesis that the fees were disproportionate.[13] For each of the *Gartenberg* factors, the analysis is the same. The plaintiffs begin with the hypothesis that the fees are disproportional and then allege "on information and belief" a conclusory allegation that is consistent with their own assumption. That kind of bootstrapping is insufficient as a matter of law.

---

[13] In fact, the SAI contradicts plaintiffs' vague assertions and indicates that the trustees did consider the very kinds of information that would be relevant to a determination of the proportionality of Harris's fees. SAI at 20-21 (Felicello Decl. Exh. B).

II.     **THE COMPLAINT'S CLAIM TO AN "EXCESS PROFITS" REMEDY AND TO RESCISSION OF THE CONTRACT SHOULD BE STRICKEN BECAUSE THEY ARE NOT PROVIDED FOR BY SECTION 36(b)**

In addition to the Complaint's shortcomings set forth in Point I above, Count II of the Complaint should be dismissed for the independent reason that it seeks recovery on a theory of liability that does not exist under Section 36(b) of the ICA. While Count I asserts that Harris violated the statute by charging excessive fees "disproportionate to the services rendered," Count II instead avers that Harris "has received and continues to receive *excess profits* attributable to extraordinary economies of scale." Complaint ¶ 57 (emphasis added).

Section 36(b) provides a cause of action for excessive fees, but not for "excess profits." As discussed above, the statute is violated only where fees are so disproportionate to services rendered that they could not have been bargained at arm's length. Nowhere does the statute or case law refer to an action based on the impact of such payments on the adviser's bottom line. Indeed, as a matter of common sense and economic reality, there is no necessary connection between "excessive fees" under the statute – *i.e.*, fees disproportionate to the services rendered – and the adviser's profits. The adviser's profits will be determined by a number of variables, many of which will have nothing to do with whether the advisory fees charged were proportionate to the services rendered in connection with those fees. Harris respectfully requests that the Court dismiss Count II for the independently sufficient reason that there is no "excess profits" cause of action under Section 36(b).

Similarly, in both Counts I and II, the plaintiffs purport to seek an order declaring the advisory agreements between the Funds and Harris "void ab initio." *See* Complaint ¶ 59. This prayer for relief should be stricken. Section 36(b) expressly delimits the form of relief available to shareholder plaintiffs – "the actual damages resulting from the breach of fiduciary duty," recoverable for a period of one year preceding the filing of an action. *See* ICA § 36(b)(3).

- 24 -

Nowhere does the statute provide for the much broader relief of rescission of the advisory agreements or a declaration that the agreements were "void ab initio." By including this request, the plaintiffs apparently seek to extend the reach of the money damages they might recover beyond the one-year period provided by statute. There is no legal basis for such a maneuver, and this prayer for relief should be stricken from the Complaint. *See Green v. Fund Asset Mgmt., L.P.*, 286 F.3d. 682, 685 (3rd Cir. 2002) ("§ 36(b) was intended to provide a very specific, narrow federal remedy . . . . [U]nder § 36(b), a shareholder may only sue the recipient of the fees; recovery is limited to *actual* damages resulting from the breach; and damages are not recoverable for any period prior to one year before the action was instituted."(citation omitted).

## CONCLUSION

For all of the foregoing reasons, the plaintiffs' Complaint should be dismissed in its entirety.

Respectfully submitted,

BY: _____

Gordon B. Nash, Jr.
Ngozi C. Okorafor-Johns
GARDNER CARTON & DOUGLAS LLP
191 North Wacker Drive, Suite 3700
Chicago, IL 60606-1698
Telephone: (312) 569-1421
Facsimile: (312) 569-3421

John D. Donovan, Jr.
Robert A. Skinner
Rosanne E. Felicello
ROPES & GRAY, LLP
One International Place
Boston, Massachusetts 02110
Telephone: (617) 951-7000
Facsimile: (617) 951-7050
*Admitted pro hac vice*

Dated: March 1, 2005

- 25 -

## SCHEDULE A

Following are the advisory fees schedules for the Oakmark Funds at issue in the

Complaint, effective as of the filing of the Complaint. *See* SAI at 19-20 (Felicello Decl. Exh.

B).[*]

| Net Daily Assets | Advisory Fee as a % of Assets |
|---|---|
| Oakmark Fund | |
| Up to $2 billion | 1.00% |
| $2 billion - $3 billion | 0.90% |
| $3 billion - $5 billion | 0.80% |
| Over $5 billion | 0.75% |
| Oakmark Equity and Income Fund | |
| Up to $5 billion | 0.75% |
| $5 billion - $7.5 billion | 0.70% |
| $7.5 billion - $10 billion | 0.675% |
| Over $10 billion | 0.65% |
| Oakmark Global Fund | |
| Up to $2 billion | 1.00% |
| $2 billion - $4 billion | 0.95% |
| Over $4 billion | 0.90% |
| Oakmark International Fund | |
| Up to $2 billion | 1.00% |
| $2 billion - $3 billion | 0.95% |
| Over $3 billion | 0.85% |

---

[*] At a meeting on October 28, 2004, the trustees approved modest revisions to these fee schedules effective November 1, 2004. The revised schedules continue to feature a declining marginal fee as assets grow. Because these revised schedules were not in effect at the time of the filing of the Complaint, Harris does not intend to make these facts part of the current motion.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JERRY N. JONES, MARY FRANCES )
JONES, and OLGA MENYHART, )
                    )
                    ) Civil Action No.: 1:04-CV-08305 CPK
            Plaintiffs, )
                    ) Judge Charles P. Kocoras
vs.                   )
                    )
HARRIS ASSOCIATES L.P., )
                    )
            Defendant. )
                    )

## DECLARATION OF ROSANNE E. FELICELLO

I, Rosanne E. Felicello, hereby declare:

1.     I am a member of the Massachusetts bar and have been admitted *pro hac vice* in this

Court in this action. I am an associate at the law firm of Ropes & Gray LLP which, along with

Gardner Carton & Douglass LLP, represents the defendant in this matter.

2.     I have personal knowledge of the facts presented in this declaration. I respectfully submit

this declaration, along with the accompanying memorandum, in support of defendant's motion to

dismiss the complaint.

3.     Attached as Exhibit A is a true and correct copy of the original complaint filed by the

plaintiffs against defendant Harris Associates L.P. ("Harris"), without exhibits.

9571907_2

4.      Attached as Exhibit B is a true and correct copy of relevant excerpts of the applicable Statement of Additional Information ("SAI") for the Oakmark Family of Funds, dated January 31, 2004 and updated February 11, 2004 (the "Relevant SAI").  During the relevant time period and at the time that the complaint was filed, the Relevant SAI was available at the Oakmark Family of Funds' website, www.oakmark.com.

5.      Attached as Exhibit C is a true and correct copy of relevant excerpts of the current Statement of Additional Information ("SAI") for the Oakmark Family of Funds, dated January 28, 2005, which is available at the Oakmark Family of Funds' website, www.oakmark.com.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 28th of February, 2005.

_Rosanne E. Felicello_

Rosanne E. Felicello

# EXHIBIT A

AUG.31.2004   3:11PM   HARRIS ASSOC                      NO.431    P.3

8/16/04

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
### CENTRAL DIVISION

JERRY N. JONES, MARY FRANCES          )
JONES, and OLGA MENYHART,             )
                                      )
      Plaintiffs,                      )
                                      )   **04-4184-CV-  C-NKL**
      v.                               )   Case No:_____
                                      )
HARRIS ASSOCIATES L.P.,               )
                                      )
      Defendant.                       )

## COMPLAINT

Plaintiffs, Jerry N. Jones, Mary Frances Jones, and Olga Menyhart for the use and benefit

of the Oakmark Fund, the Oakmark Equity and Income Fund, the Oakmark Global Fund, and the

Oakmark International Fund, sue Defendant, Harris Associates L.P., and allege:

### I. JURISDICTION AND VENUE

1.      This action is a derivative action brought by Plaintiffs on behalf of the Oakmark

Fund, the Oakmark Equity and Income Fund, the Oakmark Global Fund, and the Oakmark

International Fund (collectively, the "Funds") pursuant to §§ 36(b) of the Investment Company

Act of 1940 ("ICA"), as amended, 15 U.S.C. §§ 80a-35(b).

2.      This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 80a-43, 15

U.S.C. § 80a-35(b)(5), and 28 U.S.C § 1331.

3.      Venue is proper in this judicial district pursuant to 15 U.S.C. § 80a-43 and 28

U.S.C. § 1391(b). Defendant is an inhabitant of or transacts business in this district, Defendant

resides in this district, a substantial part of the events or omissions that give rise to Plaintiffs'

claims occurred in this district, and/or Defendant may be found in this district.

4.      All conditions precedent have been performed or have occurred.

## II. BACKGROUND

5.      Plaintiffs are shareholders in the Funds, which are open-end registered investment companies,[1] or mutual funds, created, sold, advised, and managed with other funds as part of a fund family or complex by Defendant and its affiliates (the "Oakmark Complex" or the "Fund Complex"). Defendant and its affiliates, as the underwriters, distributors, advisors, and control persons of the Funds, owe fiduciary and other duties to Plaintiffs and all shareholders of the funds in the Fund Complex.

6.      Plaintiffs and the other shareholders of the Funds pay Defendant and its affiliates, or other third parties, fees for providing pure investment advisory services and administrative services.  For the pure investment advisory services, the Funds pay Defendant a fee based on a percentage of the net assets of each of the funds in the Fund Complex.  The Funds pay separate fees for some or all of the administrative services provided to the Funds by Defendant's affiliates or other third parties.

7.      The pure investment advisory services Defendant provides to the Funds are identical to the investment advisory services Defendant provides to other clients, such as institutional clients, and entail identical costs.  In fact, the costs of advisors, analysts, research data, the physical plant, and other aspects of Defendant's investment advisory services are shared between the mutual funds and the other clients.

8.      Despite the equivalence of the investment advisory services Defendant provides to the Funds and the other clients, the fees Defendant receives from the Funds for pure investment

---

[1] The Oakmark Global Fund and the Oakmark International Fund closed to new investors as of December 15, 2003, but was open-ended at the time of purchase.

2

advisory services are much higher than the fees Defendant or its affiliates receive from other

clients for the identical services.

### Section 36(b) of the Investment Company Act of 1940

9.   In 1940, Congress enacted the Investment Company Act of 1940, 15 U.S.C. §

80a-1 et seq. (the "ICA "). The ICA was designed to regulate and curb abuses in the mutual fund

industry and to create standards of care applicable to investment advisors such as Defendant. In

the 1960s, it became clear to Congress that investment advisors to equity mutual funds were

gouging those funds with excessive fees, particularly by not taking economies of scale into

account. As a result, § 36(b), 15 U.S.C., § 80a-35(b), was added to the ICA in 1970, which

created a federal cause of action for breach of fiduciary duty.

10.   Section 36(b) provides in pertinent part:

> [T]he investment adviser of a registered investment company shall be
> deemed to have a fiduciary duty with respect to the receipt of
> compensation for services, or of payments of a material nature, paid by
> such registered investment company, or by the security holders thereof, to
> such investment adviser or any affiliated person of such investment
> adviser. An action may be brought under this subsection by the
> Commission, or by a security holder of such registered investment
> company on behalf of such company, against such investment advisers, or
> an affiliated person of such investment advisor, or any other person
> enumerated in subsection (a) of this section who has a fiduciary duty
> concerning such compensation or payments, for breach of fiduciary duty
> in respect to such compensation or payments paid by such registered
> investment company or by the security holders thereof to such investment
> adviser or person. . . .

11.   In the past decade, the assets managed by Defendant within the Fund Complex

have grown dramatically. In 1993, the Fund Complex had $295.3 Million in average net assets.

By 2003, the Fund Complex had exploded to over $11.7 Billion in average net assets, almost 40

times the assets in 1993. Meanwhile, advisory fees for the Fund Complex increased from $2.45

million (or 0.83% of assets) in 1993 to $107.3 million (or 0.91% of assets) in 2003.

Accordingly, despite the Fund Complex's dramatic growth, no economies of scale or incremental

savings were realized by the shareholders. Rather, fees actually grew as a percentage of assets.

12.     While the assets of the Fund Complex and the fees have grown dramatically in

size, the nature of the services rendered by Defendant has changed little, if at all. Indeed,

advances in computing and communication technologies in the past twenty years have resulted in

exponential efficiencies that have dramatically reduced the costs of servicing mutual funds in

ways Congress could not have imagined when it enacted ICA § 36(b). Nonetheless, the advisory

fees paid to Defendant have grown dramatically. As a result, the advisory fees paid to Defendant

(and accepted by Defendant in violation of its statutory fiduciary duties) are disproportionately

large in relationship to the services rendered to Plaintiffs.

13.     In addition, Defendant, in violation of its fiduciary duties to Plaintiffs, has

retained excess profits resulting from economies of scale. These economies of scale are a product

of the dramatic growth in assets managed by Defendant. As assets under management increase,

the cost of providing services to the assets does not increase at the same rate. In fact, with very

large funds, such as the Funds at issue here, the cost of servicing additional assets approaches

zero, resulting in tremendous economies of scale. Accordingly, any fees received in connection

with the additional assets represent almost pure profit. The excess profits resulting from these

economies of scale belong to Plaintiffs and the other shareholders of the Funds.

14.     The fees paid to Defendant are technically approved by the Funds' board of

directors.[2]  A majority of the board is comprised of statutorily presumed "disinterested" directors

---

[2] While the Funds at issue here are technically governed by a board of trustees rather than directors, the term "directors" is used throughout the complaint and should be read as synonymous with "trustees," as it is under the ICA.

4

as that term is defined in § 10 of the ICA. **Regardless** of whether these presumably
"disinterested" directors meet the requirements of § 10 of the ICA, there is a lack of
conscientiousness by the directors in reviewing the advisory fees paid by the Funds. In addition,
even if statutorily disinterested, the directors are in all practical respects dominated and unduly
influenced by Defendant in reviewing the fees paid by Plaintiffs and the other shareholders of the
Funds. In particular, Defendant does not provide the directors with sufficient information for the
directors to fulfill their obligations, a factor supporting a finding that Defendant has breached its
fiduciary duties.

15.     Although the fees challenged in this lawsuit may appear to the Court to be very
small on a shareholder-by-shareholder basis, they cause a dramatic decrease in Plaintiffs'
investment returns over time. Arthur Levitt, past Chairman of the Securities and Exchange
Commission ("SEC"), was critical of what he called the "tyranny of compounding high costs":

> Instinct tells me that many investors would be shocked to know how seemingly
> small fees can over time, create such drastic erosion in returns. ... In the years
> ahead, what will mutual fund investors say if they realize too late their returns
> have fallen hard under the weight of compounding fees?

Arthur Levitt, Jr., Inaugural address: Costs Paid with Other People's Money, Address at
Fordham University School of Law (Nov. 3, 2000), in 6 Fordham J. Corp. & Fin. L. 261, 267
(2001).

### Nature of Claims

16.     In this action, Plaintiffs seeks to rescind the investment advisory agreements and
to recover for the Funds the total fees charged by Defendant or, alternatively, to recover for the
Funds the excess profits resulting from economies of scale wrongfully retained by Defendant and

---

*See* 15 U.S.C., § 80a-2(a)(12).

to recover other excessive compensation received by, or improper payments wrongfully retained

by, Defendant in breach of its fiduciary duty under the ICA § 36(b), 15 U.S.C. § 80a-35(b).

Because the conduct complained of herein is continuing in nature, Plaintiffs seek recovery for a

period commencing at the earliest date in light of any applicable statute of limitations through the

date of final judgment after trial.

17.     No pre-suit demand on the board of directors of the Funds is required, as the

requirements of F.R.C.P. 23.1 do not apply to actions under § 36(b) of the ICA. *Daily Income

Fund v. Fox*, 464 U.S. 523 (1984).

18.     Plaintiffs do not allege or seek relief for any claims based upon improper market

timing or late trading activity involving the Funds.

### III. PARTIES

19.     Plaintiffs Jerry N. Jones and Mary Frances Jones are residents of Columbia,

Missouri. They are shareholders at all relevant times of the Oakmark Equity and Income Fund

and the Oakmark Global Fund.

20.     Plaintiff Olga Menyhart is a resident of Tampa, Florida. She is a shareholder at

all relevant times of the Oakmark Fund and the Oakmark International Fund.

21.     Each of the Funds is a separate operating series of the Harris Associates

Investment Trust, a Massachusetts business trust that is registered with the Securities and

Exchange Commission under the Investment Company Act of 1940 as an open-end management

investment company.

22.     Defendant Harris Associates LP ("Harris") is a Delaware limited partnership and

is registered as an investment adviser under the Investment Advisers Act of 1940. Harris is the

6

investment advisor to each of the Funds. Harris also serves as the investment advisor to

individuals and other institutions, including trusts, retirement plans, endowments and

foundations, and manages a number of private partnerships.

## IV. GENERAL ALLEGATIONS

23.     The test for determining whether compensation paid to Defendant violates §36(b)

is "essentially whether the fee schedule represents a charge within the range of what would have

been negotiated at arm's-length in the light of all of the surrounding circumstances." *Gartenberg*

*v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923, 928 (2d Cir. 1982). In order to violate §

36(b), "the advisor-manager must charge a fee that is so disproportionately large that it bears no

reasonable relationship to the services rendered and could not have been the product of arm's-

length bargaining." *Id.*

24.     In applying this test, all pertinent facts must be weighed in determining whether a

fee or other compensation violates § 36(b). The *Gartenberg* court specifically identified six

factors (a portion of "all pertinent facts") to be considered in determining whether a fee is so

disproportionately large that it bears no reasonable relationship to the services rendered. These

factors include: (1) the nature and quality of the services rendered; (2) the profitability of the

funds to the advisor/manager; (3) economies of scale; (4) comparative fee structures; (5) fallout

benefits (i.e. indirect profits to the advisor/manager resulting from the existence of the funds; and

(6) the care and conscientiousness of the directors. A review of these factors, and the facts in this

case, demonstrates that the fees charged by Defendant to the Funds violate § 36(b).

### *(1) The Nature and Quality of the Services Provided to the Funds*

25.     The nature of the investment advisory services provided to the Funds is

7

straightforward: Defendant buys and sells, at its discretion, stocks, bonds, and other securities for the Funds. This is precisely the same service provided to Defendant's institutional and other clients (albeit at a dramatically lower cost). On information and belief, the materials provided by Defendant to the directors of the Funds establish that the nature of these services has remained unchanged despite dramatic growth in the assets of the Funds and advisory revenues.

26.    Despite the fact that the Funds receive identical investment advisory services as Defendant's institutional and other clients, on information and belief Plaintiffs pay Defendant dramatically higher fees because these fees are not negotiated at arm's length as they are with the institutional and other clients. This disparity in fees evinces Defendant's willingness and determination to prefer their own financial interests to the interests of the Funds and the shareholders of the Funds.

27.    On information and belief, Defendant repeatedly puts its own financial interests ahead of the interests of the Funds and the shareholders of the Funds by participating in arrangements and schemes that benefit Defendant at the expense of the Funds and their shareholders. The cost of this conflict of interest, which does not exist in the case of the arm's-length relationships with institutional clients, is manifest not only in higher fees, but in other losses and expenses borne by the Funds and the shareholders of the Funds. These losses and expenses directly impact the quality of the investment advisory services Defendant provides to the Funds.

### (2) The Profitability of the Fund to the Adviser/Manager

28.    "[T]he 'profitability of the fund to the adviser' [must] be studied in order that the price paid by the fund to its adviser be equivalent to 'the product of arm's-length bargaining.'"

8

*See* John P. Freeman & Stewart L. Brown, *Mutual Fund Advisory Fees: The Cost of Conflicts of Interest*, 26 J. Corp L. 610, 661 (2001) (the "Freeman & Brown Study") (citing *Gartenberg*) [Ex. 1]. The profitability of a fund to an adviser-manager is a function of revenues minus the costs of providing services. However, upon information and belief, Defendant's reporting of its revenues and costs is intended to, and does, obfuscate Defendant's true profitability. For instance, upon information and belief, Defendant employs inaccurate accounting practices in its financial reporting, including arbitrary and unreasonable cost allocations.

29.    Defendant's true profitability can be determined on either an incremental basis or a full-cost basis. Defendant's incremental cost of providing advisory services to Plaintiffs is nominal while the additional fees received by Defendant are hugely disproportionate given that the nature, quality, and level of the services remain the same. On information and belief, a review of Defendant's full costs of providing advisory services will also demonstrate the enormous profitability to Defendant of managing the Funds.

### (3) Economies of Scale

30.    The existence of economies of scale in the mutual fund industry has been recently confirmed by both the SEC and the Governmental Accounting Office (the "GAO"). Both conducted in-depth studies of mutual fund fees in 2000, and both concluded that economies of scale exist in the provision of advisory services. *See* SEC Division of Investment Management: Report on Mutual Fund Fees and Expenses (Dec. 2000) ("SEC Report"), at 30-31 [Ex. 2]; GAO, Report on Mutual Fund Fees to the Chairman, Subcommittee on Finance and Hazardous Materials; and the Ranking Member, Committee on Commerce, House of Representatives (June 2000) ("GAO Report"), at 9 [Ex. 3].

31.     In addition, the most significant academic research undertaken since the Wharton

School study in the 1960s establishes the existence of economies of scale that are not being

passed along to mutual fund shareholders in violation of Defendant's duty to do so under § 36(b).

*See* Freeman & Brown Study" [Ex. 1]. As the Freeman & Brown Study noted: "The existence

of economies of scale has been admitted in SEC filings made by fund managers and is implicit in

the industry's frequent use of fee rates that decrease as assets under management increase. Fund

industry investment managers are prone to cite economies of scale as justification for business

combinations." Id. at 620 [Ex. 1].

32.     These economies of scale exist not only fund by fund but also exist with respect to

an entire fund complex and even with respect to an investment advisor's entire scope of

operations, including services provided to institutional and other clients. *See* Freeman & Brown

Study at 621 n.62 (quoting Victoria E. Schonfeld & Thomas M.J. Kerwin, Organization of a

Mutual Fund, 49 Bus. Law 107 (1993)) [Ex. 1].

33.     The clearest example of economies of scale occurs when total assets under

management increase due purely to market forces (without the institution of new advisory

relationships or new asset gathering). In such instances, as the GAO confirms, it is possible for

the advisor to service the additional assets with zero additional costs. See GAO Report at 9

(noting that growth from portfolio appreciation is unaccompanied by costs) [Ex. 3]. In other

words, an investment advisor can advise a fund that doubles in size purely because of market

forces with no increased costs because the services are unchanged. *See* GAO Report at 9 [Ex. 3];

Freeman & Brown Study at 619 n.43, 621 (noting that investment advisors have benefited by

garnering "increased fees from the general increase in market prices with no commensurate

10

efforts on their part" and also noting that as much as 64% of mutual fund asset growth has come

from appreciation of portfolio securities, which, unlike growth from share sales to new investors,

is costless) [Ex. 1].

34.     From 1993 through 2003, the assets under management in the Oakmark Complex

grew from $295.3 million to nearly $11.7 billion.  However, this phenomenal growth in mutual

fund assets not only produced no economies of scale, but fees actually increased faster than the

growth in assets.  Fees went from $2.45 million (or 0.83% of assets) in 1993 to $107.3 million

(or 0.91% of assets) in 2003.

35.     The economies of scale enjoyed by Defendant with respect to the Funds have not

been shared with Plaintiffs as required by § 36(b).  As a result, the fees paid to Defendant for

advisory services provided to the Funds are grossly disproportionate to those services, are

excessive, and violate § 36(b).

### (4) Comparative Fee Structures

36.     The fees advisors receive from mutual funds for investment advisory services are

directly comparable to, though much higher than, the fees advisors receive from other clients for

the identical services.  As the Freeman & Brown Study noted: "None of the leading advisory fee

cases involved equity funds, and hence, none of the courts were confronted directly with the

strong analogies that can be drawn between equity advisory services in the fund industry as

compared to the pension field where prices are notably lower." Freeman & Brown Study at 653

[Ex. 1].  While a "manager may encounter different levels of fixed and variable research costs

depending on the type of the portfolio, . . . the fundamental management process is essentially

the same for large and small portfolios, as well as for pension funds and mutual funds.  The

11

portfolio owner's identity (pension fund versus mutual fund) should not logically provide a

reason for portfolio management costs being higher or lower." Freeman & Brown Study at 627-

28 [Ex 1]. Indeed, "a mutual fund, as an entity, actually is an institutional investor. When it

comes to fee discrepancies, the difference between funds and other institutional investors does

not turn on 'institutional status,' it turns on self-dealing and conflict of interest." Freeman &

Brown Study at 629 n.93 [Ex. 1]. Accordingly, the "'apples-to-apples' fee comparisons between

equity pension managers and equity fund managers can be most difficult and embarrassing for

those selling advice to mutual funds." Freeman & Brown Study at 671-72 [Ex. 1].

     37.    More recently, New York's Attorney General surveyed two fund complexes and

confirmed the existence of massive over-charging of fund advisory fees. Specifically, Mr.

Spitzer testified before a Senate Subcommittee on January 27, 2004, as follows:

> Putnam's mutual fund investors were charged 40 percent more for
> advisory services than Putnam's institutional investors. In dollar terms,
> what this fee disparity means is that in 2002 Putnam mutual fund investors
> paid $290 million more in advisory fees than they would have paid had
> they been charged the rate given to Putnam's institutional clients, and
> these are for identical services.

> There was a similar disparity in the advisory fees charged by
> Alliance. Once again, mutual fund investors were charged significantly
> higher advisory fees than institutional investors. Specifically, Alliance's
> mutual fund investors paid advisory fees that were twice those paid by
> institutional investors. In dollar terms, this means that Alliance investors
> paid more than $200 million more in advisory fees than they would have
> paid had they been charged the rate given to Alliance's institutional
> clients.

     38.    On information and belief, the shareholders of the Funds at issue here are plagued

by the same discriminatory over-charging. Indeed, a number of relevant comparative fee

structures clearly establish that Defendant is charging advisory fees to the Funds that are

disproportionate to the value of the services rendered. For example, upon information and belief:

    a. Harris serves as the subadvisor to the CDC Nvest Growth and Income Fund. For its services, Harris receives a fee equal to 45 basis points (.45%) of the first $250 Million in assets, 40 basis points (.40%) of the next $250 Million in assets, and 35 basis points (.35%) of assets over $500 Million (the "Nvest G&I Fee Schedule"). By way of contrast, for its services to the Oakmark Equity and Income Fund, Harris receives a fee equal to 75 basis points (.75%) of the first $5 Billion in assets, 70 basis points (.70%) of the next $2.5 Billion in assets, 675 basis points (.675%) of the next $2.5 Billion in assets, and 65 basis points (.65%) of assets over $10 Billion. As of June 2004, the Oakmark Equity and Income Fund had over $7.727 Billion in assets. If the Oakmark Equity and Income Fund were to have average assets of this amount throughout 2004, it would pay a blended fee of 73.2 basis points (.732%). However, if the Oakmark Equity and Income Fund benefited from the Nvest G&I Fee Schedule, the Oakmark Equity and Income Fund would pay a blended fee of only 35.5 basis points (.355%). Under this fee schedule, the Oakmark Equity and Income Fund would pay less than half of what it will pay under its current schedule, which would save the shareholders of the Oakmark Equity and Income Fund over $29 million in fees this year.

    b. Harris serves as the subadvisor to the MassMutual Focused Value Fund (a mid-cap fund). For its services, Harris receives a fee equal to 50 basis points (.50%) of the first $100 Million in assets, 45 basis points (.45%) of the next $400 Million in assets, and 40 basis points (.40%) of assets over $500 Million (the "MassMutual Focused

13

Value Fee Schedule"). By way of contrast, for its services to the Oakmark Select Fund (also a mid-cap fund), Harris receives a fee equal to 100 basis points (1.00%) of the first $1 Billion in assets, 95 basis points (.95%) of the next $500 Million in assets, 90 basis points (.90%) of the next $500 Million in assets, 85 basis points (.85%) of the next $500 Million in assets, 80 basis points (.80%) of the next $2.5 Billion in assets, and 75 basis points (.75%) of assets over $5 Billion. As of June 2004, the Oakmark Select Fund had over $5.623 Billion in assets. If the Oakmark Select Fund were to have average assets of this amount throughout 2004, it would pay a blended fee of 85.7 basis points (.857%). However, if the Oakmark Select Fund benefited from the MassMutual Focused Value Fee Schedule, the Oakmark Select Fund would pay a blended fee of only 40.5 basis points (.405%). Under this fee schedule, the Oakmark Select Fund would pay less than half of what it will pay under its current schedule, which would save the shareholders of the Oakmark Select Fund over $25 million in fees this year.

c. Harris serves as the subadvisor to the MassMutual Overseas Fund. For its services, Harris receives a fee equal to 65 basis points (.65%) of the first $50 Million in assets, 60 basis points (.60%) of the next $50 Million in assets, and 50 basis points (.50%) of assets over $100 Million (the "MassMutual Overseas Fee Schedule"). By way of contrast, for its services to the Oakmark International Fund, Harris receives a fee equal to 100 basis points (1.00%) of the first $2 Billion in assets, 95 basis points (.95%) of the next $1 Billion in assets, and 85 basis points (.85%) of assets over $3 Billion. As of June 2004, the Oakmark International Fund had over $4.231 Billion in

14

assets. If the Oakmark International Fund were to have average assets of this amount

throughout 2004, it would pay a blended fee of 94.5 basis points (.945%). However,

if the Oakmark International Fund benefited from the MassMutual Overseas Fee

Schedule, the Oakmark International Fund would pay a blended fee of only 50.3 basis

points (.503%). Under this fee schedule, the Oakmark International Fund would pay

slightly more than half of what it will pay under its current schedule, which would

save the shareholders of the Oakmark International Fund over $18 million in fees this

year.

### (5) Fallout Benefits

39.    Defendant indirectly profits because of the existence of the Funds through fallout

benefits. Obvious, but difficult to quantify fallout benefits include the attraction of new

customers, cross selling related funds to current customers, and other benefits associated

generally with the development of goodwill and the growth in assets of the Funds.

40.    Other, easier to quantify, benefits include "soft dollars" payable from broker-

dealers. Essentially, "soft dollars" are credits furnished to Defendant from broker-dealers and

other securities-industry firms in exchange for routing the Funds' securities transaction orders

and other business to paying firms. These soft-dollar credits should be used to purchase research

and other goods or services that benefit the shareholders of the Funds. On information and

belief, however, the soft-dollar arrangements benefit Defendant and result in increased costs to

the shareholders of the Funds with little to no corresponding benefits to the shareholders of the

Funds. On information and belief, the soft dollar arrangements are concealed from the

shareholders of the Funds in breach of Defendant's fiduciary duty.

15

41.    On information and belief, Defendant also receives "kickbacks," either directly or indirectly, as transfer agency and custodian fees grow due to increases in the assets of the Funds and the number of shareholders.

42.    On information and belief, Defendant receives further fallout benefits from securities lending arrangements. Essentially, Defendant loans out the securities of the Funds and receives compensation as the lending agent of the Funds.

43.    A highly profitable fallout benefit to Defendant is the ability to sell investment advisory services paid for by the Funds at virtually no additional cost. Much like computer software, once the investment research and resulting recommendations are paid for, that research and those recommendations may be sold to other clients at virtually no cost whatsoever to Defendant. Without payment by Plaintiffs and other shareholders of the Funds of millions of dollars in advisory fees, Defendant would have to pay to conduct that research independently in order to provide investment advisory services to other clients, including institutional clients. This is a natural byproduct of the extraordinary economies of scale inherent in the investment advisory business. However, although Plaintiffs and other shareholders of the Funds pay all of the costs associated with the investment advisory services, Defendant resells these services to third parties without compensating shareholders through reduced fees or in any other way.

44.    On information and belief, Defendant does not provide sufficient information regarding the existence and extent of these and other fallout benefits to the shareholders of the Funds or to the Funds' directors. The directors are thus unable to quantify or even meaningfully consider the benefits. Plaintiffs and other shareholders of the Funds have paid for these benefits and are entitled to compensation in the form of reduced advisory fees.

16

### (6) The Independence and Conscientiousness of the Directors

45.     At least 40% of the Funds' directors must be "disinterested" as defined in § 10 of

the ICA. As the GAO Report noted, the structure of most mutual funds embodies a potential

conflict of interest between the fund's shareholders and its adviser. This conflict arises because

the fees paid by the shareholders represent revenue to the adviser. The United States Supreme

Court has stated that the disinterested-director requirement is "the cornerstone of the ICA's

efforts to control" this conflict of interest. *Burks v. Lasker*, 441 U.S. 471 (1979).

46.     The disinterested directors are supposed to serve as "watchdogs" for the

shareholders of the Funds. As such, the disinterested directors have primary responsibility for,

among many other things, negotiating and approving all contracts and agreements with

Defendant and reviewing the reasonableness of the advisory fees received by Defendant.

Accordingly, as noted by the GAO, the directors are expected to review, among other things, the

advisor's costs, whether fees have been reduced when the Funds' assets have grown, and the fees

charged for similar services. See GAO Report at 14 [Ex. 3]. These responsibilities are intensive,

requiring the directors to rely on information provided by Defendant. Defendant, in turn, has a

fiduciary duty to provide all information reasonably necessary for the directors to perform their

obligations. *See* 15 U.S.C., § 80a-15(c).

47.     The ICA contains a presumption that the disinterested directors are in fact

disinterested. However, the lack of conscientiousness of even disinterested directors in

reviewing the fees paid by the Funds, the lack of adequate information provided to the directors

in connection with their approvals of the advisory agreements, and the control of management

over the directors in reviewing the fees paid by the Funds are not presumed but, rather, are

important factors recognized in the *Gartenberg* line of cases in determining whether Defendant

has breached its fiduciary duties. In addition, the SEC has specifically recognized that even

disinterested directors may not be independent but, rather, may be subject to domination or

undue influence by a fund's investment adviser.

48.     Two noteworthy industry insiders have commented on the general failure of

mutual fund boards to fulfill their responsibilities under the ICA. Jack Bogle, founder of the

Vanguard Group, made the following comment:

> Well, fund directors are, or at least to a very major extent, sort of a
> bad joke. They've watched industry fees go up year after year,
> they've added 12b-1 fees. I think they've forgotten, maybe they've
> never been told, that the law, the Investment Company Act, says
> they're required to put the interest of the fund shareholders ahead of
> the interest of the fund adviser. It's simply impossible for me to see
> how they could have ever measured up to that mandate, or are
> measuring up to it.

Warren Buffet, famous investor and chairman of Berkshire Hathaway, Inc., made the following

comment, which was recently quoted by a United States District Court:

> I think independent directors have been anything but independent.
> The Investment Company Act, in 1940, made these provisions for
> independent directors on the theory that they would be the watchdogs
> for all these people pooling their money. The behavior of
> independent directors in aggregate since 1940 has been to rubber
> stamp every deal that's come along from management—whether
> management was good, bad, or indifferent. Not negotiate for fee
> reductions and so on. A long time ago, an attorney said that in
> selecting directors, the management companies were looking for
> Cocker Spaniels and not Dobermans. I'd say they found a lot of
> Cocker Spaniels out there. *Strougo v. BEA Assoc.*, 188 F. Supp.2d
> 373, 383 (S.D.N.Y. 2002) (citation omitted).

Mr. Buffet also stated, in a letter to shareholders in the 2002 Berkshire Hathaway, Inc. annual report:

> [A] monkey will type out a Shakespeare play before an "independent"
> mutual-fund director will suggest that his fund look at other managers,

18

even if the incumbent manager has persistently delivered substandard performance. When they are handling their own money, of course, directors will look to alternative advisors – but it never enters their minds to do so when they are acting as fiduciaries for others. . . . Investment company directors have failed as well in negotiating management fees . . . . If you or I were empowered, I can assure you that we could easily negotiate materially lower management fees with the incumbent managers of most mutual funds. And, believe me, if directors were promised a portion of any fee savings they realized, the skies would be filled with falling fees. Under the current system, though, reductions mean nothing to "independent" directors while meaning everything to managers. So guess who wins? . . . [I]n stepping up to [their] all-important responsibilities, tens of thousands of "independent" directors, over more than six decades, have failed miserably. (They've succeeded, however, in taking care of themselves; their fees from serving on multiple boards of a single "family" of funds often run well into six figures.) 2002 Berkshire Hathaway, Inc. Annual Report to Shareholders, p. 17 – 18.

49.    As part of their scheme to receive excessive fees, Defendant did not keep the

directors fully informed regarding all material facts and aspects of its fees and other

compensation, and the directors failed to insist upon adequate information. For example:

a.    On information and belief, Defendant provided virtually no information to

the directors regarding the advisory fees charged to pension and other institutional

clients or to other mutual funds being advised or sub-advised by Defendant.

b.    On information and belief, Defendant provided virtually no information to

the directors regarding the economies of scale enjoyed or fallout benefits received by

Defendant.

c.    On information and belief, the profitability data given to the board of

directors provide no explanation as to how the board should evaluate economies of

scale.

d.    On information and belief, the directors rarely, if ever, question any

19

information or recommendations provided by Defendant.

50.     The foregoing assures that the directors do not understand Defendant's true cost

structure and, in particular, the economies of scale enjoyed by Defendant in providing investment

advisory services to the Funds and its institutional and other clients.

51.     On information and belief, the disinterested directors of the Funds have not

received the benefit of any measures to enhance their ability to act independently, which has

caused the directors to be dependent on Defendant and has allowed Defendant to dominate and

unduly influence the directors.  In addition, the directors' failure to insist on adequate

information evinces a lack of care and conscientiousness on their part.

### COUNT I
### ICA §36(b)
### BREACH OF FIDUCIARY DUTY
#### (Excessive Investment Advisory Fees)

52.     Plaintiffs repeat and re-allege each allegation contained in the foregoing

paragraphs of this Complaint as if fully set forth herein.

53.     The fees charged by Defendant for providing advisory services to the Funds are

and continue to be disproportionate to the services rendered and are not within the range of what

would have been negotiated at arm's length in light of all the surrounding circumstances,

including the advisory fees that Defendant charges its other clients.

54.     In charging and receiving excessive or inappropriate compensation, and in failing

to put the interests of Plaintiffs and the other shareholders of the Funds ahead of its own

interests, Defendant has breached and continues to breach its statutory fiduciary duty to Plaintiffs

in violation of ICA § 36(b).

55.     Plaintiffs seek, pursuant to § 36(b)(3) of the ICA, the "actual damages resulting

20

from the breach of fiduciary duty" by Defendant, up to and including, "the amount of

compensation or payments received from" the Funds.

### COUNT II
### ICA § 36(b)
### BREACH OF FIDUCIARY DUTY
#### (Excess Profits from Economies of Scale)

56.   Plaintiffs repeat and re-allege each allegation contained in the foregoing

paragraphs of this Complaint as if fully set forth herein.

57.   Defendant has received and continues to receive excess profits attributable to

extraordinary economies of scale.

58.   By retaining excess profits derived from economies of scale, Defendant has

breached and continues to breach its statutory fiduciary duty to Plaintiffs in violation of ICA §

36(b).

59.   Plaintiffs seek, pursuant to § 36(b)(3) of the ICA, the "actual damages resulting

from the breach of fiduciary duty" by Defendant, up to and including, the "amount of

compensation or payments received from" the Funds.

WHEREFORE, Plaintiffs demand judgment as follows:

a.   An order declaring that Defendant has violated and continues to violate  §

36(b) of the ICA and that any advisory agreements entered into are void ab initio;

b.   An order preliminarily and permanently enjoining Defendant from further

violations of the ICA;

c.   An order awarding damages against Defendant including all fees paid to

them by Plaintiffs and the Funds for all periods not precluded by any applicable statute of

limitation through the trial of this case, together with interest, costs, disbursements,

21

attorneys' fees, and such other items as may be allowed to the maximum extent permitted

by law; and

    d.          Such other and further relief as may be proper and just.

Dated: 8-16-04

                    By: s/ Wm. Dirk Vandever
                    Wm. Dirk Vandever, Esq.
                    THE POPHAM LAW FIRM, P.C.
                    323 W. 8th Street
                    Suite 200
                    Kansas City, Missouri  64105
                    (816) 221-2288
                    Fax: (816) 221-3999

                    Guy M. Burns,
                    Jonathan S. Coleman,
                    Becky Ferrell-Anton,
                    JOHNSON, POPE, BOKOR
                    RUPPEL & BURNS, L.L.P.
                    100 North Tampa Street, Ste. 1800
                    Tampa, FL  33602
                    (813) 225-2500
                    Fax:  (813) 223-7118

                    Michael J. Brickman
                    James C. Bradley
                    Nina H. Fields
                    RICHARDSON, PATRICK,
                    WESTBROOK & BRICKMAN, LLC
                    174 East Bay Street
                    Charleston, SC  29401
                    (843) 727-6500
                    Fax: (843) 727-3103

                    *Attorneys for Plaintiffs*

22

# EXHIBIT B

# STATEMENT OF ADDITIONAL INFORMATION

January 31, 2004
As Supplemented February 11, 2004

## THE OAKMARK FAMILY OF FUNDS
No-Load Funds

Two North LaSalle Street
Chicago, Illinois 60602-3790
Telephone 1-800-OAKMARK
(1-800-625-6275)
www.oakmark.com

This Statement of Additional Information relates to The Oakmark Fund ("Oakmark Fund"), The Oakmark Select Fund ("Select Fund"), The Oakmark Small Cap Fund ("Small Cap Fund"), The Oakmark Equity and Income Fund, ("Equity and Income Fund"), The Oakmark Global Fund ("Global Fund"), The Oakmark International Fund ("International Fund") and The Oakmark International Small Cap Fund ("International Small Cap Fund"), each a series of Harris Associates Investment Trust (the "Trust"). This Statement of Additional Information is not a prospectus but provides information that should be read in conjunction with the Funds' prospectus dated the same date as this Statement of Additional Information and any supplement thereto. You may obtain a prospectus or semi-annual or annual report from the Funds at no charge by writing, telephoning or accessing the Funds at their address, telephone number or website shown above.

### Table of Contents

The Funds ..................................................................................................................... 2

Investment Restrictions ................................................................................................. 2

How the Funds Invest .................................................................................................... 4

Performance Information ................................................................................................ 13

Investment Adviser ........................................................................................................ 19

Code of Ethics ............................................................................................................... 21

Proxy Voting Policies and Procedures .......................................................................... 22

Trustees and Officers .................................................................................................... 23

Principal Shareholders .................................................................................................. 29

Purchasing and Redeeming Shares .............................................................................. 31

Additional Tax Information ............................................................................................. 33

Distributor ...................................................................................................................... 35

Portfolio Transactions ................................................................................................... 35

Declaration of Trust ....................................................................................................... 38

Custodian and Transfer Agent ...................................................................................... 38

Independent Auditors .................................................................................................... 39

Appendix A -- Bond Ratings .......................................................................................... A-1

Appendix B -- Financial Statements .............................................................................. B-1

## THE FUNDS

Oakmark Fund, Select Fund, Small Cap Fund, Global Fund, International Fund and International Small Cap Fund seek long-term capital appreciation.

Equity and Income Fund seeks high current income and preservation and growth of capital.

The Funds are series of the Trust, an open-end management investment company, and each Fund other than Select Fund is diversified. The Trust is a Massachusetts business trust organized under an Agreement and Declaration of Trust dated February 1, 1991 (the "Declaration of Trust").

All shares issued will be fully paid and non-assessable and will have no preemptive or conversion rights.

Each Fund's shares are divided into two share classes: Class I Shares and Class II Shares. Class I Shares of each Fund are offered to members of the general public. As described more fully in the prospectus, Class II Shares of each Fund are offered to certain retirement and profit sharing plans. Class II Shares of a Fund pay a service fee at the annual rate of .25% of the average net assets of Class II Shares of the Fund. This service fee is paid to an administrator for performing the services associated with the administration of such retirement plans. The shares of each class of a Fund represent an interest in the same portfolio of investments of the Fund. All shares of a Fund have equal voting rights (except as to matters affecting the interests of only one class) and the shares of each class are entitled to participate pro rata in any dividends and other distributions declared by the Trust's board of trustees. All shares of a Fund of a given class have equal rights in the event of liquidation of that class.

## INVESTMENT RESTRICTIONS

In pursuing their respective investment objectives no Fund will:

1.      *[This restriction does not apply to Select Fund]* In regard to 75% of its assets, invest more than 5% of its assets (valued at the time of investment) in securities of any one issuer, except in U.S. government obligations;

2.      Acquire securities of any one issuer which at the time of investment (a) represent more than 10% of the voting securities of the issuer or (b) have a value greater than 10% of the value of the outstanding securities of the issuer;

3.      Invest more than 25% of its assets (valued at the time of investment) in securities of companies in any one industry, except that this restriction does not apply to investments in U.S. government obligations;

4.      Borrow money except from banks for temporary or emergency purposes in amounts not exceeding 10% of the value of the Fund's assets at the time of borrowing [the Fund will not purchase additional securities when its borrowings, less receivables from portfolio securities sold, exceed 5% of the value of the Fund's total assets];

5.      Issue any senior security except in connection with permitted borrowings;

6.      Underwrite the distribution of securities of other issuers; however the Fund may acquire "restricted" securities which, in the event of a resale, might be required to be registered under the Securities Act of 1933 on the ground that the Fund could be regarded as an underwriter as defined by that act with respect to such resale;

7.      Make loans, but this restriction shall not prevent the Fund from (a) investing in debt obligations, (b) investing in repurchase agreements,[1] or (c) *[Funds other than Oakmark Fund]* lending its portfolio securities

---

[1]      A repurchase agreement involves a sale of securities to a Fund with the concurrent agreement of the seller (bank or securities dealer) to repurchase the securities at the same price plus an amount equal to an agreed-upon interest rate within a specified time. In the event of a bankruptcy or other default of a seller of a repurchase agreement, the Fund could experience both delays in liquidating the underlying securities and losses. No Fund may invest more than 15% of its net assets in repurchase agreements maturing in more than seven days and other illiquid securities.

[the Fund will not lend securities having a value in excess of 33% of its assets, including collateral received for loaned securities (valued at the time of any loan)];

8.  Purchase and sell real estate or interests in real estate, although it may invest in marketable securities of enterprises which invest in real estate or interests in real estate;

9.  Purchase and sell commodities or commodity contracts, except that it may enter into forward foreign currency contracts;

10.  Acquire securities of other investment companies except (a) by purchase in the open market, where no commission or profit to a sponsor or dealer results from such purchase other than the customary broker's commission or (b) where the acquisition results from a dividend or a merger, consolidation or other reorganization;[2]

11.  Make margin purchases or participate in a joint or on a joint or several basis in any trading account in securities;

12.  Invest in companies for the purpose of management or the exercise of control;

13.  Invest more than 15% of its net assets (valued at the time of investment) in illiquid securities, including repurchase agreements maturing in more than seven days;

14.  [Oakmark Fund, Select Fund, Small Cap Fund and Equity and Income Fund only] Invest more than 2% of its net assets (valued at the time of investment) in warrants not listed on the New York or American stock exchanges, valued at cost, nor more than 5% of its net assets in all warrants, provided that warrants acquired in units or attached to other securities shall be deemed to be without value for purposes of this restriction; [Global Fund, International Fund and International Small Cap Fund only] Invest more than 10% of its net assets (valued at the time of investment) in warrants valued at the lower of cost or market, provided that warrants acquired in units or attached to securities shall be deemed to be without value for purposes of this restriction;

15.  [Oakmark Fund, Select Fund, Small Cap Fund and Equity and Income Fund only] Invest more than 25% of its total assets (valued at the time of investment) in securities of non-U.S. issuers (other than securities represented by American Depositary Receipts);[3]

16.  Make short sales of securities unless (i) the Fund owns at least an equal amount of such securities, or of securities that are convertible or exchangeable, or anticipated to be convertible or exchangeable, into at least an equal amount of such securities with no restriction other than the payment of additional consideration or (ii) immediately after such a short sale, the aggregate value of all securities that the Fund is short (excluding short sales against-the-box[4]) does not exceed 5% of the value of the Fund's net assets, and the Fund covers such a short sale as required by the current rules and positions of the Securities and Exchange Commission or its staff;

---

[2]  In addition to this investment restriction, the Investment Company Act of 1940 provides that a Fund may neither purchase more than 3% of the voting securities of any one investment company nor invest more than 10% of the Fund's assets (valued at the time of investment) in all investment company securities purchased by the Fund. Investment in the shares of another investment company would require the Fund to bear a portion of the management and advisory fees paid by that investment company, which might duplicate the fees paid by the Fund.

[3]  Although securities represented by American Depositary Receipts ("ADRs") are not subject to restriction 15, none of these Funds has any present intention to invest more than the indicated percentage of its total assets in ADRs and securities of foreign issuers.

[4]  A short sale "against the box" involves the sale of a security with respect to which the Fund already owns or has the right to acquire an equivalent amount of such security in kind or amount, or securities that are convertible or exchangeable, or anticipated to be convertible or exchangeable, into at least an equal amount of such securities with no restriction other than the payment of additional consideration.

17.     Purchase a call option or a put option if, immediately thereafter, the aggregate market value of all call and put options then held would exceed 10% of its net assets;

18.     Write any call option or put option unless the option is covered* and immediately thereafter the aggregate market value of all portfolio securities or currencies required to cover such options written by the Fund would not exceed 15% of its net assets;

19.     Invest in futures or options on futures, except that it may invest in forward foreign currency contracts.

The first 10 restrictions listed above, except the bracketed portions and the footnotes related to the restrictions, are fundamental policies and may be changed only with the approval of the holders of a "majority of the outstanding voting securities" of the respective Fund, which is defined in the Investment Company Act of 1940 (the "1940 Act") as the lesser of (i) 67% of the shares of the Fund present at a meeting if more than 50% of the outstanding shares of the Fund are present in person or represented by proxy or (ii) more than 50% of the outstanding shares of the Fund. Those restrictions not designated as "fundamental," and a Fund's investment objective, may be changed by the board of trustees without shareholder approval. A Fund's investment objective will not be changed without at least 30 days' notice to shareholders.

Notwithstanding the foregoing investment restrictions, a Fund may purchase securities pursuant to the exercise of subscription rights, provided, in the case of each Fund other than Select Fund, that such purchase will not result in the Fund's ceasing to be a diversified investment company. Japanese and European corporations frequently issue additional capital stock by means of subscription rights offerings to existing shareholders at a price substantially below the market price of the shares. The failure to exercise such rights would result in a Fund's interest in the issuing company being diluted. The market for such rights is not well developed in all cases and, accordingly, a Fund may not always realize full value on the sale of rights. The exception applies in cases where the limits set forth in the investment restrictions would otherwise be exceeded by exercising rights or would have already been exceeded as a result of fluctuations in the market value of a Fund's portfolio securities with the result that the Fund would be forced either to sell securities at a time when it might not otherwise have done so, or to forego exercising the rights.

## HOW THE FUNDS INVEST

### Bottom-Up Investment Process

All portfolio managers at Harris Associates L.P., investment adviser to The Oakmark Family of Funds (the "Adviser"), strive to abide by a consistent philosophy and process. This process involves a collective, unified effort at identifying what the managers believe are the best values in the marketplace.

---

\*       In the case of a call option, the option is covered if the Fund owns (a) the securities underlying the option, (b) other securities with respect to which the Fund anticipates receiving the underlying securities as a dividend or distribution or upon a conversion or exchange and liquid assets held by the Fund having a value at least equal to the value of such underlying securities are segregated on the books of the Fund's custodian or (c) an absolute and immediate right to acquire the underlying security without additional consideration (or, if additional consideration is required, liquid assets held by the Fund having a value at least equal to that amount are segregated on the books of the Fund's custodian) upon conversion or exchange of other securities held in its portfolio. In the case of a put option, the option is covered if assets having a value at least equal to the exercise price of the option are segregated on the books of the Fund's custodian on a daily basis. For purposes of this restriction, the aggregate market value of all portfolio securities or currencies required to cover such options written by the Fund is the aggregate value of all securities held to cover call options written plus the value of all liquid assets required to be so segregated in connection with call and put options written.

4

Government/Corporate Bond Index. Each of International Fund, International Small Cap Fund and Global Fund may compare its performance to the following indexes and averages: Lipper International & Global Funds Average; Lipper Global Fund Index; Lipper International Fund Index; Lipper International Equity Funds Average; Micropal International Small Company Fund Index; Morgan Stanley Capital International World ex U.S. Index; Morgan Stanley Capital International EAFE (Europe, Australia and Far East Index); Morningstar Growth Average; Morningstar Small-Cap Funds Average; Morningstar U.S. Diversified Average; Morningstar Equity Fund Average; Morningstar Hybrid Fund Average; Morningstar All Equity Funds Average; Morningstar General Equity Average; and Morningstar International Stock Average.

Lipper Indexes and Averages are calculated and published by Lipper, Inc. ("Lipper"), an independent service that monitors the performance of more than 1,000 funds. The Funds may also use comparative performance as computed in a ranking by Lipper or category averages and rankings provided by another independent service. Should Lipper or another service reclassify a Fund to a different category or develop (and place a Fund into) a new category, that Fund may compare its performance or ranking against other funds in the newly assigned category, as published by the service. Each Fund may also compare its performance or ranking against all funds tracked by Lipper or another independent service, including Morningstar, Inc.

The Funds may cite their ratings, recognition, or other mention by Morningstar or any other entity. For each Fund with at least a three-year history, Morningstar calculates a Morningstar Rating™ metric each month by subtracting the return on a 90-day U.S. Treasury Bill from the Fund's load-adjusted return for the same period, and then adjusting this excess return for risk. The top 10% of funds in each broad asset class receive 5 stars, the next 22.5% receive 4 stars, the next 35% receive 3 stars, the next 22.5% receive 2 stars and the bottom 10% receive 1 star. The Overall Morningstar Rating is derived from a weighted average of the performance figures associated with the Fund's three-, five- and ten-year (if applicable) Morningstar Rating metrics.

To illustrate the historical returns on various types of financial assets, the Funds may use historical data provided by Ibbotson Associates, Inc. ("Ibbotson"), a Chicago-based investment firm. Ibbotson constructs (or obtains) very long-term (since 1926) total return data (including, for example, total return indexes, total return percentages, average annual total returns and standard deviations of such returns) for the following asset types: common stocks; small company stocks; long-term corporate bonds; long-term government bonds; intermediate-term government bonds; U.S. Treasury bills; and Consumer Price Index.

## INVESTMENT ADVISER

The Adviser furnishes continuing investment supervision to the Funds and is responsible for overall management of the Funds' business affairs pursuant to investment advisory agreements relating to the respective Funds (the "Agreements"). The Adviser furnishes office space, equipment and personnel to the Funds, and assumes the expenses of printing and distributing the Funds' prospectus, profiles and reports to prospective investors.

Each Fund pays the cost of its custodial, stock transfer, dividend disbursing, bookkeeping, audit and legal services. Each Fund also pays other expenses such as the cost of proxy solicitations, printing and distributing notices and copies of the prospectus and shareholder reports furnished to existing shareholders, taxes, insurance premiums, the expenses of maintaining the registration of that Fund's shares under federal and state securities laws and the fees of trustees not affiliated with the Adviser.

For its services as investment adviser, the Adviser receives from each Fund a monthly fee based on that Fund's net assets at the end of the preceding month. Basing the fee on net assets at the end of the preceding month has the effect of (i) delaying the impact of changes in assets on the amount of the fee and (ii) in the first year of a fund's operation, reducing the amount of the aggregate fee by providing for no fee in the first month of operation. The annual rates of fees as a percentage of each Fund's net assets are as follows:

| Fund | Fee |
|------|-----|
| Oakmark | 1.00% up to $2.0 billion; .90% on the next $1.0 billion; .80% on the next $2.0 billion; and .75% on net assets in excess of $5.0 billion |

| Fund | Fee |
|------|-----|
| Select | 1.00% up to $1.0 billion; .95% on the next $500 million; .90% on the next $500 million; .85% on the next $500 million; .80% on the next $2.5 billion; and .75% on net assets in excess of $5.0 billion |
| Small Cap | 1.00% |
| Equity and Income | 0.75% up to $5 billion; 0.70% on the next $2.5 billion; 0.675% on the next $2.5 billion; and 0.65% on net assets in excess of $10 billion |
| Global | 1.00% up to $2 billion; 0.95% on the next $2 billion; and 0.90% on net assets in excess of $4 billion |
| International | 1.00% up to $2.0 billion; .95% on the next $1.0 billion; and .85% on net assets in excess of $3 billion |
| International Small Cap | 1.25% up to $500 million; and 1.10% on net assets in excess of $500 million |

The table below shows gross advisory fees paid by the Funds and any expense reimbursements by the Adviser to them, which are described in the prospectus.

| Fund | Type of Payment | Year Ended September 30, 2003 | Year Ended September 30, 2002 | Year Ended September 30, 2001 |
|------|-----------------|------------------------------|------------------------------|------------------------------|
| Oakmark | Advisory fee | $37,074,474 | $34,848,853 | $25,662,135 |
| Select | Advisory fee | 38,938,068 | 40,838,462 | 27,774,016 |
| Small Cap | Advisory fee Reimbursement | 3,492,495 654 | 4,121,533 — | 2,490,470 — |
| Equity and Income | Advisory fee | 23,468,519 | 12,099,581 | 1,591,905 |
| Global | Advisory fee Reimbursement | 2,982,092 — | 1,333,497 — | 387,377 20,815 |
| International | Advisory fee | 19,015,388 | 12,048,977 | 8,269,717 |
| International Small Cap | Advisory fee | 4,626,713 | 3,860,436 | 1,238,024 |

The Agreement for each Fund was for an initial term that expired on October 31, 2001. Each Agreement continues from year to year thereafter so long as such continuation is approved at least annually by (1) the board of trustees or the vote of a majority of the outstanding voting securities of the Fund, and (2) a majority of the trustees who are not interested persons of any party to the Agreement, cast in person at a meeting called for the purpose of voting on such approval. Each Agreement may be terminated at any time, without penalty, by either the Trust or the Adviser upon 60 days' written notice, and automatically terminates in the event of its assignment as defined in the 1940 Act.

At a meeting of the board of trustees of the Trust held on October 21, 2003, called in part for the purpose of voting on the renewal of the Agreements, the Agreements were renewed through October 31, 2004 by the unanimous vote of the trustees present at the meeting, and the unanimous vote of the "non-interested" trustees of the Trust voting separately. The trustees considered information about, among other things:

- the Adviser and its personnel (including particularly those personnel with responsibilities for providing services to the Funds), resources and investment processes;

- the terms of each Agreement;

- the scope and quality of services that the Adviser has been providing to the Funds;

- the investment performance of each Fund and of comparable funds managed by other advisers over various periods;

- the advisory fee rates payable by each Fund to the Adviser and by comparable funds managed by other advisers;

- the total expense ratio of each Fund and of comparable funds managed by other advisers;

- the compensation payable by the Funds to affiliates of the Adviser for other services;

- the profitability of the Adviser and its affiliates from their relationships with the Funds; and

- the Adviser's use of the Funds' portfolio brokerage transactions to obtain research benefiting the Funds or other clients of the Adviser at a cost that may be in excess of the amount other brokers would charge.

The Adviser is a limited partnership managed by its general partner, Harris Associates, Inc. ("HAI"), whose directors are David G. Herro, Robert M. Levy, John R. Raitt, Kristi L. Rowsell, G. Neal Ryland and Peter S. Voss. Mr. Raitt is the president and chief executive officer of HAI. HAI is a wholly-owned subsidiary of CDC IXIS Asset Management North America, L.P. ("CDC IXIS AMNA"). CDC IXIS AMNA owns 99.67% of the limited partnership interests in the Adviser and, through its wholly-owned subsidiary, CDC IXIS Asset Management Holdings, Inc. ("CDC IXIS Holdings"), all of the outstanding shares of HAI. CDC IXIS AMNA is a limited partnership that owns investment management and related firms, including CDC IXIS Asset Management Services, Inc., the Funds' transfer agent.

CDC IXIS AMNA is an indirect wholly owned subsidiary of CDC IXIS Asset Management ("CDC AM"), which in turn is owned by CDC IXIS, a direct and indirect subsidiary of France's Caisse de Dépôts et Consignations ("CDC"). Founded in 1816, CDC is a major diversified financial institution with a strong global presence in the banking, insurance, investment banking, asset management and global custody industries. CDC owns approximately 44% of CDC IXIS directly and 53% of CDC IXIS indirectly through its subsidiaries Eulia and Caisse Nationale des Caisses D'Epargne. CDC owns 50% of Eulia and 35% of Caisse Nationale des Caisses D'Epargne, which itself owns 50% of Eulia. Eulia owns 53% of CDC IXIS, which owns 80% of CDC IXIS AM. In addition to its ownership of CDC IXIS AM through CDC IXIS, CDC owns approximately 40% of CNP Assurances, a leading French insurance company, which itself owns 20% of CDC IXIS AM. The main place of business of CDC AM is 7, place des Cinq Martyrs du Lycée Buffon, 75015 Paris, France. The registered address of CDC IXIS is 56, rue de Lille, 75007 Paris, France. The registered address of CNP Assurances is 4, place Raoul Dautry, 75015 Paris, France. The registered address of Caisse National des Caisses d'Epargne is 5, rue Masseran, 75007 Paris, France.

The Adviser has contractually agreed to reimburse Class I Shares of each Fund to the extent that the annual ordinary operating expenses of that class exceed the following percentages of the average net assets of Class I Shares: 1.50% in the case of Oakmark Fund, Select Fund or Small Cap Fund; 1.00% in the case of Equity and Income Fund; 1.75% in the case of Global Fund; and 2.00% in the case of International Fund and International Small Cap Fund. The Adviser has also contractually agreed to reimburse Class II Shares of each Fund to the extent that the annual ordinary operating expenses of that class exceed the following percentages of the average net assets of Class II Shares: Oakmark Fund, Select Fund or Small Cap Fund, 1.75% (1.50% + .25%); Equity and Income Fund, 1.25% (1.00% + .25%); Global Fund, 2.00% (1.75% + .25%); and International Fund and International Small Cap Fund, 2.25% (2.00% + .25%). Each such agreement is effective through January 31, 2005.

For the purpose of determining whether a share class of a Fund is entitled to any reduction in advisory fee or expense reimbursement, the pro rata portion of the Fund's expenses attributable to a share class of that Fund is calculated daily and any reduction in fee or reimbursement is made monthly.

## CODES OF ETHICS

The Trust, the Adviser and the Funds' distributor, Harris Associates Securities L.P. ("HASLP"), establish standards and procedures for the detection and prevention of certain conflicts of interest, including activities by which persons having knowledge of the investments and investment intentions of the Trust might take advantage of

that knowledge for their own benefit. The Trust, the Adviser and HASLP have adopted codes of ethics to meet those concerns and legal requirements. Although the codes do not prohibit employees who have knowledge of the investments and investment intentions of any of the Funds from engaging in personal securities investing, they regulate such investing by those employees.

## PROXY VOTING POLICIES AND PROCEDURES

The Adviser has authority to exercise all voting rights with respect to portfolio securities of the Funds in accordance with the Adviser's proxy voting policies and procedures.

The Adviser exercises voting rights solely with the goal of serving the best interests of its clients (including the Funds) as shareholders of a company. In determining how to vote on any proposal, the Adviser's Proxy Committee considers the proposal's expected impact on shareholder value and does not consider any benefit to the Adviser or its employees or affiliates.

The Adviser considers the reputation, experience and competence of a company's management when it evaluates the merits of investing in a particular company, and it invests in companies in which it believes management goals and shareholder goals are aligned. Therefore, on most issues, the Adviser casts votes in accordance with management's recommendations. However, when the Adviser believes that management's position on a particular issue is not in the best interests of the Funds and their shareholders, the Adviser will vote contrary to management's recommendation.

### Proxy Voting Guidelines

The Adviser's Proxy Committee has established a number of proxy voting guidelines on various issues of concern to investors. The Proxy Committee normally votes proxies in accordance with those guidelines unless it determines that it is in the best economic interests of a Fund and its shareholders to vote contrary to the guidelines. The voting guidelines generally address issues related to boards of directors, auditors, equity based compensation plans, and shareholder rights.

- With respect to a company's board of directors, the Adviser believes that there should be a majority of independent directors and that audit, compensation and nominating committees should consist solely of independent directors, and it will normally vote in favor of proposals that insure such independence.

- With respect to auditors, the Adviser believes that the relationship between a public company and its auditors should be limited primarily to the audit engagement, and it will normally vote in favor of proposals to prohibit or limit fees paid to auditors for any services other than auditing and closely-related activities that do not raise any appearance of impaired independence.

- With respect to equity based compensation plans, the Adviser believes that appropriately designed plans approved by a company's shareholders can be an effective way to align the interests of long-term shareholders and the interests of management, employees and directors. However, the Adviser will normally vote against plans that substantially dilute its clients' ownership interest in the company or provide participants with excessive awards. The Adviser will also normally vote in favor of proposals to require the expensing of options.

- With respect to shareholder rights, the Adviser believes that all shareholders of a company should have an equal voice and that barriers that limit the ability of shareholders to effect corporate change and to realize the full value of their investment are not desirable. Therefore, the Adviser will normally vote against proposals for supermajority voting rights, against the issuance of poison pill preferred shares, and against proposals for different classes of stock with different voting rights.

- With respect to "social responsibility" issues, the Adviser believes that matters related to a company's day-to-day business operations are primarily the responsibility of management. The Adviser is focused on maximizing long-term shareholder value and will normally vote against shareholder proposals requesting that a company disclose or change certain business practices unless it believes the proposal would have a substantial positive economic impact on the company.

*Conflicts of Interest*

The Proxy Committee, in consultation with the Adviser's legal and compliance departments, will monitor and resolve any potential conflicts of interest with respect to proxy voting. A conflict of interest might exist, for example, when an issuer who is soliciting proxy votes also has a client relationship with the Adviser, when a client of the Adviser is involved in a proxy contest (such as a corporate director), or when one of the Adviser's employees has a personal interest in a proxy matter. When a conflict of interest arises, in order to insure that proxies are voted solely in the best interest of the Funds and their shareholders, the Adviser will vote in accordance with either its written guidelines or the recommendation of an independent third-party voting service. If the Adviser believes that voting in accordance with the guidelines or the recommendation of the proxy voting service would not be in the collective best interests of the Funds and their shareholders, the Executive Committee of the Board of Trustees of the Funds will determine how shares should be voted.

*How to Obtain the Oakmark Funds' Proxy Voting Record*

No later than August 31, 2004, information regarding how the Adviser, on behalf of the Funds, voted proxies relating to the Funds' portfolio securities for the twelve months ended June 30, 2004 will be available through a link on the Funds' website at www.oakmark.com and on the SEC's website at http://www.sec.gov.

## TRUSTEES AND OFFICERS

The board of trustees has overall responsibility for the Funds' operations. Each of the trustees and officers serves until the election and qualification of his or her successor, or until he or she sooner dies, resigns, or is removed or disqualified. The retirement age for trustees is 72. Information regarding the trustees and officers of the Trust including their principal business activities during the past five years is set forth below:

### Trustees Who Are Not Interested Persons of the Trust

| Name, Address[†] and Age at December 31, 2003 | Position(s) with Trust | Date First Elected or Appointed to Current Office | Principal Occupation(s) Held During Past Five Years[#] | Number of Portfolios in Fund Overseen by Trustee | Other Directorships Held by Trustee |
|---|---|---|---|---|---|
| Victor A. Morgenstern, 61 | Trustee and Chairman of the Board of Trustees | 1991 | President, Resolute Advisors, Inc. (private investment management firm) since 2002; Chairman Valor Equity Partners, LLC (private equity fund) since 2002; Managing Partner, Drill Hall Partners LLC; Chairman of the Board, HAI, 1998 – 2000; President and Chief Executive Officer prior thereto; Chairman, Harris Partners, L.L.C., 1995 – 2000. | 7 | Trustee, Illinois Institute of Technology (educational institution); Director, Bio-Sante Pharmaceuticals Inc. (developer of hormone therapy products) |
| Michael J. Friduss, 61 | Trustee | 1995 | Principal, MJ Friduss & Associates, Inc. (telecommunications consultants) | 7 | None |

23

| Name, Address[1] and Age at December 31, 2003 | Position(s) with Trust | Date First Elected or Appointed to Current Office | Principal Occupation(s) Held During Past Five Years[2] | Number of Portfolios In Fund Overseen by Trustee | Other Directorships Held by Trustee |
|---|---|---|---|---|---|
| Thomas H. Hayden, 52 | Trustee | 1995 | President, Greenhouse Communications (advertising agency) since 2004; Executive Vice President, Campbell Mithun, prior thereto (advertising and marketing communication agency) | 7 | None |
| Christine M. Maki, 43 | Trustee | 1996 | Vice President—Tax, Hyatt Corporation (hotel management) | 7 | Director, Illinois CPA Society |
| Allan J. Reich, 55 | Trustee | 1993 | Partner, Seyfarth Shaw LLP (law firm) since 2003; Vice Chairman of the law firm D'Ancona & Pflaum LLC, prior thereto | 7 | None |
| Marv R. Rotter, 57 | Trustee | 1996 | Senior Advisor to Chief Executive Officer, AXA Advisors, LLC (formerly named Rotter & Associates) | 7 | None |
| Burton W. Ruder, 60 | Trustee | 1995 | President, The Academy Financial Group (venture capital investment and transaction financing firm); Manager, Cedar Green Associates (real estate management firm) | 7 | None |
| Gary N. Wilner, M.D., 63 | Trustee | 1993 | Senior Attending Physician, Evanston Hospital; Medical Director – Cardio-Pulmonary Wellness Program, Evanston Hospital Corporation | 7 | Director, North American Scientific, Inc. (developer of radioisotopic products for the treatment and diagnosis of disease) |

## Trustees Who are Interested Persons of the Trust

| Name, Address[1] and Age at December 31, 2003 | Position(s) with Trust | Date First Elected or Appointed to Current Office | Principal Occupation(s) Held During Past Five Years[2] | Number of Portfolios in Fund Overseen by Trustee | Other Directorships Held by Trustee |
|---|---|---|---|---|---|
| Peter S. Voss*, 57 | Trustee | 1995 | President and Chief Executive Officer, CDC IXIS Asset Management North America, L.P., formerly known as Nvest Companies, L.P. and its predecessor firms (investment management); Director, HAI | 7 | Chairman, AEW Real Estate Income Fund (closed-end investment company); Chairman and Chief Executive Officer, CDC Nvest Funds (open-end investment company – 14 portfolios) |
| John R. Raitt*, 49 | Trustee and President | 2003++ | President and Chief Executive Officer, HAI, HASLP and HALP, since 2003; Chief Operating Officer, HALP 2001- 2002; Director of Research, HALP 1998 – 2002; and Associate Director of Research, HALP, prior thereto | 7 | |

## Other Officers of the Trust

| Name, Address[1] and Age at December 31, 2003 | Position(s) with Trust | Date First Elected or Appointed to Current Office | Principal Occupation(s) Held During Past Five Years[2] |
|---|---|---|---|
| Robert M. Levy, 53 | President | 2001 | Chairman, HAI; Chief Investment Officer, HALP, since 2001; President and Chief Executive Officer, HAI, HALP and HASLP, 1997 – 2002; Portfolio Manager, HALP |
| James P. Benson, 46 | Vice President and Portfolio Manager (The Oakmark Small Cap Fund) | 2000 | Portfolio Manager and Analyst, HALP |
| Henry R. Berghoef, 54 | Vice President and Portfolio Manager (The Oakmark Select Fund), | 2000 | Director of Domestic Research, HALP, since 2003; Associate Director of Research, 2001 – 2002; Portfolio Manager and Analyst, HALP |
| Kevin G. Grant, 39 | Vice President and Portfolio Manager (The Oakmark Fund) | 2000 | Portfolio Manager and Analyst, HALP |

| Name, Address[1] and Age at December 31, 2003 | Position(s) with Trust | Date First Elected or Appointed to Current Office | Principal Occupation(s) Held During Past Five Years[2] |
|---|---|---|---|
| David G. Herro, 43 | Vice President and Portfolio Manager (The Oakmark International Fund and The Oakmark International Small Cap Fund) | 1992 | Director of International Equities; Portfolio Manager and Analyst, HALP |
| John J. Kane, 32 | Assistant Treasurer | 1999 | Manager - Fund Accounting, HALP |
| Clyde S. McGregor, 51 | Vice President and Portfolio Manager (The Oakmark Equity and Income Fund and The Oakmark Global Fund) | 1995 | Portfolio Manager, HALP |
| William C. Nygren, 45 | Vice President and Portfolio Manager (The Oakmark Fund and The Oakmark Select Fund) | 1996 | Portfolio Manager and Analyst, HALP; former Director of Research, HALP |
| Vineeta D. Raketich, 32 | Vice President | 2003 | Manager, International Operations and Client Relations, HALP; Supervisor, Mutual Fund and Institutional Services, HALP, prior thereto |
| Janet L. Reall, 52 | Vice President and Secretary | 2001 | Vice President, General Counsel and Secretary, HAI, HALP and HASLP since 2001; Senior Executive Vice President, General Counsel and Secretary, Everen Capital Corp. and Everen Securities, Inc. 1995-1999 (broker/dealer) |
| Ann W. Regan, 55 | Vice President– Shareholder Operations and Assistant Secretary | 1996 | Director of Mutual Fund Operations, HALP |
| Kristi L. Rowsell, 37 | Treasurer | 1997 | Director, Chief Financial Officer and Treasurer, HAI; Chief Financial Officer, HALP and HASLP since 1999 |
| Edward A. Studzinski, 54 | Vice President and Portfolio Manager (The Oakmark Equity and Income Fund and The Oakmark Small Cap Fund) | 2000 | Portfolio Manager and Analyst, HALP |

| Name, Address† and Age at December 31, 2003 | Position(s) with Trust | Date First Elected or Appointed to Current Office | Principal Occupation(s) Held During Past Five Years# |
|---|---|---|---|
| Michael J. Welsh, 40 | Vice President and Portfolio Manager (The Oakmark Global Fund, The Oakmark International Fund and The Oakmark International Small Cap Fund) | 1997 | Director of International Equities; Portfolio Manager and Analyst, HALP |

---

†   Unless otherwise noted, the business address of each officer and trustee listed in the table is Two North LaSalle Street, Suite 500, Chicago, Illinois 60602-3790.

#   As used in this table, "HALP," "HAI" and "HASLP" refer to the Adviser, the general partner of the Adviser, and the Fund's distributor, respectively.

++   Mr. Raitt succeeded Mr. Levy as President of the Trust on January 1, 2004.

*   Mr. Voss and Mr. Raitt are trustees who are "interested persons" of the Trust as defined in the 1940 Act because Mr. Voss is an officer of the Adviser's parent company, and Mr. Raitt is an officer of the Adviser.

     The committees of the board of trustees including an executive committee, audit committee, governance committee and management contracts committee. The following table identifies the members of those committees, the function of each committee, and the number of meetings of each committee held during the fiscal year ended September 30, 2003.

| Committee | Members of Committee | Number of meetings during fiscal year ended September 30, 2003 | Principal Functions of Committee |
|---|---|---|---|
| **Executive Committee** | Victor A. Morgenstern* Peter S. Voss Christine M. Maki | 10** | The executive committee generally has the authority to exercise the powers of the board during intervals between meetings. |
| **Audit Committee** | Thomas H. Hayden Christine M. Maki Allan J. Reich* Gary N. Wilner, M.D. Marvin R. Rotter | 6 | The principal responsibilities of the audit committee include the following: <br>• to oversee the accounting and financial reporting policies and practices of the Trust, its internal controls and, as appropriate, the internal controls of certain service providers;<br>• to oversee the quality and objectivity of the financial statements of the Funds and the independent audits thereof;<br>• to approve the selection of the independent Auditors of the Funds;<br>• to act as liaison between the independent auditors of the Funds and the full board of trustees; and<br>• to oversee the portfolio transaction policies and practices of the Funds. |

| Committee | Members of Committee | Number of meetings during fiscal year ended September 30, 2003 | Principal Functions of Committee |
|---|---|---|---|
| Governance Committee | Michael J. Friduss<br>Christine M. Maki<br>Victor A. Morgenstern<br>Allan J. Reich<br>Burton W. Ruder<br>Gary N. Wilner, M.D. * | 4 | The governance committee makes recommendations to the board regarding board committees and committee assignments, the composition of the board, candidates for election as non-interested trustees and compensation of non-interested trustees, and oversees the process for evaluating the functioning of the board. |
| Management Contracts Committee | Michael J. Friduss<br>Thomas H. Hayden*<br>Victor A. Morgenstern<br>Marv R. Rotter<br>Burton W. Ruder | 4 | The committee on management contracts is responsible for reviewing in the first instance, and making recommendations to the board regarding, investment advisory agreements and any other agreements relating to the management or administration of any Fund. |

---

\* Chairperson of the committee.

\*\* The executive committee held four meetings and took action by unanimous written consent of the committee members six times.

The following table shows the compensation paid by the Trust\* for the fiscal year ended September 30, 2003 to each trustee who was not an "interested person" of the Trust:

| Name of Trustee | Aggregate Compensation from the Trust\*\* | Average Compensation per Fund |
|---|---|---|
| Victor A. Morgenstern | $137,600 | $19,657 |
| Michael J. Friduss | 87,800 | 12,543 |
| Thomas H. Hayden | 88,300 | 12,614 |
| Christine M. Maki | 88,800 | 12,686 |
| Allan J. Reich | 88,300 | 12,614 |
| Marv R. Rotter | 78,000 | 11,143 |
| Burton W. Ruder | 85,600 | 12,229 |
| Gary N. Wilner, M.D. | 82,700 | 11,814 |

\* The Trust is not part of a fund complex.
\*\* Includes compensation that was deferred pursuant to the deferred compensation plan as described below. As of September 30, 2003, the total amounts accrued under the plan were $395,655 for Mr. Friduss, $320,098 for Mr. Hayden, $327,974 for Ms. Maki, $337,082 for Mr. Rotter, $323,115 for Mr. Ruder and $398,183 for Dr. Wilner.

The Trust has a deferred compensation plan (the "Plan") that permits any trustee who is not an "interested person" of the Trust to elect to defer receipt of all or a portion of his or her compensation as a trustee for two or more years. The deferred compensation of a participating trustee is credited to a book reserve account of the Trust when the compensation would otherwise have been paid to the trustee. The value of the trustee's deferral account at any time is equal to the value that the account would have had if contributions to the account had been invested and reinvested in shares of one or more of the Oakmark Funds or the Goldman Sachs Institutional Liquid Assets Government Portfolio as designated by the trustee. At the time for commencing distributions from a trustee's deferral account, which is no later than when the trustee ceases to be a member of the board of trustees, the trustee may elect to receive distributions in a lump sum or over a period of five years. Each Fund's obligation to

make distributions under the Plan is a general obligation of that Fund. No Fund will be liable for any other Fund's obligations to make distributions under the Plan.

Trustees who are "interested persons" of the Trust, as well as the officers of the Trust, are compensated by the Adviser and not by the Trust. The Trust does not provide any pension or retirement benefits to its trustees.

The following table illustrates the value of each Fund "beneficially" owned (within the meaning of that term as defined in rule 16a-1(a)(2) under the Securities Exchange Act of 1934) by each trustee (within dollar ranges) as of December 31, 2003.

| Trustee | Oakmark Fund | Select Fund | Small Cap Fund | Equity and Income Fund | Global Fund | International Fund | International Small Cap Fund |
|---|---|---|---|---|---|---|---|
| Victor A. Morgenstern | over $100,000 | over $100,000 | over $100,000 | $10,001 - 50,000 | over $100,000 | over $100,000 | over $100,000 |
| Michael J. Friduss | over $100,000 | over $100,000 | $50,001 - 100,000 | over $100,000 | over $100,000 | $50,001 - 100,000 | Over $100,000 |
| Thomas H. Hayden | $10,001 - 50,000 | over $100,000 | None | $10,001 - 50,000 | $10,001 - 50,000 | None | None |
| Christine M. Maki | $10,001 - 50,000 | $50,001 - 100,000 | $10,001 - 50,000 | $10,001 - 50,000 | $1 - 10,000 | $10,001 - 50,000 | $10,001 - 50,000 |
| John R. Raitt | over $100,000 | over $100,000 | over $100,000 | over $100,000 | over $100,000 | over $100,000 | over $100,000 |
| Allan J. Reich | over $100,000 | over $100,000 | $1 - 10,000 | $50,001 - 100,000 | $10,001 - 50,000 | $10,001 - 50,000 | $1 - 10,000 |
| Marvin R. Rotter | None | None | None | None | None | None | None |
| Burton W. Ruder | None | $10,001 - 50,000 | $10,001 - 50,000 | $1 - 10,000 | over $100,000 | over $100,000 | over $100,000 |
| Peter S. Voss | over $100,000 | over $100,000 | None | None | None | over $100,000 | over $100,000 |
| Gary N. Wilner, M.D. | $50,001 - 100,000 | $50,001 - 100,000 | $50,001 - 100,000 | $1 - 10,000 | $10,001 - 50,000 | $50,001 - 100,000 | $10,001 - 50,000 |

At December 31, 2003 the trustees and officers as a group owned beneficially less than 1% of the outstanding Class II shares of each Fund and Class I shares of Oakmark Fund, Equity and Income Fund, and International Fund and the following percentages of the outstanding shares of each of the other Funds: Select, 1.13%; Small Cap, 1.54%, Global, 1.55% and International Small Cap, 2.02%.

### PRINCIPAL SHAREHOLDERS

The only persons known by the Trust to own of record or "beneficially" (within the meaning of that term as defined in rule 13d-3 under the Securities Exchange Act of 1934) 5% or more of the outstanding shares of any Fund as of December 31, 2003 were:

# EXHIBIT C

# STATEMENT OF ADDITIONAL INFORMATION

January 28, 2005

# THE OAKMARK FUNDS

No-Load Funds

Two North LaSalle Street
Chicago, Illinois 60602-3790
Telephone 1-800-OAKMARK
(1-800-625-6275)
www.oakmark.com

This Statement of Additional Information relates to The Oakmark Fund ("Oakmark Fund"), The Oakmark Select Fund ("Select Fund"), The Oakmark Equity and Income Fund, ("Equity and Income Fund"), The Oakmark Global Fund ("Global Fund"), The Oakmark International Fund ("International Fund") and The Oakmark International Small Cap Fund ("International Small Cap Fund"), each a series of Harris Associates Investment Trust (the "Trust"). This Statement of Additional Information is not a prospectus but provides information that should be read in conjunction with the Funds' prospectus dated the same date as this Statement of Additional Information and any supplement thereto. You may obtain a prospectus or semi-annual or annual report from the Funds at no charge by writing, telephoning or accessing the Funds at their address, telephone number or website shown above.

## Table of Contents

The Funds .................................................................................................................................2

Investment Restrictions .............................................................................................................2

How the Funds Invest ................................................................................................................4

Performance Information .........................................................................................................13

Investment Adviser ..................................................................................................................17

Code of Ethics .........................................................................................................................20

Proxy Voting Policies and Procedures ....................................................................................20

Trustees and Officers ..............................................................................................................22

Principal Shareholders ............................................................................................................28

Purchasing and Redeeming Shares ........................................................................................30

Additional Tax Information .......................................................................................................33

Distributor ................................................................................................................................35

Portfolio Transactions ..............................................................................................................35

Declaration of Trust .................................................................................................................39

Custodian and Transfer Agent .................................................................................................39

Independent Registered Public Accounting Firm .....................................................................39

Appendix A -- Bond Ratings ..................................................................................................A-1

Appendix B -- Financial Statements ......................................................................................B-1

**THE FUNDS**

Oakmark Fund, Select Fund, Global Fund, International Fund and International Small Cap Fund seek long-term capital appreciation. Equity and Income Fund seeks income and preservation and growth of capital.

The Funds are series of the Trust, an open-end management investment company, and each Fund other than Select Fund is diversified. The Trust is a Massachusetts business trust organized under an Agreement and Declaration of Trust dated February 1, 1991 (the "Declaration of Trust").

The Oakmark Small Cap Fund was liquidated effective September 28, 2004.

Each Fund's shares are divided into two share classes: Class I Shares and Class II Shares. Class I Shares of each Fund are offered to members of the general public. As described more fully in the prospectus, Class II Shares of each Fund are offered to certain retirement and profit sharing plans. Class II Shares of a Fund pay a service fee at the annual rate of .25% of the average net assets of Class II Shares of the Fund. This service fee is paid to an administrator for performing the services associated with the administration of such retirement plans. The shares of each class of a Fund represent an interest in the same portfolio of investments of the Fund. All shares of a Fund have equal voting rights (except as to matters affecting the interests of only one class) and the shares of each class are entitled to participate pro rata in any dividends and other distributions declared by the Trust's board of trustees. All shares of a Fund of a given class have equal rights in the event of liquidation of that class. All shares issued will be fully paid and non-assessable and will have no preemptive or conversion rights.

**INVESTMENT RESTRICTIONS**

In pursuing their respective investment objectives no Fund will:

1.      *[This restriction does not apply to Select Fund]* In regard to 75% of its assets, invest more than 5% of its assets (valued at the time of investment) in securities of any one issuer, except in U.S. government obligations;

2.      Acquire securities of any one issuer which at the time of investment (a) represent more than 10% of the voting securities of the issuer or (b) have a value greater than 10% of the value of the outstanding securities of the issuer;

3.      Invest more than 25% of its assets (valued at the time of investment) in securities of companies in any one industry, except that this restriction does not apply to investments in U.S. government obligations;

4.      Borrow money except from banks for temporary or emergency purposes in amounts not exceeding 10% of the value of the Fund's assets at the time of borrowing [the Fund will not purchase additional securities when its borrowings, less receivables from portfolio securities sold, exceed 5% of the value of the Fund's total assets];

5.      Issue any senior security except in connection with permitted borrowings;

6.      Underwrite the distribution of securities of other issuers; however the Fund may acquire "restricted" securities which, in the event of a resale, might be required to be registered under the Securities Act of 1933 on the ground that the Fund could be regarded as an underwriter as defined by that act with respect to such resale;

7.      Make loans, but this restriction shall not prevent the Fund from (a) investing in debt obligations, (b) investing in repurchase agreements,[1] or (c) *[Funds other than Oakmark Fund]* lending its portfolio securities

---

[1]      A repurchase agreement involves a sale of securities to a Fund with the concurrent agreement of the seller (bank or securities dealer) to repurchase the securities at the same price plus an amount equal to an agreed-upon interest rate within a specified time. In the event of a bankruptcy or other default of a seller of a repurchase agreement, the Fund could experience both delays in liquidating the underlying securities and losses. No Fund may invest more than 15% of its net assets in repurchase agreements maturing in more than seven days and other illiquid securities.

[the Fund will not lend securities having a value in excess of 33% of its assets, including collateral received for loaned securities (valued at the time of any loan)];

       8.      Purchase and sell real estate or interests in real estate, although it may invest in marketable securities of enterprises which invest in real estate or interests in real estate;

       9.      Purchase and sell commodities or commodity contracts, except that it may enter into forward foreign currency contracts;

       10.      Acquire securities of other investment companies except (a) by purchase in the open market, where no commission or profit to a sponsor or dealer results from such purchase other than the customary broker's commission or (b) where the acquisition results from a dividend or a merger, consolidation or other reorganization;[2]

       11.      Make margin purchases or participate in a joint or on a joint or several basis in any trading account in securities;

       12.      Invest in companies for the purpose of management or the exercise of control;

       13.      Invest more than 15% of its net assets (valued at the time of investment) in illiquid securities, including repurchase agreements maturing in more than seven days;

       14.      *[Oakmark Fund, Select Fund and Equity and Income Fund only]* Invest more than 2% of its net assets (valued at the time of investment) in warrants not listed on the New York or American stock exchanges, valued at cost, nor more than 5% of its net assets in all warrants, provided that warrants acquired in units or attached to other securities shall be deemed to be without value for purposes of this restriction; *[Global Fund, International Fund and International Small Cap Fund only]* Invest more than 10% of its net assets (valued at the time of investment) in warrants valued at the lower of cost or market, provided that warrants acquired in units or attached to securities shall be deemed to be without value for purposes of this restriction;

       15.      *[Oakmark Fund, Select Fund and Equity and Income Fund only]* Invest more than 25% of its total assets (valued at the time of investment) in securities of non-U.S. issuers (other than securities represented by American Depositary Receipts);[3]

       16.      Make short sales of securities unless (i) the Fund owns at least an equal amount of such securities, or of securities that are convertible or exchangeable, or anticipated to be convertible or exchangeable, into at least an equal amount of such securities with no restriction other than the payment of additional consideration or (ii) immediately after such a short sale, the aggregate value of all securities that the Fund is short (excluding short sales against-the-box[4]) does not exceed 5% of the value of the Fund's net assets, and the Fund covers such a short sale as required by the current rules and positions of the Securities and Exchange Commission or its staff;

---

  [2]    In addition to this investment restriction, the Investment Company Act of 1940 provides that a Fund may neither purchase more than 3% of the voting securities of any one investment company nor invest more than 10% of the Fund's assets (valued at the time of investment) in all investment company securities purchased by the Fund. Investment in the shares of another investment company would require the Fund to bear a portion of the management and advisory fees paid by that investment company, which might duplicate the fees paid by the Fund.

  [3]    Although securities represented by American Depositary Receipts ("ADRs") are not subject to restriction 15, none of these Funds has any present intention to invest more than the indicated percentage of its total assets in ADRs and securities of foreign issuers.

  [4]    A short sale "against the box" involves the sale of a security with respect to which the Fund already owns or has the right to acquire an equivalent amount of such security in kind or amount, or securities that are convertible or exchangeable, or anticipated to be convertible or exchangeable, into at least an equal amount of such securities with no restriction other than the payment of additional consideration.

17.     Purchase a call option or a put option if, immediately thereafter, the aggregate market value of all call and put options then held would exceed 10% of its net assets;

18.     Write any call option or put option unless the option is covered* and immediately thereafter the aggregate market value of all portfolio securities or currencies required to cover such options written by the Fund would not exceed 15% of its net assets;

19.     Invest in futures or options on futures, except that it may invest in forward foreign currency contracts.

The first 10 restrictions listed above, except the bracketed portions and the footnotes related to the restrictions, are fundamental policies and may be changed only with the approval of the holders of a "majority of the outstanding voting securities" of the respective Fund, which is defined in the Investment Company Act of 1940 (the "1940 Act") as the lesser of (i) 67% of the shares of the Fund present at a meeting if more than 50% of the outstanding shares of the Fund are present in person or represented by proxy or (ii) more than 50% of the outstanding shares of the Fund. Those restrictions not designated as "fundamental," and a Fund's investment objective, may be changed by the board of trustees without shareholder approval. A Fund's investment objective will not be changed without at least 30 days' notice to shareholders.

Notwithstanding the foregoing investment restrictions, a Fund may purchase securities pursuant to the exercise of subscription rights, provided, in the case of each Fund other than Select Fund, that such purchase will not result in the Fund's ceasing to be a diversified investment company. Japanese and European corporations frequently issue additional capital stock by means of subscription rights offerings to existing shareholders at a price substantially below the market price of the shares. The failure to exercise such rights would result in a Fund's interest in the issuing company being diluted. The market for such rights is not well developed in all cases and, accordingly, a Fund may not always realize full value on the sale of rights. The exception applies in cases where the limits set forth in the investment restrictions would otherwise be exceeded by exercising rights or would have already been exceeded as a result of fluctuations in the market value of a Fund's portfolio securities with the result that the Fund would be forced either to sell securities at a time when it might not otherwise have done so, or to forego exercising the rights.

## HOW THE FUNDS INVEST

**Bottom-Up Investment Process**

All portfolio managers at Harris Associates L.P., investment adviser to The Oakmark Funds (the "Adviser"), strive to abide by a consistent philosophy and process. This process involves a collective, unified effort at identifying what the managers believe are the best values in the marketplace.

---

\*     In the case of a call option, the option is covered if the Fund owns (a) the securities underlying the option, (b) other securities with respect to which the Fund anticipates receiving the underlying securities as a dividend or distribution or upon a conversion or exchange and liquid assets held by the Fund having a value at least equal to the value of such underlying securities are segregated on the books of the Fund's custodian or (c) an absolute and immediate right to acquire the underlying security without additional consideration (or, if additional consideration is required, liquid assets held by the Fund having a value at least equal to that amount are segregated on the books of the Fund's custodian) upon conversion or exchange of other securities held in its portfolio. In the case of a put option, the option is covered if assets having a value at least equal to the exercise price of the option are segregated on the books of the Fund's custodian on a daily basis. For purposes of this restriction, the aggregate market value of all portfolio securities or currencies required to cover such options written by the Fund is the aggregate value of all securities held to cover call options written plus the value of all liquid assets required to be so segregated in connection with call and put options written.

**International Small Cap Fund – Class I Shares**

| Before Taxes | 1 Year | 5 Year | Life of Fund* |
|---|---|---|---|
| Average Annual Total Return | 28.95% | 13.92% | 13.16% |

| After Taxes on Distributions | 1 Year | 5 Year | Life of Fund* |
|---|---|---|---|
| Average Annual Total Return | 28.15% | 13.09% | 11.77% |

| After Taxes on Distributions and Sale of Fund Shares | 1 Year | 5 Year | Life of Fund* |
|---|---|---|---|
| Average Annual Total Return | 19.45% | 11.77% | 10.86% |

\*   From the date Class I Shares were first offered for sale - November 1, 1995.

**International Small Cap Fund – Class II Shares**

| Before Taxes | 1 Year | Life of Fund* |
|---|---|---|
| Average Annual Total Return | 28.99% | 19.80% |

\*   From the date Class II Shares were first offered for sale – January 8, 2001.

The Funds impose no sales charge and pay no distribution ("12b-1") expenses. Performance figures quoted by the Funds are not necessarily indicative of future results. Each Fund's performance is a function of conditions in the securities markets, portfolio management, and operating expenses. Although information such as yield and total return is useful in reviewing a Fund's performance and in providing some basis for comparison with other investment alternatives, it should not be used for comparison with other investments using different reinvestment assumptions or time periods. The Funds may invest in initial public offerings (IPOs). IPOs and other investment techniques may have a magnified performance impact on a Fund with a small asset base and similar performance may not continue as assets grow.

In advertising and sales literature, the performance of a Fund may be compared with that of other mutual funds, indexes or averages of other mutual funds, indexes of related financial assets or data, and other competing investment and deposit products available from or through other financial institutions. The composition of these indexes or averages differs from that of the Funds. Comparison of a Fund to an alternative investment should consider differences in features and expected performance. The Funds may also note their mention (including performance or other comparative rankings) in newspapers, magazines, or other media from time to time. However, the Funds assume no responsibility for the accuracy of such data.

## INVESTMENT ADVISER

The Adviser furnishes continuing investment supervision to the Funds and is responsible for overall management of the Funds' business affairs pursuant to investment advisory agreements relating to the respective Funds (the "Agreements"). The Adviser furnishes office space, equipment and personnel to the Funds, and assumes the expenses of printing and distributing the Funds' prospectus, profiles and reports to prospective investors.

Each Fund pays the cost of its custodial, stock transfer, dividend disbursing, bookkeeping, audit and legal services. Each Fund also pays other expenses such as the cost of proxy solicitations, printing and distributing notices and copies of the prospectus and shareholder reports furnished to existing shareholders, taxes, insurance premiums, the expenses of maintaining the registration of that Fund's shares under federal and state securities laws and the fees of trustees not affiliated with the Adviser.

For its services as investment adviser, the Adviser receives from each Fund a monthly fee based on that Fund's net assets at the end of the preceding month. Basing the fee on net assets at the end of the preceding month has the effect of (i) delaying the impact of changes in assets on the amount of the fee and (ii) in the first year of a fund's operation, reducing the amount of the aggregate fee by providing for no fee in the first month of operation. The annual rates of fees as a percentage of each Fund's net assets are as follows:

| Fund | Fee |
|------|-----|
| Oakmark | 1.00% up to $2 billion; 0.90% from $2-3 billion; 0.80% from $3-5 billion; 0.75% from $5-7.5 billion; 0.70% from $7.5-10 billion; and 0.65% over $10 billion |
| Select | 1.00% up to $1 billion; 0.95% from $1-1.5 billion; 0.90% from $1.5-2 billion; 0.85% from $2-2.5 billion; 0.80% from $2.5-5 billion; 0.75% from $5-10 billion; and 0.725% over $10 billion |
| Equity and Income | 0.75% up to $5 billion; 0.70% from $5-7.5 billion; 0.675% from $7.5-10 billion; 0.65% from $10-12.5 billion; and 0.60% over $12.5 billion |
| Global | 1.00% up to $2 billion; 0.95% from $2-4 billion; and 0.90% over $4 billion |
| International | 1.00% up to $2 billion; 0.95% from $2-3 billion; 0.85% from $3-5 billion; 0.825% from $5-7.5 billion; and 0.815% over $7.5 billion |
| International Small Cap | 1.25% up to $500 million; 1.10% from $500 million to $1.5 billion; and 1.05% over $1.5 billion |

The table below shows gross advisory fees paid by the Funds and any expense reimbursements by the Adviser to them, which are described in the prospectus.

| Fund | Type of Payment | Year Ended September 30, 2004 | Year Ended September 30, 2003 | Year Ended September 30, 2002 |
|------|-----------------|-------------------------------|-------------------------------|-------------------------------|
| Oakmark | Advisory fee | $50,652,178 | $37,074,474 | $34,848,853 |
| Select | Advisory fee | 48,070,958 | 36,938,068 | 40,838,462 |
| Equity and Income | Advisory fee | 46,997,810 | 23,468,519 | 12,099,581 |
| Global | Advisory fee | 12,245,761 | 2,982,092 | 1,333,497 |
| International | Advisory fee | 36,337,644 | 19,015,386 | 12,048,977 |
| International Small Cap | Advisory fee | 7,616,526 | 4,626,713 | 3,860,436 |

The Agreement for each Fund was for an initial term that expired on October 31, 2001. Each Agreement continues from year to year thereafter so long as such continuation is approved at least annually by (1) the board of trustees or the vote of a majority of the outstanding voting securities of the Fund, and (2) a majority of the trustees who are not interested persons of any party to the Agreement, cast in person at a meeting called for the purpose of

voting on such approval. Each Agreement may be terminated at any time, without penalty, by either the Trust or the Adviser upon 60 days' written notice, and automatically terminates in the event of its assignment as defined in the 1940 Act.

At a meeting of the board of trustees of the Trust held on October 28, 2004, called in part for the purpose of voting on the renewal of the Agreements, the Agreements, with certain restrictions in the schedule of advisory fee rates, were renewed through October 31, 2005 by the affirmative vote of a majority of the trustees, and a majority of "non-interested" trustees, voting separately. The trustees considered information about, among other things:

- the Adviser and its personnel (including particularly those personnel with responsibilities for providing services to the Funds), resources and investment processes;

- the terms of each Agreement;

- the scope and quality of services that the Adviser has been providing to the Funds;

- the investment performance of each Fund and of comparable funds managed by other advisers over various periods;

- the advisory fee rates payable by each Fund to the Adviser and by comparable funds managed by other advisers, as well as advisory fee rates payable by other types of accounts managed by the Adviser;

- the total expense ratio of each Fund and of comparable funds managed by other advisers;

- the compensation payable by the Funds to affiliates of the Adviser for other services, and the Adviser's contractual undertaking to limit Fund expenses;

- the profitability of the Adviser and its affiliates from their relationships with the Funds, as well as economies of scale and sharing of those economies with the Funds; and

- the Adviser's use of the Funds' portfolio brokerage transactions to obtain research benefiting the Funds or other clients of the Adviser at a cost that may be in excess of the amount other brokers would charge.

The action of the trustees to renew the Agreements was taken upon recommendation of the committee on management contracts, which had met several times over the preceding five months, and was taken after successive board meetings at which the agreements were discussed.

The Adviser is a limited partnership managed by its general partner, Harris Associates, Inc. ("HAI"), whose directors are David G. Herro, Robert M. Levy, John R. Raitt, Kristi L. Rowsell, G. Neal Ryland and Peter S. Voss. Mr. Raitt is the president and chief executive officer of HAI. HAI is a wholly-owned subsidiary of IXIS Asset Management North America, L.P. ("IXIS AMNA"). IXIS AMNA owns 99.67% of the limited partnership interests in the Adviser and, through its wholly-owned subsidiary, IXIS Asset Management Holdings, LLC ("IXIS Holdings"), all of the outstanding shares of HAI. IXIS AMNA is a limited partnership that owns investment management and distribution and service entities, including IXIS Asset Management Services Company, the Funds' transfer agent.

IXIS AMNA is part of IXIS Asset Management Group, an international asset management group based in Paris, France. IXIS Asset Management Group is ultimately owned principally, directly or indirectly, by three large affiliated French financial services entities: the Caisse des Depots et Consignations ("CDC"), a public sector financial institution created by the French government in 1816; the Caisse Nationale des Caisses d'Epargne ("CNC"), a financial institution owned by CDC and by French regional savings banks known as the Caisses d'Epargne; and CNP Assurances, a large French life insurance company. The registered address of CNC is 5, rue Masseran, 75007 Paris, France. The registered office of CDC is 56, rue de Lille, 75007 Paris, France. The registered address of CNP Assurances is 4, place Raoul Dautry, 75015 Paris, France.

The Adviser has contractually agreed to reimburse Class I Shares of each Fund to the extent that the annual ordinary operating expenses of that class exceed the following percentages of the average net assets of Class I Shares: 1.50% in the case of Oakmark Fund or Select Fund; 1.00% in the case of Equity and Income Fund; 1.75% in the case of Global Fund; and 2.00% in the case of International Fund and International Small Cap Fund. The Adviser has also contractually agreed to reimburse Class II Shares of each Fund to the extent that the annual ordinary operating expenses of that class exceed the following percentages of the average net assets of Class II Shares: Oakmark Fund or Select Fund,1.75% (1.50% + .25%); Equity and Income Fund, 1.25% (1.00% + .25%); Global Fund, 2.00% (1.75% + .25%); and International Fund and International Small Cap Fund, 2.25% (2.00% + .25%). Each such agreement is effective through January 31, 2006.

For the purpose of determining whether a share class of a Fund is entitled to any reduction in advisory fee or expense reimbursement, the pro rata portion of the Fund's expenses attributable to a share class of that Fund is calculated daily and any reduction in fee or reimbursement is made monthly.

## CODES OF ETHICS

The Trust, the Adviser and the Funds' distributor, Harris Associates Securities L.P. ("HASLP"), establish standards and procedures for the detection and prevention of certain conflicts of interest, including activities by which persons having knowledge of the investments and investment intentions of the Trust might take advantage of that knowledge for their own benefit. The Trust, the Adviser and HASLP have adopted codes of ethics to meet those concerns and legal requirements. Although the codes do not prohibit employees who have knowledge of the investments and investment intentions of any of the Funds from engaging in personal securities investing, they regulate such investing by those employees.

## PROXY VOTING POLICIES AND PROCEDURES

The Adviser, as part of its management responsibilities, is responsible for exercising all voting rights with respect to portfolio securities of the Funds in accordance with the Adviser's proxy voting policies and procedures.

The Adviser exercises voting rights solely with the goal of serving the best interests of its clients (including the Funds) as shareholders of a company. In determining how to vote on any proposal, the Adviser's Proxy Committee considers the proposal's expected impact on shareholder value and does not consider any benefit to the Adviser or its employees or affiliates.

The Adviser considers the reputation, experience and competence of a company's management when it evaluates the merits of investing in a particular company, and it invests in companies in which it believes management goals and shareholder goals are aligned. Therefore, on most issues, the Adviser casts votes in accordance with management's recommendations. However, when the Adviser believes that management's position on a particular issue is not in the best interests of the Funds and their shareholders, the Adviser will vote contrary to management's recommendation.

*Proxy Voting Guidelines*

The Adviser's Proxy Committee has established a number of proxy voting guidelines on various issues of concern to investors. The Proxy Committee normally votes proxies in accordance with those guidelines unless it determines that it is in the best economic interests of a Fund and its shareholders to vote contrary to the guidelines. The voting guidelines generally address issues related to boards of directors, auditors, equity based compensation plans, and shareholder rights.

- With respect to a company's board of directors, the Adviser believes that there should be a majority of independent directors and that audit, compensation and nominating committees should consist solely of independent directors, and it will normally vote in favor of proposals that insure such independence.

- With respect to auditors, the Adviser believes that the relationship between a public company and its auditors should be limited primarily to the audit engagement, and it will normally vote in favor of proposals to prohibit or limit fees paid to auditors for any services other than auditing and closely-related activities that do not raise any appearance of impaired independence.

-

With respect to equity based compensation plans, the Adviser believes that appropriately designed plans approved by a company's shareholders can be an effective way to align the interests of long-term shareholders and the interests of management, employees and directors. However, the Adviser will normally vote against plans that substantially dilute its clients' ownership interest in the company or provide participants with excessive awards. The Adviser will also normally vote in favor of proposals to require the expensing of options.

- With respect to shareholder rights, the Adviser believes that all shareholders of a company should have an equal voice and that barriers that limit the ability of shareholders to effect corporate change and to realize the full value of their investment are not desirable. Therefore, the Adviser will normally vote against proposals for supermajority voting rights, against the issuance of poison pill preferred shares, and against proposals for different classes of stock with different voting rights.

- With respect to "social responsibility" issues, the Adviser believes that matters related to a company's day-to-day business operations are primarily the responsibility of management. The Adviser is focused on maximizing long-term shareholder value and will normally vote against shareholder proposals requesting that a company disclose or change certain business practices unless it believes the proposal would have a substantial positive economic impact on the company.

The proxy voting committee may determine not to vote a Fund's proxy if it has concluded that the costs of or disadvantages resulting from voting outweigh the economic benefits of voting. For example, in some non-U.S. jurisdictions, the sale of securities voted may be prohibited for some period of time, usually between the record and meeting dates ("share blocking"), and the Adviser may determine that the loss of investment flexibility resulting from share blocking outweighs the benefit to be gained by voting.

### Conflicts of Interest

The Proxy Committee, in consultation with the Adviser's legal and compliance departments, will monitor and resolve any potential conflicts of interest with respect to proxy voting. A conflict of interest might exist, for example, when an issuer who is soliciting proxy votes also has a client relationship with the Adviser, when a client of the Adviser is involved in a proxy contest (such as a corporate director), or when one of the Adviser's employees has a personal interest in a proxy matter. When a conflict of interest arises, in order to insure that proxies are voted solely in the best interest of the Funds and their shareholders, the Adviser will vote in accordance with either its written guidelines or the recommendation of an independent voting service. If the Adviser believes that voting in accordance with the guidelines or the recommendation of the voting service would not be in the collective best interests of the Funds and their shareholders, the Executive Committee of the Board of Trustees of the Funds will determine how shares should be voted.

### How to Obtain the Oakmark Funds' Proxy Voting Record

No later than August 31 of each year, information regarding how the Adviser, on behalf of the Funds, voted proxies relating to the Funds' portfolio securities for the twelve months ended the preceding June 30 will be available through a link on the Funds' website at www.oakmark.com and on the SEC's website at http://www.sec.gov.

## TRUSTEES AND OFFICERS

The board of trustees has overall responsibility for the Funds' operations. Each of the trustees and officers serves until the election and qualification of his or her successor, or until he or she sooner dies, resigns, or is removed or disqualified. The retirement age for trustees is 72. Information regarding the trustees and officers of the Trust including their principal business activities during the past five years is set forth below:

### Trustees Who Are Not Interested Persons of the Trust

| Name, Address[†] and Age at December 31, 2004 | Position(s) with Trust | Year First Elected or Appointed to Current Office | Principal Occupation(s) Held During Past Five Years[‡] | Number of Portfolios in Fund Overseen by Trustee | Other Directorships Held by Trustee |
|---|---|---|---|---|---|
| Michael J. Friduss, 62 | Trustee | 1995 | Principal, MJ Friduss & Associates, Inc. (telecommunications consultants) | 6 | None |
| Thomas H. Hayden, 53 | Trustee | 1995 | President, Greenhouse Communications (advertising agency), since 2004; Executive Vice President, Campbell Mithun, (advertising and marketing communication agency), prior thereto | 6 | None |
| Christine M. Maki, 44 | Trustee | 1995 | Vice President—Tax, Hyatt Corporation (hotel management) | 6 | Director, Illinois CPA Society |
| Allan J. Reich, 56 | Trustee | 1993 | Partner, Seyfarth Shaw LLP (law firm), since 2003; Vice Chairman of the law firm D'Ancona & Pflaum LLC, prior thereto | 6 | None |
| Marv R. Rotter, 58 | Trustee | 1995 | Retired since 2004; Senior Advisor to Chief Executive Officer, AXA Advisors, LLC (formerly named Rotter & Associates) prior thereto | 6 | None |
| Burton W. Ruder, 61 | Trustee | 1995 | President, The Academy Financial Group (venture capital investment and transaction financing firm); Manager, Cedar Green Associates (real estate management firm) | 6 | None |

| Name, Address[†] and Age at December 31, 2004 | Position(s) with Trust | Year First Elected or Appointed to Current Office | Principal Occupation(s) Held During Past Five Years[#] | Number of Portfolios in Fund Overseen by Trustee | Other Directorships Held by Trustee |
|---|---|---|---|---|---|
| Gary N. Wilner, M.D., 64 | Trustee and Chairman of the Board of Trustees | 1993 | Retired, since 2004; Senior Attending Physician, Evanston Hospital; Medical Director – Cardiopulmonary Wellness Program, Evanston Hospital Corporation, prior thereto | 6 | Director, North American Scientific, Inc. (developer of radioisotopic products for the treatment and diagnosis of disease) |

## Trustees Who are Interested Persons of the Trust

| Name, Address[†] and Age at December 31, 2004 | Position(s) with Trust | Year First Elected or Appointed to Current Office | Principal Occupation(s) Held During Past Five Years[#] | Number of Portfolios in Fund Overseen by Trustee | Other Directorships Held by Trustee |
|---|---|---|---|---|---|
| Peter S. Voss*, 58 | Trustee | 1995 | Chairman and Chief Executive Officer, IXIS Asset Management Group; President and Chief Executive Officer, IXIS Asset Management North America, L.P., formerly named CDC IXIS Asset Management North America, L.P. (investment management); Chairman of the Management Board, IXIS Asset Management; Director, Harris Associates, Inc. ("HAI") | 6 | Chairman, AEW Real Estate Income Fund (closed-end investment company); Chairman and Chief Executive Officer, CDC Nvest Funds (open-end investment company – 14 portfolios) |
| John R. Raitt*, 50 | Trustee and President | 2003 | President and Chief Executive Officer, HAI, Harris Associates L.P. ("HALP") and Harris Associates Securities L.P. ("HASLP") since 2003; Chief Operating Officer, HALP 2001-2002; Director of Research, HALP, prior thereto | 6 | |

## Other Officers of the Trust

| Name, Address[†] and Age at December 31, 2004 | Position(s) with Trust | Year First Elected or Appointed to Current Office | Principal Occupation(s) Held During Past Five Years[‡] |
|---|---|---|---|
| Robert M. Levy, 54 | Executive Vice President | 2004 | Chairman, HAI; Chief Investment Officer, HALP, since 2001; President and Chief Executive Officer, HAI, HALP and HASLP, 1997 – 2002; Portfolio Manager, HALP |
| Henry R. Berghoef, 55 | Vice President and Portfolio Manager (The Oakmark Select Fund) | 2000 | Director of Domestic Research, HALP, since 2003; Associate Director of Research, 2001 – 2002; Portfolio Manager and Analyst, HALP |
| Chad M. Clark, 32 | Vice President and Portfolio Manager (The Oakmark International Small Cap Fund) | 2005 | Portfolio Manager, HALP, since 2001; International Analyst, HALP |
| Kevin G. Grant, 40 | Vice President and Portfolio Manager (The Oakmark Fund) | 2000 | Portfolio Manager and Analyst, HALP |
| David G. Herro, 44 | Vice President and Portfolio Manager (The Oakmark International Fund and The Oakmark International Small Cap Fund) | 1992 | Chief Investment Officer of International Equity, since 2003; Portfolio Manager and Analyst, HALP |
| John J. Kane, 33 | Assistant Treasurer | 1999 | Manager – Mutual Fund and Institutional Services, HALP |
| Clyde S. McGregor, 52 | Vice President and Portfolio Manager (The Oakmark Equity and Income Fund and The Oakmark Global Fund) | 1995 | Portfolio Manager, HALP |
| William C. Nygren, 46 | Vice President and Portfolio Manager (The Oakmark Fund and The Oakmark Select Fund) | 1996 | Portfolio Manager and Analyst, HALP |
| Vineeta D. Raketich, 33 | Vice President | 2003 | Manager, International Operations and Client Relations, HALP, since 2003; Supervisor, Mutual Fund and Institutional Services, HALP, prior thereto |

24

| Name, Address[†] and Age at December 31, 2004 | Position(s) with Trust | Year First Elected or Appointed to Current Office | Principal Occupation(s) Held During Past Five Years[#] |
|---|---|---|---|
| Janet L. Reali, 53 | Vice President and Secretary | 2001 | Vice President, General Counsel and Secretary, HAI, HALP and HASLP, since 2001; Senior Executive Vice President, General Counsel and Secretary, Everen Capital Corp. and Everen Securities, Inc. (broker/dealer), 1995-1999 |
| Ann W. Regan, 56 | Chief Compliance Officer, Vice President and Assistant Secretary | 1996 | Chief Compliance Officer of the Trust, since 2004; Director of Mutual Fund Operations, HALP, prior thereto |
| Kristi L. Rowsell, 38 | Treasurer | 1997 | Director, Chief Financial Officer and Treasurer, HAI; Chief Financial Officer, HALP and HASLP, since 1999 |
| Edward A. Studzinski, 55 | Vice President and Portfolio Manager (The Oakmark Equity and Income Fund) | 2000 | Portfolio Manager and Analyst, HALP |
| Michael J. Welsh, 41 | Vice President and Portfolio Manager (The Oakmark Global Fund and The Oakmark International Fund) | 1997 | Director of International Research, since 2003; Portfolio Manager and Analyst, HALP |

---

[†]  Unless otherwise noted, the business address of each officer and trustee listed in the table is Two North LaSalle Street, Suite 500, Chicago, Illinois 60602-3790.

[#]  As used in this table, "HALP," "HAI" and "HASLP" refer to the Adviser, the general partner of the Adviser, and the Fund's distributor, respectively.

[*]  Mr. Voss and Mr. Raitt are trustees who are "interested persons" of the Trust as defined in the 1940 Act because Mr. Voss is an officer of the Adviser's parent company, Mr. Raitt is an officer of the Adviser, and both Mr. Raitt and Mr. Voss are on the board of HAI.

The Adviser, on customary terms, manages investment accounts controlled by Messrs. Reich and Rotter.

The committees of the board of trustees including an executive committee, audit committee, governance committee and management contracts committee. The following table identifies the members of those committees, the function of each committee, and the number of meetings of each committee held during the fiscal year ended September 30, 2004.

| Committee | Members of Committee | Number of meetings during fiscal year ended September 30, 2004 | Principal Functions of Committee |
|---|---|---|---|
| *Executive Committee* | Gary N. Wilner, M.D.* Burton W. Ruder Peter S. Voss | 1** | The executive committee generally has the authority to exercise the powers of the board during intervals between meetings. |
| *Audit Committee* | Allan J. Reich* Michael J. Friduss Thomas H. Hayden Christine M. Maki Gary N. Wilner, M.D. | 5 | The principal responsibilities of the audit committee include the following: <br>• to oversee the accounting and financial reporting policies and practices of the Trust, its internal controls and, as appropriate, the internal controls of certain service providers; <br>• to oversee the quality and objectivity of the financial statements of the Funds and the independent audits thereof; <br>• to approve the selection of the independent registered public accounting firm of the Funds; <br>• to act as liaison between the independent auditors of the Funds and the full board of trustees; and <br>• to oversee the portfolio transaction policies and practices of the Funds. |
| *Governance Committee* | Michael J. Friduss* Allan J. Reich Marvin R. Rotter Burton W. Ruder Gary N. Wilner, M.D. | 5 | The governance committee makes recommendations to the board regarding board committees and committee assignments, the composition of the board, candidates for election as non-interested trustees and compensation of non-interested trustees, and oversees the process for evaluating the functioning of the board. |
| *Management Contracts Committee* | Thomas H. Hayden* Christine M. Maki Marvin R. Rotter Burton W. Ruder Gary N. Wilner, M.D. | 6 | The committee on management contracts is responsible for reviewing in the first instance, and making recommendations to the board regarding, investment advisory agreements and any other agreements relating to the management or administration of any Fund. |
| *Pricing Committee**** | John R. Raitt Janet L. Reall Kristi L. Rowsell Vineeta D. Raketich John J. Kane | 10 | The committee is authorized, on behalf of the board, to determine, in accordance with the valuation procedures established by the board, fair valuations of portfolio securities. |

---

\* Chair of the committee.

\*\* The executive committee held one joint meeting with the Audit Committee on March 1, 2004 and took one action by unanimous written consent of the Executive Committee members at that meeting.

\*\*\* The Foreign Pricing Committee met three times and the Domestic Pricing Committee met seven times during the fiscal year ended September 30, 2004.

The following table shows the compensation paid by the Trust for the fiscal year ended September 30, 2004 to each trustee who was not an "interested person" of the Trust:

| Name of Trustee | Aggregate Compensation from the Trust* | Average Compensation per Fund |
|---|---|---|
| Victor A. Morgenstern** | $159,200 | $26,533 |
| Michael J. Friduss | 101,800 | 16,967 |
| Thomas H. Hayden | 105,800 | 17,633 |
| Christine M. Maki | 109,200 | 18,200 |
| Allan J. Reich | 110,450 | 18,408 |
| Marvin R. Rotter | 88,600 | 14,767 |
| Burton W. Ruder | 101,800 | 16,967 |
| Gary N. Wilner, M.D. | 103,800 | 17,300 |

* Each Fund is a series of the Trust and the Trust constitutes the entire fund complex. Aggregate compensation includes compensation that was deferred pursuant to the deferred compensation plan as described below. As of September 30, 2004, the total amounts accrued under the plan were $476,234 for Mr. Friduss, $450,817 for Mr. Hayden, $488,714 for Ms. Maki, $474,887 for Mr. Rotter, $370,740 for Mr. Ruder and $523,788 for Dr. Wilner.

** Mr. Morgenstern resigned as a trustee as of December 31, 2004.

The Trust has a deferred compensation plan (the "Plan") that permits any trustee who is not an "interested person" of the Trust to elect to defer receipt of all or a portion of his or her compensation as a trustee for two or more years. The deferred compensation of a participating trustee is credited to a book reserve account of the Trust when the compensation would otherwise have been paid to the trustee. The value of the trustee's deferral account at any time is equal to the value that the account would have had if contributions to the account had been invested and reinvested in shares of one or more of the Oakmark Funds or the Goldman Sachs Institutional Liquid Assets Government Portfolio as designated by the trustee. At the time for commencing distributions from a trustee's deferral account, which is no later than when the trustee ceases to be a member of the board of trustees, the trustee may elect to receive distributions in a lump sum or over a period of five years. Each Fund's obligation to make distributions under the Plan is a general obligation of that Fund. No Fund will be liable for any other Fund's obligations to make distributions under the Plan.

Trustees who are "interested persons" of the Trust, as well as the officers of the Trust, are compensated by the Adviser and not by the Trust. The Trust does not provide any pension or retirement benefits to its trustees.

The following table shows the value of shares of each Fund "beneficially" owned (within the meaning of that term as defined in rule 16a-1(a)(2) under the Securities Exchange Act of 1934) by each trustee (within dollar ranges) as of December 31, 2004.

| Trustee | Oakmark Fund | Select Fund | Equity and Income Fund | Global Fund | International Fund | International Small Cap Fund |
|---|---|---|---|---|---|---|
| Michael J. Friduss | Over 100,000 | Over 100,000 | Over 100,000 | Over 100,000 | 10,001-50,000 | Over 100,000 |
| Thomas H. Hayden | 10,001-50,000 | Over 100,000 | 10,001-50,000 | 50,000-100,000 | None | None |
| Christine M. Maki | 10,001-50,000 | 50,001-100,000 | 10,001-50,000 | 50,000-100,000 | 10,001-50,000 | 10,001-50,000 |
| John R. Raitt | Over 100,000 | Over 100,000 | Over 100,000 | Over 100,000 | Over 100,000 | Over 100,000 |
| Allan J. Reich | Over 100,000 | Over 100,000 | Over 100,000 | 50,001-100,000 | 50,001-100,000 | 1-10,000 |
| Marvin R. Rotter | None | None | None | None | Over 100,000 | None |
| Burton W. Ruder | None | 10,001-50,000 | 1-10,000 | Over 100,000 | Over 100,000 | Over 100,000 |
| Peter S. Voss | Over 100,000 | Over 100,000 | None | None | Over 100,000 | Over 100,000 |
| Gary N. Wilner, M.D. | Over 100,000 | Over 100,000 | 1-10,000 | Over 100,000 | 50,001-100,000 | 10,001-50,000 |

At December 31, 2004 the trustees and officers as a group owned beneficially less than 1% of the outstanding Class II shares of each Fund and Class I shares of Oakmark Fund, Equity and Income Fund, and International Fund and the following percentages of the outstanding shares of each of the other Funds: Select, 1.5, Global, 1.3, and International Small Cap, 1.7.

## PRINCIPAL SHAREHOLDERS

The only persons known by the Trust to own of record or "beneficially" (within the meaning of that term as defined in rule 13d-3 under the Securities Exchange Act of 1934) 5% or more of the outstanding shares of any Fund as of December 31, 2004 were:

| Name and Address | Fund and Class | Percentage of Outstanding Shares Held |
|---|---|---|
| Charles Schwab & Co. Inc. (1)<br>101 Montgomery Street<br>San Francisco, CA  94104-4122 | Oakmark, Class I<br>International Fund, Class I<br>Select, Class I<br>Equity and Income, Class I<br>International Small Cap, Class I<br>Global, Class I | 27.87%<br>37.91<br>24.27<br>34.00<br>42.93<br>39.54 |
| Connecticut General Life Insurance Co. (1)<br>280 Trumbull Street<br>Hartford, CT 06103-3509 | Select Fund, Class II | 10.21% |