UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| JERRY N. JONES, MARY FRANCES JONES, and ARLINE WINNERMAN, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:04-cv-08305 CPK |
| v. | ) ) | |
| HARRIS ASSOCIATES L.P., | ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM OF LAW IN SUPPORT
OF DEFENDANT HARRIS ASSOCIATES, L.P's
MOTION FOR SUMMARY JUDGMENT**

Gordon B. Nash, Jr.
GARDNER CARTON & DOUGLAS LLP
191 North Wacker Drive
Suite 3700
Chicago, IL 60606-1698
Telephone:  (312) 569-1421
Facsimile:  (312) 569-3421

John D. Donovan, Jr.
Robert A. Skinner
Brian R. Blais
Patricia M. Festin
ROPES & GRAY, LLP
One International Place
Boston, Massachusetts 02110
Telephone:  (617) 951-7000
Facsimile:  (617) 951-7050

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF FACTS .......................................................................................4

    1.    The Parties.......................................................................................4

    2.    The Investment Company Act's Regulatory Structure for Mutual
         Fund Governance ...........................................................................4

    3.    Harris's Advisory Fees.....................................................................5

    4.    The Annual Negotiation and Approval of The Advisory Contract
         and Fees.........................................................................................6

    5.    Harris's Performance Record ...........................................................8

ARGUMENT .....................................................................................................10

I.    PLAINTIFFS MUST ADDUCE EVIDENCE THAT THE FEES CHARGED
    TO THE FUNDS WERE "SO DISPROPORTIONATELY LARGE" THAT
    THEY BEAR "NO REASONABLE RELATIONSHIP TO THE SERVICES
    RENDERED AND COULD NOT HAVE BEEN THE PRODUCT OF
    ARM'S-LENGTH BARGAINING." .................................................10

    A.    Harris Is Entitled To Summary Judgment If Plaintiffs Fail To Adduce
         Evidence Sufficient To Allow The Trier Of Fact – The Court In This
         Case – To Find For Plaintiffs Under Section 36(b)...............................10

    B.    The Test Under Section 36(b) Is Not Whether A Challenged Fee Was
         "Reasonable," But Instead Whether It Was "So Disproportionately Large
         That It Bears No Reasonable Relationship To The Services Rendered
         And Could Not Have Been The Product Of Arm's-Length Bargaining.".............11

II.    PLAINTIFFS HAVE FAILED TO ADDUCE EVIDENCE SUFFICIENT
    FOR THE COURT TO FIND THAT THE FUND PAID EXCESSIVE FEES
    IN VIOLATION OF SECTION 36(b)...............................................14

    A.    The Undisputed Record Of Harris's Fees And The Services Rendered To
         The Funds Defeats Plaintiffs' Claims Under Section 36(b) ....................14

    B.    Comparison Of Mutual Fund Fees To Non-Mutual Fund Fees Is
         Irrelevant As A Matter Of Law, And Plaintiffs Have Shown No Factual
         Predicate Of Comparability ..............................................................16

    C.    Plaintiffs' Evidence Relating To The So-Called "Gartenberg Factors"
         Raises No Genuine Issue Of Material Fact Under Section 36(b) As To
         The Fees Being The Product Of Arm's-Length Bargaining....................21

         1.    Plaintiffs Do Not Challenge The Voluminous Data Reviewed By
             The Trustees Regarding The "Nature And Quality Of Services"
             Provided By Harris To The Funds .................................................21

**TABLE OF CONTENTS**

**(Continued)**

Page

2. Plaintiffs' "Comparative Fee Structure" Analyses Focus On An Irrelevant Comparison Between Mutual Fund Fees And Non-Mutual Fund Fees, And They Ignore The Data Considered By The Trustees Comparing The Oakmark Funds To Comparable Mutual Funds ................................................................................................... 22

3. Plaintiffs' Expert Evidence On "Economies Of Scale" Ignores The Fact That The Fund Fees Decrease As The Funds Grow In Size And Have Decreased Over Time ................................................................ 23

4. The "Fall-Out Benefits" Raised By Plaintiffs Were Fully Disclosed To The Trustees ............................................................................... 24

5. Plaintiffs' Challenge To The Trustees' Profitability Report Does Not Quantify The Effect Of Any Supposed Failings In The Report ............. 24

6. Beyond Their Challenge To The Independent Status Of The Trustees, Plaintiffs Raise No Substantive Challenge To The Independence And Diligence Of The Trustees' Performance In Negotiating Fees ......................................................................................... 25

III. PLAINTIFFS' ALTERNATIVE THEORIES OF LIABILITY ARE GOVERNED BY PROVISIONS OF THE INVESTMENT COMPANY ACT OTHER THAN SECTION 36(b), AND CANNOT FORM THE BASIS FOR A CLAIM IN THIS CASE ............................................................................ 26

A. Payment of Allegedly Inappropriate Brokerage Commissions By The Funds To An Affiliated Broker Is Not Actionable Under Section 36(b), As These Transactions Are Governed By ICA Section 17 ...................... 27

B. Allegedly Inappropriate "Distribution" Payments By The Funds To Third-Party Intermediaries Are Governed By ICA Section 12(b) And Are Not Actionable Under Section 36(b) ............................................. 28

C. There Is No "Common Law" Excessive Fee Claim That Supplements The Statutory Claim Under Section 36(b) of the ICA ................................. 30

D. Plaintiffs' Challenge To The "Disinterested" Status Of Trustee Victor Morgenstern Is Not Actionable Under Section 36(b), As Trustee Approval Of Fees And Fund Board Composition Are Governed By ICA Sections 15(c) and 10(a) ...................................................................... 31

E. Plaintiffs' Assertion That The Remaining Disinterested Trustees Were Not Sufficiently "Independent" Has No Legal Basis And Is Irrelevant Under Section 36(b) ................................................................................ 34

CONCLUSION ......................................................................................................... 35

### TABLE OF AUTHORITIES

### FEDERAL CASES

*Alexander v. Sandoval*, 532 U.S. 275 (2001)..............................................................26, 33

*In re AllianceBernstein Mut. Fund Excessive Fee Litig.*, No. 04 Civ. 4885(SWK),
2005 WL 2677753 (S.D.N.Y. Oct. 19, 2005).............................................................12

*In re AllianceBernstein Mut. Fund Excessive Fee Litig.*, No. 04 Civ. 4885(SWK),
2006 WL 1520222 (S.D.N.Y. May 31, 2006)............................................................18

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)...............................................11, 16

*Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232 (7th Cir. 1991)...................................11

*Batra v. Investors Research Corp.*, 144 F.R.D. 97 (D. Mo. 1992)...................................18

*Benak v. Alliance Capital Management L.P.,* No. Civ. A. 01-5734, 2004 WL
1459249 (D.N.J. Feb. 9, 2004)...................................................................................12

*Bromson v. Lehman Management Co.*, No. 84-Civ.-7795 (JFK), 1986 WL 165
(S.D.N.Y. Mar. 13, 1986)..........................................................................................18

*Burks v. Lasker*, 441 U.S. 471 (1979)......................................................................33, 35

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)..............................................................11

*Cohen v. Fund Asset Management, Inc.*, No. 79-Civ.-2512, 1980 WL 1488
(S.D.N.Y. Mar. 31, 1980)..........................................................................................33

*DH2 v. Athanassiades*, 359 F. Supp. 2d 708 (N.D. Ill. 2005).........................................28

*In re Eaton Vance Mutual Funds Fee Litigation*, 380 F. Supp. 2d 222 (S.D.N.Y.
2005)..................................................................................................................12, 29

*Fanslow v. Chicago Manufacturing Center, Inc.*, 384 F.3d 469 (7th Cir. 2004).............16

*Forsythe v. Sun Life Financial, Inc.*, 417 F. Supp. 2d 100 (D. Mass. 2006)...............26, 33

*Gallus v. American Express Finance Corp.*, 370 F. Supp. 2d 862 (D. Minn. 2005)...12, 30

*Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923 (2d Cir.
1982)...............................................................................................1, 12, 13, 14, 17, 19,
21

## TABLE OF AUTHORITIES

### (Continued)

**Page**

*Gartenberg v. Merrill Lynch Asset Management, Inc.*, 740 F.2d 190 (2d Cir. 1984) .................................................................................................................23

*Gartenberg v. Merrill Lynch Asset Management, Inc.*, 528 F. Supp. 1038 (S.D.N.Y. 1981) .................................................................................13, 14, 17

*Green v. Fund Asset Management, L.P.*, 286 F.3d 682 (3d Cir. 2002) ......................13, 30

*Green v. Fund Asset Management, L.P.*, 147 F. Supp. 2d 318 (D.N.J. 2001)...................13

*Green v. Nuveen Advisory Corp.*, 295 F.3d 738 (7th Cir. 2002) ................................11, 13

*Green v. Nuveen Advisory Corp.*, No. 97-C-5255, 2001 WL 1035652 (N.D. Ill. Sept. 10, 2001) ......................................................................................................13

*Halligan v. Standard & Poor's/Intercapital, Inc.*, 434 F. Supp. 1082 (E.D.N.Y. 1977) .................................................................................................................33

*ING Principal Protection Funds Derivative Litigation*, 369 F. Supp. 2d 163 (D. Mass. 2005)...........................................................................................................12

*Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222 (S.D.N.Y. 1990) ...........................18

*Kamen v. Kemper Finance Services*, 500 U.S. 90 (1991)...............................................35

*King v. Douglass*, 973 F. Supp. 707 (S.D. Tex. 1996) ......................................................12

*Krantz v. Prudential Investments Fund Management LLC*, 77 F. Supp. 2d 559 (D.N.J. 1999)...........................................................................................................33

*Krinsk v. Fund Asset Management, Inc.*, 875 F.2d 404 (2d Cir. 1989) ............................12

*Krinsk v. Fund Asset Management, Inc.*, 715 F. Supp. 472 (S.D.N.Y. 1988) .12, 14, 18, 19

*Langner v. Brown*, 913 F. Supp. 260 (S.D.N.Y. 1996).....................................................32

*Lessler v. Little*, 857 F.2d 866 (1st Cir. 1988) .................................................................28

*Levy v. Alliance Capital Management LP*, No. 97-Civ.-4672(DC), 1998 WL 744005 (S.D.N.Y. Oct. 26, 1998) ...........................................................................12

*Logan v. Commercial Union Insurance Co.*, 96 F.3d 971 (7th Cir. 1996).......................16

## TABLE OF AUTHORITIES

### (Continued)

**Page**

*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)........................................................................................................................11

*McDonnell v. Allstate Life Insurance Co.*, No. 04-C-3076, 2004 WL 2392169 (N.D. Ill. Oct. 25, 2004)...........................................................................................12

*Meyer v. Oppenheimer Management Corp.*, 895 F.2d 861 (2d Cir. 1990).........................12

*Migdal v. Rowe Price-Fleming, International, Inc.*, 248 F.3d 321 (4th Cir. 2001).....12, 32

*Migdal v. Rowe Price-Fleming, International, Inc.,* No. AMD 98-2162, 2000 WL 350400 (D. Md. Mar. 20, 2000)...................................................................................12

*Miller v. Mitchell Hutchins Asset Management, Inc.*, No. 01-CV-00192DRH, 2003 WL 24260305 (S.D. Ill. Mar. 6, 2003) ................................................................12

*Mutchka v. Harris*, 373 F. Supp. 2d 1021 (C.D. Cal. 2005)..............................................26

*NutraSweet Co. v. X-L Engineering Co.*, 227 F.3d 776 (7th Cir. 2000)............................11

*In re Nuveen Fund Litigation*, No. 94-C-360, 1996 WL 328006 (N.D. Ill. June 11, 1996) .....................................................................................................................12, 14

*Olmsted v. Pruco Life Insurance Co.*, 283 F.3d 429 (2d Cir. 2002)............................29, 30

*Pfieffer v. Bjurman, Barry & Associates*, No. 03-Civ.-9741-DLC, 2004 WL 1903075 (S.D.N.Y. Aug. 26, 2004) .........................................................................12

*Reed v. International Union of United Automobile, Aerospace & Agr. Implement Workers of America*, 945 F.2d 198 (7th Cir. 1991) .......................................................10

*In re Salomon Smith Barney Mutual Fund Fees Litigation*, ___ F. Supp. 2d ____, 2006 WL 2085979 (S.D.N.Y. Jul. 26, 2006) ................................................................29

*Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 663 F. Supp. 962 (S.D.N.Y. 1987) ..............................................................................................................12, 14, 18

*Stegall v. Ladner*, 394 F. Supp. 2d 358 (D. Mass. 2005)....................................................29

*Strigliabotti v. Franklin Resources, Inc.*, No. C-04-00883-SI, 2005 WL 645529 (N.D. Cal. Mar. 7, 2005).............................................................................................12, 30

*Strougo v. BEA Assocs.*, No. 98-CIV.-3725(RWS), 1999 WL 147737 (S.D.N.Y. Mar. 18, 1999)..............................................................................................................32

## TABLE OF AUTHORITIES

### (Continued)

**Page**

*Strougo v. BEA Associates*, 188 F. Supp. 2d 373 (S.D.N.Y. 2002) ...................12, 17, 33

*Tarlov v. Paine Webber Cashfund, Inc.*, 559 F. Supp. 429 (D. Conn. 1983) ...................33

*Transamerica Mtg. Advisors, Inc. v. Lewis*, 444 U.S. 11 (1979).........................28

*Wexler v. Equitable Capital Mgmt. Corp.*, No. 93-Civ.-3834 (RPP), 1994 WL 48807 (S.D.N.Y. Feb. 17, 1994) ................................................12

*Yameen v. Eaton Vance Distributing, Inc.*, No. CIV. A. 03-12437-DPW, 2005 WL 2709116 (D. Mass. Oct. 14, 2005).........................................12

*Yampolsky v. Morgan Stanley Investment Advisers, Inc.*, No. 03-Civ.-5710(RO), 2004 WL 1065533 (S.D.N.Y. May 12, 2004) ..............................12

### DOCKETED CASES

*Baker v. American Century Investment Management, Inc.*, No. 04-4039-CV-C-ODS (W.D. Mo. July 17, 2006) .............................................3, 17

### FEDERAL STATUTES

15 U.S.C. § 80a-2(a)(3)(C) ..............................................................31

15 U.S.C. § 80a-2(a)(9)...................................................................31

15 U.S.C. § 80a-2(a)(12).................................................................4

15 U.S.C. § 80a-2(a)(19).............................................................5, 31, 35

15 U.S.C. § 80a-10(a) ............................................8, 31, 32, 33, 34, 35

15 U.S.C. § 80a-12(b) ...................................................28, 29, 30

15 U.S.C. §§ 80a-15(a) ................................................................4

15 U.S.C. § 80a-15(c) ..........................................4, 5, 6, 7, 8, 31, 32, 33, 34, 35

15 U.S.C. § 80a-17...................................................................27, 28

15 U.S.C. § 80a-35(b) ................................................................ passim

## TABLE OF AUTHORITIES

### (Continued)

**Page**

**FEDERAL RULES**

Fed. R. Civ. P. 56...........................................................................................................10, 11

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 91-1382 (1970)............................................................................................13

S. Rep. No. 91-184 (1969), *reprinted* in 1970 U.S.C.C.A.N. 4897..........................13, 30

Defendant Harris Associates L.P. ("Harris") respectfully submits this memorandum in support of its Motion for Summary Judgment.

## PRELIMINARY STATEMENT

Section 36(b) of the Investment Company Act 1940 (the "ICA") imposes a "fiduciary duty with respect to the receipt of compensation" on investment advisers to mutual funds, and authorizes individual shareholders to recover for their fund excessive fees charged in breach of that obligation. The standard against which "excessiveness" is measured – and to which all parties agree – is stringent: "the adviser-manager must charge a fee that is *so disproportionately large* that it bears *no reasonable relationship* to the services rendered," such that it "*could not have been* the product of arm's-length bargaining." *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923, 928 (2d Cir. 1982) (emphasis added). As a matter of law, the question a Section 36(b) claim raises is *not* whether investment advisory fees were "reasonable." Rather, a Section 36(b) case addresses whether the fees were *so un*reasonable that they evince no hint of good faith negotiation. *See id.* As a matter of fact, that means an investment adviser cannot be liable for breach of its "fiduciary duty with respect to the receipt of compensation" if *either* its fees are not objectively unreasonable *or* the fees are objectively the result of bargaining at arms' length.

In this case, the plaintiffs challenge the fees charged by Harris to three Oakmark mutual funds that the plaintiffs own and that Harris managed, for the period August 17, 2003 to August 16, 2004. But no disputed, material fact permits the required inference that the fees either were grossly unreasonable or not fairly negotiated. The three Oakmark funds provided investors exceptional investment performance, were consistently ranked among the very best in the mutual fund marketplace, and were charged fees within the range that other investment advisers charged

to similar mutual funds. *Net* of fees, the three funds were respectively ranked first, third, and twelfth in total return for the relevant period against their peer groups of hundreds of other mutual funds. In other words, had the plaintiffs opted not to buy these Oakmark funds in favor of virtually any other funds investing in the same asset classes, they would have suffered *inferior* returns, even if the alternative funds incurred *lower* fees. Fees that compare favorably to fees charged by competitor funds are not objectively unreasonable. And competitive fees that produce manifestly superior investment performance self-evidently are not "so disproportionately large" that they bear "no reasonable relationship to the services rendered." The inability of any plaintiff to obtain better performance elsewhere even for *higher* fees confirms beyond argument the "proportionality" of the relevant "relationship" between fees and value.

Likewise, no disputed issue of material fact warrants the conclusion that the fees Harris charged were anything other than the product of a robust negotiation between Harris and fully informed trustees who were disinterested in the outcome and met all legal standards for independence. The record adduced in discovery shows what information the Oakmark funds independent trustees collected, what they considered, and what they did – none of which supports the inference of "bad faith" essential to the conclusion that fees were not bargained for at arm's length. Indeed, in the relevant time period, the parties' negotiation produced *lower* aggregate fees to Harris through the introduction of additional "breakpoints." It is hard to imagine that a process that produces fee *reductions* reflects a tainted bargain.

The plaintiffs have adduced no evidence to undermine these core facts or their significance under the governing standard. Their experts say nothing about the funds' investment performance relative to other mutual funds or why, in light of that performance,

Harris's fees are grossly disproportionate to the value of Harris's services. Instead, the plaintiffs raise matters that are legally and logically irrelevant to their excessive fee claims under Section 36(b).

At the heart of plaintiffs' case – indeed, the only basis upon which they quantify their allegation that Harris' fees are "excessive" – is the assertion that mutual fund fees *must be* excessive because fees paid to Harris by non-mutual fund clients are lower. But that theory has repeatedly failed in the courts as a matter of law because it is unsupported as a matter of fact by a predicate of comparability. Courts have repeatedly found that the clear differences between the services advisers provide to mutual funds and non-mutual fund clients rob this apples-to-oranges comparison of any probative value. Most recently, in July 2006, following a long line of precedent, a district court excluded all evidence of an adviser's non-mutual fund fees in a companion case brought by the same plaintiffs' counsel – whereupon they promptly dismissed the complaint with prejudice. *See* Order Granting Def.'s Mot. In Limine, *Baker v. American Century Inv. Mgmt., Inc.*, No. 04-4039-CV-C-ODS (W.D. Mo. July 17, 2006), attached as Ex. 23 to Declaration of Brian R. Blais ("Blais Decl."). Here, the same legal analysis applies. And the factual record includes the same gap in competent evidence to establish that the fees Harris charges its different clients are for the same things. To the contrary, the record confirms that Harris provides its mutual funds with different and additional services that it does not perform for other clients, justifying the rate differential. That simply is not a basis, then, upon which to contend that Harris's mutual fund fees are excessive just because they are different.

At bottom, the plaintiffs' claim of "excessiveness" is an assault on the industry – not Harris or the fees it charges to the three Oakmark funds. But the plaintiffs' personal opinion that investment advisers in general charge fees to mutual funds that they consider too high is not a

basis for liability. Section 36(b)'s jurisprudence – and common sense – require much more. Since the plaintiffs have not begun to supply that additional information, summary judgment is required as a matter of law.

## STATEMENT OF FACTS

### 1.    The Parties

The Plaintiffs bring this action derivatively on behalf of three of the six mutual funds managed by Harris – the Oakmark Fund, the Oakmark Equity and Income Fund and the Oakmark Global Fund (collectively, the "Funds"). *See* Defendant Harris Associates L.P.'s Local Rule 56.1 Statement of Undisputed Facts ("L.R. 56.1 Stmt.") ¶ 1. Each of the funds in the Oakmark family of funds is a series of Harris Associates Investment Trust, a Massachusetts business trust ("HAIT"), which is governed by a board of trustees. *See id.* ¶ 5. Each fund is a registered investment company under the ICA, 15 U.S.C. § 80a-1 *et seq.*, and Harris serves as investment adviser pursuant to a separate advisory agreement with each Fund. *See* L.R. 56.1 Stmt. ¶ 6. Plaintiffs Jerry N. Jones and Mary Frances Jones are shareholders of the Oakmark Equity and Income Fund and the Oakmark Global Fund. Plaintiff Arline Winnerman is a shareholder of the Oakmark Fund. *See id.* ¶ 7.

### 2.    The Investment Company Act's Regulatory Structure for Mutual Fund Governance

The ICA creates a regulatory structure for mutual fund governance designed to safeguard the interests of fund shareholders. Section 15(a) of the ICA requires that fund investment advisers serve pursuant to written management contracts approved by a majority of the fund's shareholders, which must thereafter be approved annually by the fund's board of trustees or a majority of shareholders. *See* 15 U.S.C. §§ 80a-15(a), 80a-2(a)(12). Section 15(c) requires that approval of the management contract by the fund trustees be accomplished by a majority of

disinterested trustees, and it requires fund trustees to request and evaluate such information from the adviser as may be reasonably necessary to evaluate the terms of the proposed contract. *See* 15 U.S.C. § 80a-15(c). As for the composition of the board approving the contracts, Section 10(a) of the ICA provides that no more than 60 per cent of the fund's board of trustees can be comprised of "interested persons" of the fund, as defined by Section 2(a)(19). *See* 15 U.S.C. §§ 80a-2(a)(19), 80a-10(a).

### 3. Harris's Advisory Fees

For its services, Harris receives a fee from each Fund, calculated as a percentage of that Fund's net assets at the end of the preceding month. *See* L.R. 56.1 Stmt. ¶ 8. The fee schedule is set forth as part of the management contract and is thus negotiated and approved each year by the trustees as required by the ICA provisions described above. *See id.* ¶ 9. The fee schedule for each of the Funds features "breakpoints," *i.e.*, asset levels at which the fees decline. *See id.* ¶ 10. In recent years, the annual contract renewal process has resulted in the initiation of additional breakpoints in the Funds' fee schedules – further decreasing the fee rate as the Funds grow in size. *See id.* ¶ 11. The following table summarizes the fee schedule for each of the Funds, as negotiated and approved by the trustees, including the additional breakpoints negotiated and approved by the trustees in recent years:

| The Oakmark Fund | Equity & Income Fund | Global Fund |
|---|---|---|
| First $2.0 billion under mgmt: 1.00% | First $5.0 billion under mgmt: 0.75% | First $2.0 billion under mgmt: 1.00% |
| Next $1.0 billion under mgmt: 0.90% | Next $2.5 billion under mgmt: 0.70% *(New breakpoint as of 11/1/03)* | |
| Next $2.0 billion under mgmt: 0.80% | Next $2.5 billion under mgmt: 0.675% *(New breakpoint as of 11/1/03)* | |
| Next $2.5 billion under mgmt: 0.75% | Next $2.5 billion under mgmt: 0.65% *(New breakpoint as of 11/1/2003)* | Next $2.0 billion under mgmt: 0.95% *(New breakpoint as of 11/1/2003)* |
| Next $2.5 billion under mgmt: 0.70% *(New breakpoint as of 11/1/2004)* | | |

| Net assets over $10 billion 0.65% (*New breakpoint as of 11/1/2004*) | Net assets in excess of $12.5 billion: 0.60% (*New breakpoint as of 11/1/2004*) | Net assets in excess of $4 billion: 0.90% (*New breakpoint as of 11/1/2003*) |
|---|---|---|

*See id.* ¶ 12. The applicable fees are fully disclosed to shareholders in the Funds' Statement of Additional Information, and the shareholders are able to redeem their shares at any time should they prefer to invest in a fund with lower fees. *See id.* ¶ 13.

### 4.     The Annual Negotiation and Approval of The Advisory Contract and Fees

The annual process of negotiating and approving Harris's fees pursuant to Section 15(c) of the ICA spans several months and involves multiple meetings between Harris and the trustees. *See id.* ¶ 14. Much of the trustees' information-gathering and analysis is completed by a Management Contracts Committee of the board, which then makes a recommendation to the full board for consideration. The Management Contracts Committee met five times over the course of five months in 2002, four times over the course of five months in 2003, and four times over the course of the six months prior to the filing of the complaint in this action in August 2004. *See id.* ¶ 15. The trustees are advised throughout this process by independent, outside legal counsel from the firm of Bell Boyd & Lloyd. *See id.* ¶ 16.

Each year, Harris provides to the trustees at their request information on a variety of topics: the services provided by Harris to the Funds in exchange for the fees; the Harris personnel providing those services; the investment performance of the Funds; the profitability of the contracts to Harris, including detailed information about Harris expenses; certain transactions between the Funds and entities affiliated with Harris (*e.g.*, Harris's affiliated broker); benefits accruing to Harris in addition to fees (*e.g.*, use of "soft dollars" to offset the cost of research services); and compliance information, including information about the best execution of portfolio transactions for each Fund, allocation of purchase and sale transactions among broker-dealers and compliance with the Funds' investment restrictions. *See id.* ¶ 17. These materials

are often referred to as "15(c) materials," because it is Section 15(c) of the ICA that mandates they be provided.

The trustees also commission a third-party industry consultant known as Lipper to provide certain requested data. The so-called "Lipper materials" include comparisons of the Oakmark Funds' investment performance and fees to those of a peer group of the Funds' competitors. *See id.* ¶ 18. Significantly, the investment performance figures in the Lipper materials are reported *net of the advisers' fees* – meaning that any differences among the advisory fee levels within the peer groups are taken into account in the performance comparisons. *See id.*

The 15(c) materials provided by Harris to the trustees describe in detail how, as investment adviser to the Funds, Harris provides continuing portfolio management services to the Funds and overall management of the Funds' business affairs and operations. The portfolio management services provided by Harris to the Funds include, among others, research, stock selection, portfolio construction, monitoring compliance with investment restrictions, investor conference calls and proxy voting. *See id.* ¶ 19. In addition to providing portfolio management services, Harris provides office space, equipment and personnel to the Funds. *See id.* ¶ 20. Harris also provides additional administrative services to the Funds, such as shareholder communications, including the preparation and distribution of quarterly reports and prospectuses; oversight of third-party service providers, including the transfer agent, custodian and other intermediaries; trustee support, including trustee education and the preparation of materials for board meetings; and risk management. *See id.* ¶ 21.

Harris also serves as investment adviser to a variety of non-mutual fund clients, including accounts of institutional investors and high net worth individuals. In addition, Harris contracts to

provide sub-advisory services to various mutual funds for which other investment advisers act as the primary adviser. *See id.* ¶ 22. Harris provides a spectrum of advisory services to these various non-mutual fund accounts and the fees charged to these accounts for the advisory services provided to them are generally different from the fees charged to the Funds. *See id.* ¶ 23. At the request of the trustees, the 15(c) materials also describe which of the services provided by Harris to the Funds are *not* provided to Harris's non-mutual fund clients. *See id.* ¶ 24.

**5.  Harris's Performance Record**

During and prior to the time period at issue in the case, the Funds at issue in this action have generated exceptional investment returns. The following comparisons of the Funds to their peer groups reflect relative performance *net of fees* – thus, any differences among the fees paid by the funds in the peer group are reflected in the net return figures, so that the trustees can compare the Funds *performance and fees* to those of comparable funds investing in the same asset classes on an apples-to-apples basis.

*The Oakmark Global Fund.* For the three year period ended March 31, 2004, the Global Fund generated an average annual return of 22.36% net of fees, the single best performance result of any of the 254 funds in its performance universe, as defined by Lipper. This return was far above its benchmark, the Lipper Global Fund Index, which had an average annual return during that period of 2.31%. *See id.* ¶ 27. The fund's average annual net return over the prior *four* year period[1] was 20.24%, again the single best performance result of any fund in its performance universe for this period, and far above its benchmark, which had an average annual *loss* of 4.8%. *See id.*

---

[1] Shares of the Oakmark Global Fund were first offered for sale on August 4, 1999, so a five year performance figure was not used in the 2004 Lipper report.

*The Oakmark Equity and Income Fund*.  For the three year period ended March 31, 2004 the Equity and Income Fund generated an average annual return of 12.49% net of fees, the third best performance during that three year period of the 445 funds in its performance universe, and far above its benchmark, the Lipper Balanced Fund Index, which had an average annual return of 3.76%.  *See id.* ¶ 25.  For the *five* year period ended March 31, 2004, the Equity and Income Fund's average annual net return of 13.91% was the single best performance result of any fund in its performance universe, and far above its benchmark figure of 3.11%.  *See id.*

*The Oakmark Fund*.  For the three year period ended March 31, 2004, the Oakmark Fund generated an average annual return of 6.22% net of fees, giving it a rank of 12 out of 307 funds in its Lipper performance universe, and placing it above its benchmark, the Lipper Large-Cap Value Index, which had an average annual return of 1.43%.  *See id.* ¶ 26.  For the *five* year period ended March 31, 2004, the fund's average annual net return was 5.29%, giving it a rank of 18 out of 224 funds in its performance universe, and above its benchmark figure of 1.22%. *See id.*

The Lipper materials also present data on fees in isolation from the net performance figures.  Each of the Funds was charged fees within the range that other investment advisers charged to funds determined by Lipper to be comparable for expense purposes.  The 2004 Lipper report shows total expenses for each Fund as follows:  Global Fund was 0.168% *below* the median for its peer group, the Equity and income Fund was 0.025% above the median for its peer group, and the Oakmark Fund was 0.174% above the median for its peer group.  *See id.* ¶ 18.

The Funds at issue in this action, along with the other Oakmark funds, have been consistently recognized by analysts as being among the very best performers in the mutual fund industry.  *Kiplinger's* magazine selected the Oakmark family as one of the ten best no-load fund

families on the market in August 2003 and named the Oakmark Fund as one of 25 "all-star" stock funds in May 2004. *See id.* ¶ 28. *Barron's* and *Money* magazine both named the Oakmark Fund and the Oakmark Equity and Income Fund to their lists of the world's top 100 mutual funds in August 2003. *See id.* ¶ 29. Fund industry analyst Lipper placed both the Oakmark Global Fund and the Oakmark Equity and Income Fund in its list of 35 funds that "provided consistently superior returns in their respective groups." *See id.* ¶ 30. In a survey analyzing "which fund companies put investors first," *Money* magazine gave the Oakmark family "top marks" for having "especially laudable or innovative policies." *See id.* ¶ 31. Fund industry analyst Morningstar selected William Nygren, the portfolio manager of the Oakmark Fund, as the industry's "Domestic Stock Manager of the Year" for 2001. *See id.* ¶ 32. A March 2004 survey by *SmartMoney* magazine named Mr. Nygren as one of the 11 top fund managers out of 11,000 under consideration. *See id.* ¶ 33. An August 2004 survey by *Barron's* named the managers of Equity and Income Fund (Clyde McGregor) and Global Fund (Michael Welsh) as the top managers in the industry for their respective investment objective categories. *See id.* ¶ 34.

## ARGUMENT

I.   **PLAINTIFFS MUST ADDUCE EVIDENCE THAT THE FEES CHARGED TO THE FUNDS WERE "SO DISPROPORTIONATELY LARGE" THAT THEY BEAR "<u>NO REASONABLE RELATIONSHIP</u> TO THE SERVICES RENDERED AND <u>COULD NOT HAVE BEEN</u> THE PRODUCT OF ARM'S-LENGTH BARGAINING."**

   A.   **Harris Is Entitled To Summary Judgment If Plaintiffs Fail To Adduce Evidence Sufficient To Allow The Trier Of Fact – The Court In This Case – To Find For Plaintiffs Under Section 36(b)**

Summary judgment is mandated whenever "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Reed v. Int'l Union of United Auto., Aerospace & Agr. Implement Workers of Am.*, 945 F.2d 198, 202 (7th Cir. 1991) (quoting Fed. R. Civ. P. 56(c)). It is the responsibility of the party opposing the motion for

summary judgment "to set forth specific facts demonstrating that there is a genuine issue for trial." *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991) (citing Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In so doing, the nonmovant cannot simply proffer evidence that is "merely colorable or is not significantly probative," *Anderson*, 477 U.S. at 249 (citations omitted); *NutraSweet Co. v. X-L Engineering Co.*, 227 F.3d 776, 784-85 (7th Cir. 2000), nor argue "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmovant also cannot raise "[f]actual disputes that are irrelevant or unnecessary." *Anderson,* 477 U.S. at 248. "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

**B.**  **The Test Under Section 36(b) Is Not Whether A Challenged Fee Was "Reasonable," But Instead Whether It Was "So Disproportionately Large That It Bears No Reasonable Relationship To The Services Rendered And Could Not Have Been The Product Of Arm's-Length Bargaining."**

The statutory provision at issue in both Counts I and II of plaintiffs' complaint is found in Section 36(b) of the ICA, which provides:

> [T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser.

15 U.S.C. § 80a-35(b). Section 36(b)(1) further provides that "the plaintiff shall have the burden of proving a breach of fiduciary duty."[2]

---

[2] The Seventh Circuit has left open the possibility of a Section 36(b) claim resting on an arrangement that is improper for reasons other than excessiveness, *Green v. Nuveen Advisory Corp.*, 295 F.3d 738, 743 n.8 (7th Cir. 2002), but it nonetheless requires that the breach of fiduciary duty must be with respect to the "receipt of fees and the compensation structure." *Id.* In any event, plaintiffs' two counts solely deal with an excessive fee claim. *See* Compl. ¶¶ 52-59; *see also* Memorandum Opinion, dated 7, 2005 ("Mem.

Courts addressing Section 36(b) claims uniformly apply the standard first articulated by the Second Circuit in *Gartenberg v. Merrill Lynch Asset Management, Inc.*: "the adviser-manager must charge a fee that is *so disproportionately large* that it bears *no reasonable relationship* to the services rendered and *could not have been* the product of arm's-length bargaining." 694 F.2d at 928 (emphasis added). Every court directly addressing such a claim – including courts in this District – has applied this standard. *See In re Nuveen Fund Litigation*, No. 94-C-360, 1996 WL 328006, at *14 (N.D. Ill. June 11, 1996); *McDonnell v. Allstate Life Ins. Co.*, No. 04-C-3076, 2004 WL 2392169, at *2 n.1 (N.D. Ill. Oct. 25, 2004).[3] Plaintiffs pled this standard in their Complaint, *see* Compl. ¶¶ 23, 53, and this Court articulated the standard as follows in its decision on Harris's motion to dismiss: Section 36(b) is violated *"only when the fee imposed is so disproportionately excessive* when compared to the services for which it pays that it *could not have been achieved through the arm's-length bargaining* expected from the

---

Op.") at 6-7 (plaintiffs' "excess profits" claim also addresses whether there was an "actionably disproportional relationship" between the fees paid and the services rendered"). To the extent plaintiffs allege other instances of impropriety, those allegations specifically relate to conduct governed by other parts of the Investment Company Act, and are addressed below. *See* Point III, *infra*.

[3] *Accord Migdal v. Rowe Price-Fleming, Int'l, Inc.*, 248 F.3d 321, 327 (4th Cir. 2001); *Meyer v. Oppenheimer Mgmt. Corp.*, 895 F.2d 861, 866 (2d Cir. 1990); *Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 409 (2d Cir. 1989); *In re AllianceBernstein Mut. Fund Excessive Fee Litig.*, No. 04 Civ. 4885(SWK), 2005 WL 2677753, at *4 (S.D.N.Y. Oct. 19, 2005); *Yameen v. Eaton Vance Distrib., Inc.*, No. CIV. A. 03-12437-DPW, 2005 WL 2709116, at *4 (D. Mass. Oct. 14, 2005); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 237 (S.D.N.Y. 2005); *ING Principal Protection Funds Derivative Litig.*, 369 F. Supp. 2d 163, 168 (D. Mass. 2005); *Gallus v. American Express Fin. Corp.*, 370 F. Supp. 2d 862, 865 (D. Minn. 2005); *Strigliabotti v. Franklin Resources, Inc.*, No. C-04-00883-SI, 2005 WL 645529, at *3 (N.D. Cal. Mar. 7, 2005); *Pfieffer v. Bjurman, Barry & Assocs.*, No. 03-Civ.-9741-DLC, 2004 WL 1903075, at *4 (S.D.N.Y. Aug. 26, 2004); *Yampolsky v. Morgan Stanley Investment Advisers, Inc.*, No. 03-Civ.-5710(RO), 2004 WL 1065533, at *1 (S.D.N.Y. May 12, 2004); *Benak v. Alliance Capital Mgmt. L.P.*, No. Civ. A. 01-5734, 2004 WL 1459249, at *6 (D.N.J. Feb. 9, 2004); *Miller v. Mitchell Hutchins Asset Mgmt., Inc.*, No. 01-CV-00192DRH, 2003 WL 24260305, at *2 (S.D. Ill. Mar. 6, 2003); *Strougo v. BEA Assocs.*, 188 F. Supp. 2d 373, 383 (S.D.N.Y. 2002); *Migdal v. Rowe Price-Fleming, Int'l, Inc.*, No. AMD 98-2162, 2000 WL 350400, at *2 (D. Md. Mar. 20, 2000); *Levy v. Alliance Capital Mgmt. LP*, No. 97-Civ.-4672(DC), 1998 WL 744005, at *2 (S.D.N.Y. Oct. 26, 1998); *King v. Douglass*, 973 F. Supp. 707, 722 (S.D. Tex. 1996); *Wexler v. Equitable Capital Mgmt. Corp.*, No. 93-Civ.-3834 (RPP), 1994 WL 48807, at *4 (S.D.N.Y. Feb. 17, 1994); *Krinsk v. Fund Asset Mgmt., Inc.*, 715 F. Supp. 472, 486 (S.D.N.Y. 1988); *Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 663 F. Supp. 962, 972 (S.D.N.Y. 1987).

fiduciary." Mem. Op. at 4 (emphases added) (Kocoras, C.J.) (citing *Gartenberg*, 694 F.2d at 928).

In enacting Section 36(b), Congress was explicit that "the court is not authorized 'to substitute its business judgment for that of the mutual fund's board of directors in the area of management fees.'" *Gartenberg*, 694 F.2d at 928 (quoting S. Rep. No. 91-184 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897 ("Senate Report")). As the Seventh Circuit has held, Section 36(b) was *not* passed "to fundamentally revise the system" of the investment company industry. *Green*, 295 F.3d at 743 (citing *Green v. Fund Asset Mgmt., L.P.*, 286 F.3d 682 (3d Cir. 2002); H.R. Rep. No. 91-1382 (1970) ("[T]he enactment of [Section 36(b)] was not 'intended to provide a basis . . . to undertake a general revision of the practices or structures of the investment company industry.'")); *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 528 F. Supp. 1038, 1045 (S.D.N.Y. 1981), *aff'd Gartenberg*, 694 F.2d 923 (according to the Senate Report, "'Th(is) section is not intended to shift the responsibility for managing an investment company in the best interest of its shareholders from the directors of such company to the judiciary'"). Instead, "Congress enacted Section 36(b) to provide a narrow federal remedy that 'is significantly more circumscribed than common law fiduciary duty doctrines.'" *Green*, 295 F.3d at 743 (citation omitted). Given such congressional intent, the court in *Green v. Nuveen Advisory Corp.*, No. 97-C-5255, 2001 WL 1035652 (N.D. Ill. Sept. 10, 2001), held that the board of trustees' "undisputed approval militates strongly against the contention that the advisors have breached their fiduciary duty to the funds or their shareholders." *Id.* at *6 (quoting *Green v. Fund Asset Mgmt., L.P.*, 147 F. Supp. 2d 318, 332 (D.N.J. 2001)).

Nor did Congress intend "[t]hat management fees should be tested on whether they are 'reasonable.'" *Gartenberg*, 528 F. Supp. at 1046; *accord id.* at 1047 ("[I]n order to provide

relief under Section 36(b), it is not enough for this Court to find that a better bargain was possible."). Accordingly, the question before the Court is not whether the trustees arrived at "reasonable" fees or cut the best deal possible, but rather "whether the fee schedule represents a charge *within the range* of what would have been negotiated at arm's-length in the light of all the surrounding circumstances." *Gartenberg*, 694 F.2d at 928 (emphasis added); *accord In re Nuveen Fund Litigation*, No. 94-C-360, 1996 WL 328006 (N.D. Ill. June 11, 1996); *see also Schuyt*, 663 F. Supp. at 972 ("The Senate Report also indicates that the investment adviser is entitled to make a profit.").[4] In asserting claims under Section 36(b), plaintiffs have assumed a very high burden of proof – one they cannot meet here for purposes of avoiding summary judgment.

## II.  PLAINTIFFS HAVE FAILED TO ADDUCE EVIDENCE SUFFICIENT FOR THE COURT TO FIND THAT THE FUND PAID EXCESSIVE FEES IN VIOLATION OF SECTION 36(B)

### A.  The Undisputed Record Of Harris's Fees And The Services Rendered To The Funds Defeats Plaintiffs' Claims Under Section 36(b)

Plaintiffs' claims for excessive fees under Section 36(b) fail as a matter of law. The record in this case, including the expert reports, does not admit a genuine factual dispute as to the ultimate question under Section 36(b) – whether the fees are "so disproportionately large" that they bear "no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Gartenberg*, 694 F.2d at 928. As set forth above in the Statement of Facts, there is no dispute regarding the following key facts: (i) the Funds' history of exceptional net investment returns and the accolades received by the Funds and their managers from industry analysts during the 2003-04 time period; (ii) the fees Harris was

---

[4] Congress further made clear that "'[n]othing in this bill is intended to . . . suggest that a 'cost-plus' type of contract would be required. It is not intended to introduce general concepts of rate regulation as applied to public utilities.'" *Gartenberg*, 528 F. Supp. at 1045 (quoting Senate Report at 6-7); *Krinsk*, 715 F. Supp. at 485 (same); *Schuyt*, 663 F. Supp. at 972 (same).

receiving and the fact that the fee schedules included breakpoints that diminished the fee levels as assets grew; (iii) the fact that the independent trustees not only approved the fees annually, but also negotiated additional breakpoints for the Funds in each of 2003 and 2004; and (iv) the detailed information received by the trustees – including from third-party analyst Lipper – comparing the Funds' *net* investment performance and fees to those of similar funds in their respective peer groups on a true apples-to-apples basis. *See* L.R. 56.1 Stmt. ¶¶ 10-12, 14, 17-18, 25-34. Nothing in this undisputed record permits the required inference that the fees were grossly unreasonable or not fairly negotiated.

Plaintiffs' six expert reports virtually ignore these facts and the governing standard. Whereas Section 36(b) requires plaintiffs to prove some gross disproportion between the advisory fees and the services rendered for those fees, plaintiffs nowhere undertake such an analysis. Plaintiffs do not purport to measure the value of the services rendered by Harris in absolute or relative terms, or to compare the value of those services to the fees paid for them. Indeed, the relevant apples-to-apples comparison in this regard is a juxtaposition of the Funds' fees and net investment performance (which accounts for any differences in fees) to those of similar mutual funds investing in the same asset classes – the very information provided in the Lipper materials commissioned by the Oakmark independent trustees each year. Plaintiffs raise no challenge to the accuracy or validity of the voluminous and detailed data provided by Lipper or to the legitimacy of the independent trustees' reliance on such data in negotiating and approving Harris's fees. Nor do the plaintiffs attempt to explain how a negotiation that led to the introduction of additional breakpoints in both 2003 and 2004 reflects something other than a robust process.

Instead, plaintiffs seek to prove their case by drawing legally and logically irrelevant comparisons between mutual fund fees and fees paid on *other* types of accounts, by quibbling with aspects of the fee negotiation process that plaintiffs believe should have been handled differently, and by suggesting additional pieces of information they believe the trustees should have considered. *See* Expert Report of Steve Pomerantz ("Pomerantz Rep."), attached as Ex. 24 to Blais Decl., at 4-6, 15-25; Expert Report of James D. Lamb ("Lamb Rep."), attached as Ex. 25 to Blais Decl., at 3, 17-22; Expert Report of Edward S. O'Neal ("O'Neal Rep."), attached as Ex. 26 to Blais Decl., at 17-20. Such proffers fail to articulate a genuine issue of triable fact on the material question: whether the fees resulting from the negotiations between the advisor and trustees were *so un*reasonable that they evince no hint of a good faith negotiation. Because plaintiffs cannot show a genuine material issue of triable fact on this question, summary judgment is warranted.

**B. Comparison Of Mutual Fund Fees To Non-Mutual Fund Fees Is Irrelevant As A Matter Of Law, And Plaintiffs Have Shown No Factual Predicate Of Comparability**

"Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute." *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971 (7th Cir. 1996) (citing *Anderson*, 477 U.S. at 248); *accord Fanslow v. Chicago Mfg. Center, Inc.*, 384 F.3d 469 (7th Cir. 2004) ("[T]he substantive law will identify which facts are material and only disputes over facts that might affect the outcome of the suit under the governing law properly preclude the entry of summary judgment."). Any comparisons plaintiffs make between the fees Harris received from the mutual funds and the fees it charges to its non-mutual fund clients – such as pension funds or other fund advisers for which Harris acts as sub-adviser – are legally irrelevant to the Section 36(b) claim at issue here under well-established authority. And the record reflects no competent

evidence demonstrating a factual predicate for plaintiffs' assertion that Harris is charging these other clients different fees for the same services.

When the *Gartenberg* court recognized "comparative fee structures" as a factor courts may consider in determining whether a fee is grossly disproportionate, it limited the categories of comparisons that would be useful to such an analysis. Soundly rejecting any comparisons to non-mutual fund clients, the court held:

> Appellants' argument that the lower fees charged by investment advisers to large pension funds should be used as a criterion for determining fair advisory fees for money market funds must also be rejected. The nature and extent of the services required by each type of fund differ sharply.

*Gartenberg*, 694 F.2d at 930 n.3; *accord Gartenberg*, 528 F. Supp. at 1048. Among other reasons, the district court noted that this conclusion was consistent with the intent of Congress that mutual fund fees be evaluated in light of "industry practice" and "industry level of management fees." *Id.* at 1046.

Since *Gartenberg*, courts have consistently held that the relevant benchmark for measuring fees charged is *other comparable mutual funds* – here, actively-managed equity mutual funds of similar sizes pursuing similar investment objectives – and *not non-mutual fund accounts*. In fact, in a virtually identical Section 36(b) case brought by the same plaintiffs' lawyers and involving the same type of funds, *Baker v. American Century Investment Mgmt., Inc.*, No. 04-4039-CV-C-ODS (W.D. Mo. July 17, 2006) ("*American Century*"), the court precluded the presentation of any evidence relating to the defendants' management of non-mutual fund accounts. In so ruling, the court held that "such evidence is irrelevant to Plaintiffs' claims involving mutual fund fees under Section 36(b) of the Investment Company Act." *See American Century* Order at 1 (Blais Decl. Ex. 23); *accord Strougo*, 188 F. Supp. 2d at 384 (in

challenge to fees of equity-based retail mutual funds, court held that "relevant comparison must be to other mutual funds, not to non-mutual fund institutional clients").[5]

Instead, as numerous courts have recognized, the one relevant comparison is between the investment management fee paid by the Oakmark Funds and the fees paid by comparable funds providing similar services – the very information considered by the Oakmark trustees in the comparative analysis they commissioned from Lipper. *See* L.R. 56.1 Stmt. ¶ 18; *American Century* Order at 1; *Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222, 1237 (S.D.N.Y. 1990) ("[A] mutual fund adviser-manager must be compared with members of an appropriate universe: adviser-managers of similar funds."); *Schuyt*, 663 F. Supp. at 980 n.53 (in comparing defendants' money-market fund fee with the fee of the money-market fund in *Gartenberg*, court held that "the appropriate analysis is a comparison at equivalent size levels"); *Krinsk*, 715 F. Supp. at 496-97 ("[F]ee comparisons of this Fund [which is part of a central asset account] to funds that are part of central asset accounts are more relevant than comparisons to stand-alone funds [b]ecause stand-alone funds differ from central asset accounts in their services to shareholders and in their role as a vehicle for holding a customer's assets.").

---

[5] *See also Batra v. Investors Research Corp.*, 144 F.R.D. 97, 98-99 (D. Mo. 1992) (allowing plaintiffs to gather information on non-mutual fund account fees for purposes of discovery, but noting that such information would not be permitted "at trial" since "advisory fees from dissimilar clients such as pension funds are not relevant for comparative purposes"); *Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222, 1237 (S.D.N.Y. 1990) (in challenge to fees of fixed income fund, court gave "no weight to plaintiffs' comparisons of the Fund's profitability with a wide range of different sorts of companies"); *Schuyt*, 663 F. Supp. at 963 n.4, 974 n.38 (rejecting attempt by plaintiffs' expert to "compare the fees charged by the Adviser to the Fund to fees charged by the Adviser to its private counsel accounts [a type of institutional account]"); *Bromson v. Lehman Management Co.*, No. 84-Civ.-7795 (JFK), 1986 WL 165, *2-3 & n.1 (S.D.N.Y. 1986) ("just as a comparison of money market funds to pension funds entailed . . . a comparison of apples to oranges [in *Gartenberg*], so would comparison of individual accounts add a comparison of pears to the recipe"). *Cf. In re AllianceBernstein Mut. Fund Excessive Fee Litig.*, No. 04-civ-4885, 2006 WL 1520222 (S.D.N.Y. May 31, 2006) (refusing leave to amend complaint with new Section 36(b) claim based in part on "fee discrepancies for institutional and retail clients," noting that an independent report disclosed that "the fee differential reflects, among other things, different services provided to such clients, and different liabilities assumed").

-18-

Here, that comparison establishes the facial reasonableness of the fees that Harris charges to the three Funds at issue, in particular given their respective performance. Thus, for example, Harris charges the Global Fund a management fee of 1.00%, which is equal to the median of the fees charged to similar international mutual funds, while the fund's total expense level of 1.281% is *below* the median for its Lipper expense group (1.449%). *See* L.R. 56.1 Stmt. ¶ 18. In other words, a majority of comparable international funds into which shareholders like the plaintiffs could invest charge *more* than Harris charges to the Oakmark Global Fund. Yet this fund also has produced investment returns that rank it *first* in its performance category of hundreds of funds for the one-, three- and four-year periods leading up to the period at issue in this case. *See id.* ¶ 27. Again, simply put, and *net* of fees, investors realized on average over 25% *more* by investing in the Oakmark Global Fund than they could have in any average international fund, and they would have paid more of their returns in fees. Given that performance and fee rate, it is hard to imagine that an independent trustee could not reasonably determine that the fee charged falls comfortably within the range of what an investment adviser could fairly charge to produce such performance; indeed, a trustee might equally fairly conclude that paying a premium for consistently superior performance was justified. But if on that basis the fee that Harris charges is objectively reasonable, it self-evidently is not so *un*reasonable as to violate the adviser's fiduciary obligation under Section 36(b).[6]

Yet *nowhere* do plaintiffs adduce evidence comparing the advisory fees paid by the Funds to the fees paid by comparable funds providing similar services, or calling into question the Lipper studies reviewed by the trustees on this very topic. Nor do plaintiffs make any

---

[6] To be sure, comparative fees charged to other similar mutual funds is not *necessarily* dispositive. The prices charged by other advisers to similar funds does not – *per se* – establish the "free and open market level for fiduciary compensation." *Gartenberg*, 694 F.2d at 929. But in this case, the significance of this factor cannot be overlooked in view of the plaintiff's failure to supply *any* evidence tending to rebut the conclusion of objective reasonableness.

comparison between the services performed for the funds and the services performed for non-mutual fund accounts. The record reflects the information provided to the trustees regarding the significant differences between the services provided to the mutual funds and non-mutual fund clients. *See* L.R. 56.1 Stmt. ¶¶ 22-24. Plaintiffs have produced no evidence to rebut these facts. They simply ignore them and instead compare the fees Harris charges to non-mutual funds without any references to the differences in services. *See* Pomerantz Rep. at 4-6, 15-25; Lamb Rep. at 3, 17-22; O'Neal Rep. at 17-20. This apples-to-oranges comparison is both legally and logically irrelevant, and should not be considered by the Court.

Even if a comparison of mutual fund fees to non-mutual fund account fees could be relevant as a matter of law, plaintiffs in this case have failed to establish a factual predicate to make such a comparison useful – that is, that the services are comparable. Plaintiffs cannot dispute the fact that Harris provided the trustees with detailed information regarding the *differences* in the services between the mutual funds and other clients, justifying the fee differential. *See* L.R. 56.1 Stmt. ¶ 24. Instead, plaintiffs rely on purported expert opinions that the services provided by Harris to the funds and the institutional clients are substantially the same based on nothing more than counsel's say-so and a rudimentary review of contractual language. Plaintiffs' damages expert, accountant James Lamb, based his damages calculation on the assumption of similar services under the different contacts. Lamb conceded at deposition that he had no more knowledge of the mutual fund industry at the outset of the case than the average fund investor, and that he based his assumption of similarity on the say-so of plaintiffs' counsel and his review of the contracts. *See* Dep. Tr. of James D. Lamb ("Lamb Dep."), attached as Ex. 27 to Blais Decl., at 21-22, 28, 33-35, 115, 157-67. An opinion based on nothing within an expert's area of expertise cannot create a genuine issue of fact.

**C.** **Plaintiffs' Evidence Relating To The So-Called *"Gartenberg* Factors" Raises No Genuine Issue Of Material Fact Under Section 36(b) As To The Fees Being The Product Of Arm's-Length Bargaining**

Beyond the comparison of fund fees to non-fund fees, the plaintiffs point to evidence relating to the so-called *"Gartenberg* factors," a non-exclusive list of factors that courts can consider as an aid in determining if an allegedly excessive fee exceeds the relevant standard – *i.e.*, that it is "so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." The *Gartenberg* court provided the following list of such factors: (a) the nature and quality of services provided to fund shareholders; (b) comparative fee structures; (c) economies of scale; (d) fall-out benefits; (e) the profitability of the fund to the adviser-manager; and (f) the independence and conscientiousness of the trustees. *See Gartenberg*, 694 F.2d at 929-30. These "factors" do not *establish* the standard, they simply supply a rubric for measuring whether the standard is met.

Nothing in the plaintiffs' *Gartenberg* factor evidence creates an issue of material fact under the governing standard. The Statement of Facts above summarizes the undisputed record regarding the robust annual fee negotiation process between Harris and the Oakmark independent trustees, the wide-ranging information provided to the trustees by Harris and third-party consultants in this process, and the resulting negotiated fee levels that decline as assets grow. *See* L.R. 56.1 Stmt. ¶¶ 10-18, 22-24. Plaintiffs can point to nothing approaching a fundamental flaw or failing in this process or in the resulting level of the fees relative to other funds – in short, nothing that could support an inference of "bad faith" or gross disproportion between the fees and the services rendered. Each *Gartenberg* factor is considered in turn below.

**1.** **Plaintiffs Do Not Challenge The Voluminous Data Reviewed By The Trustees Regarding The "Nature And Quality Of Services" Provided By Harris To The Funds**

With respect to the "nature and quality of services" factor, it is undisputed that the

independent trustees were provided with voluminous data reflecting what the shareholders receive in return for their fees – including reports of the Funds' exceptional net investment performance relative to benchmarks and other mutual funds, industry experts' analysis of the quality of the Funds' performance, detailed descriptions of the services provided by Harris to the Funds and the shareholders, the Harris personnel providing those services, detailed information about Harris expenses, certain transactions between the Funds and entities affiliated with Harris (*e.g.*, Harris's affiliated broker), benefits accruing to Harris in addition to fees (*e.g.*, use of "soft dollars" to offset the cost of research services), and compliance information, including information about the best execution of portfolio transactions for each Fund, allocation of purchase and sale transactions among broker-dealers and compliance with the Funds' investment restrictions. *See* L.R. 56.1 Stmt. ¶ 17. Plaintiffs adduce no evidence to call into question the accuracy or thoroughness of this information – which is compiled at the request of the trustees by Harris and third party industry consultants – or the exceptional net investment performance achieved by Funds. Plaintiffs can point to no disputed issue of *material* fact suggesting that this process *could not* have been an arm's-length one.

**2. Plaintiffs' "Comparative Fee Structure" Analyses Focus On An Irrelevant Comparison Between Mutual Fund Fees And Non-Mutual Fund Fees, And They Ignore The Data Considered By The Trustees Comparing The Oakmark Funds To Comparable Mutual Funds**

As discussed at length above, plaintiffs' evidence on the "comparative fee structures" factor focuses on how the Funds' fees compare to fees paid by non-mutual fund clients. *See* Pomerantz Rep. at 4-6, 15-25; Lamb Rep. at 3, 17-22; O'Neal Rep. at 17-20. Not only is plaintiffs' comparison legally irrelevant, it also ignores the undisputed fact that the Oakmark trustees receive extensive data comparing the Funds' fees to a *relevant* peer group – competitor mutual funds of a similar size that pursue the same investment objectives through active

management.  *See* L.R. 56.1 Stmt. ¶ 18.  In negotiating the Funds' fees each year, the independent trustees engage a third-party industry consultant, Lipper, to compile detailed data on how the Funds' fees compare with those of the relevant mutual fund peer group.  *See id.* Plaintiffs raise no challenge to the accuracy or thoroughness of these comparative data or the diligence with which the trustees considered the data.  Indeed, plaintiffs say nothing about how the Funds' fees compare to those of any of the mutual funds in the peer group.  Plaintiffs can point to no disputed issue of material fact suggesting that this process *could not* have been an arm's-length one.

### 3. Plaintiffs' Expert Evidence On "Economies Of Scale" Ignores The Fact That The Fund Fees Decrease As The Funds Grow In Size And Have Decreased Over Time

The parties have served competing expert reports regarding whether Harris is or is not achieving "economies of scale" in running the Funds – that is, whether the per-unit cost of managing the Funds decreases as the Funds get larger in size.  But technical disagreements among the experts over how to derive this elusive measurement do not create a genuine dispute over a material fact under the "so disproportionately large" standard.  It is undisputed that the Funds have "breakpoints" that cause the fees to drop as the Funds grow in size, and that the applicable advisory fee rates negotiated by the trustees and paid by the Funds have decreased over time.  *See* L.R. 56.1 Stmt. ¶ 10.  Plaintiffs and their experts make no attempt to explain why these decreasing fees do not adequately pass along to shareholders any "economies of scale" supposedly being achieved by Harris in running the Funds.  Plaintiffs have the burden of proving gross disproportion between the fees and the value of the services, including a *quantification* of the relevant costs and benefits.  *See Gartenberg v. Merrill Lynch Asset Management, Inc.*, 740 F.2d 190, 192 (2d Cir. 1984) ("[T]he plaintiff bears the burden of quantifying the relevant costs and benefits.").  They cannot satisfy this burden for purposes of summary judgment by offering

expert testimony on only half of the relevant analysis – that is, purporting to show decreasing costs while ignoring whether those decreases are matched by falling fees. Such a one-sided analysis provides the Court no reasonable basis to conclude that the fees are so disproportionately excessive that they could not have been the result of arm's-length negotiation.

### 4. The "Fall-Out Benefits" Raised By Plaintiffs Were Fully Disclosed To The Trustees

So-called "fall-out benefits" are benefits incidental to fees that accrue to the benefit of the adviser as a result of the advisory relationship. Plaintiffs' expert discussion of fall-out benefits focuses only on the use of "soft dollars", which refers to an arrangement in which the adviser directs fund brokerage transactions to a particular broker and, in exchange, obtains research services from that broker for free or at a reduced price. *See* Expert Report of Mercer E. Bullard ("Bullard Rep."), attached as Ex. 28 to Blais Decl., at ¶¶ 69-77. It is undisputed that soft dollar arrangements are completely legal and common in the industry, and that Harris provides the Oakmark trustees with a regular report of its soft-dollar arrangements. *See* L.R. 56.1 Stmt. ¶ 17. Harris also provides the independent trustees with a report expressly addressing the fall-out benefits it believes it enjoys as a result of the advisory relationship. *See id.* Plaintiffs have adduced no evidence to suggest that the independent trustees did not consider these reports and take them into account when negotiating the advisory fees with Harris.

### 5. Plaintiffs' Challenge To The Trustees' Profitability Report Does Not Quantify The Effect Of Any Supposed Failings In The Report

Plaintiffs' accounting expert, James Lamb, challenges the accuracy of the profitability report submitted by Harris to the independent trustees based on supposed failings in Harris's internal cost accounting system. *See* Lamb Rep. at 2, 7-13. According to Lamb, the way in which Harris allocates its costs across the Funds is not sufficiently precise and therefore leads to a "distortion" in the fund-by-fund profitability reported to the independent trustees as part of the

fee negotiations. *See id.* at 2, 12-13. But Lamb conceded at deposition that he made no effort to quantify the level of his supposed distortion. *See* Lamb Dep. at 76-77 ("I was unable to [quantify the degree of distortion] with the data that was available."). Thus, while the parties' respective accounting experts disagree over the adequacy of Harris's internal cost accounting procedures, plaintiffs adduce no evidence suggesting the degree of actual *impact* these supposed accounting failures have on the information provided to the trustees or on the fee negotiations. Simply asserting that there was more or different information plaintiffs believe the trustees should have had does not allow an inference of a bad faith or tainted negotiation process.

> **6.      Beyond Their Challenge To The Independent *Status* Of The Trustees, Plaintiffs Raise No Substantive Challenge To The Independence And Diligence Of The Trustees' *Performance* In Negotiating Fees.**

Plaintiffs' attack on the independence of the trustees, discussed more fully in Point III below, is based not on the results of their actual performance in the fee negotiation process, but instead on their alleged lack of independent *status* due to former employment relationships, deferred compensation, and common investments. Plaintiffs' experts argue that these status issues leave the independent trustees tainted and constitutionally incapable of engaging in a fair process. Thus, the experts regarding trustee independence did not undertake an analysis of how the fee negotiation process actually played out – in particular, the resulting level of fees negotiated by the trustees. *See, e.g.,* Dep. Tr. of Tamar Frankel ("Frankel Dep."), attached as Ex. 29 to Blais Decl., at 31 ("Q. Did you make any inquiry as to the manner in which these trustees conducted their negotiations with Harris? A. It is again not relevant."). Indeed, plaintiffs have nothing to say about the fact that the Oakmark trustees have negotiated aggressively with Harris to bring about additional fee decreases in recent years. *See* L.R. 56.1 Stmt. ¶ 11. Plaintiffs' challenge to the independent *status* of the trustees fails as a matter of law for the reasons set forth in Points III.D and III.E below. Given the plaintiffs' lack of any substantive evidence

challenging the adequacy of the negotiation process, there can be no genuine issue of material fact suggesting that this process could not have been arm's-length.

At bottom, plaintiffs have provided no reason of substance for the Court to question the soundness of the fee negotiation and approval process undertaken by the trustees or to conclude that the resulting fee schedules are not "within the range" of what would be negotiated at arm's-length. Given the plaintiffs' heavy burden in proving an excessive fee claim, they cannot demonstrate a triable issue of material fact.

### III.   PLAINTIFFS' ALTERNATIVE THEORIES OF LIABILITY ARE GOVERNED BY PROVISIONS OF THE INVESTMENT COMPANY ACT OTHER THAN SECTION 36(b), AND CANNOT FORM THE BASIS FOR A CLAIM IN THIS CASE

Section 36(b) provides a narrow statutory remedy, and courts have repeatedly recognized that a Section 36(b) claim does not extend to common law fiduciary duty breaches or provide a vehicle for enforcement of other provisions of the ICA not directly related to excessive fees. Thus, shareholders may not dress up other violations of the ICA as a Section 36(b) claim merely by labeling it as a breach of fiduciary duty and alleging some tangential connection to the advisory fee. *See Mutchka v. Harris*, 373 F. Supp. 2d 1021, 1025 (C.D. Cal. 2005) ("[T]o conclude that *any* fee is excessive merely because investment advisers allegedly have breached some other fiduciary duty is inconsistent with the meaning of the statute."); *Forsythe v. Sun Life Financial, Inc.*, 417 F. Supp. 2d 100, 115 (D. Mass. 2006) ("[Section] 36(b) is not a general vehicle for bringing claims for any and all purported breaches of fiduciary duty; claims under the statute must allege some connection between the wrongs alleged and excessive compensation of an investment adviser or affiliated person.").

Nor can plaintiffs imply private rights of action where the statute clearly does not so provide. *See Alexander v. Sandoval*, 532 U.S. 275, 286-287 (2001) ("The judicial task is to

interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy. Statutory intent on this latter point is determinative. Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute.") (internal citations omitted). In their expert reports, plaintiffs raise a number of theories of wrongdoing by Harris that cannot form the basis for a Section 36(b) claim or any other claim by shareholders under the ICA, and these theories fail as a matter of law.

### A. Payment of Allegedly Inappropriate Brokerage Commissions By The Funds To An Affiliated Broker Is Not Actionable Under Section 36(b), As These Transactions Are Governed By ICA Section 17

Plaintiffs' expert, Mercer Bullard, proposes a novel legal theory – that Harris violated its fiduciary duty as to advisory fees under Section 36(b) by the way it handled execution of the Oakmark Funds' portfolio transactions. *See* Bullard Rep. at ¶¶ 30-36. Plaintiffs fault Harris for having certain of those trades handled by Harris Associates Securities, which is an affiliate of Harris. *See id.* Execution of fund trades through a broker affiliated with the adviser is expressly permitted by Section 17 of the ICA, provided certain conditions are met, and the Funds' investment advisory contracts with Harris expressly authorize Harris to utilize its affiliated broker to execute the Funds' transactions. *See* 15 U.S.C. § 80a-17(e); L.R. 56.1 Stmt. ¶ 35. Pursuant to rules promulgated under Section 17, such "affiliated transactions" are reported to the Funds' independent Trustees for their approval. *See* L.R. 56.1 Stmt. ¶ 17.

Congress provided that affiliated transactions governed by Section 17 *could not* form the basis of a fiduciary duty claim under Section 36(b). A Section 36(b) breach claim "shall not apply to compensation or payments made in connection with transactions subject to Section 17 of this title [15 USC §80a-17], or rules, regulations, or orders thereunder." 15 U.S.C. § 80a-35(b)(4). It is clear from the face of the statute that "the rights and remedies under section 17

and section 36(b) are intended to be mutually exclusive." *Lessler v. Little*, 857 F.2d 866, 874 (1st Cir. 1988). Thus, plaintiffs' assertions of improper affiliated transactions fall under Section 17 and cannot form the basis for a Section 36(b) claim.

Moreover, there is no private right of action for purported violations of Section 17 of the Act. As the Supreme Court has held, where Congress has expressly created a private right of action in other sections of the same statute, "it is highly improbable that Congress absentmindedly forgot to mention an intended private action." *Transamerica Mtg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 20 (1979). This especially holds true for the ICA, in which "Congress expressly authorized private suits for damages in prescribed circumstances [such as Section 36(b)]. . . . Obviously, then, when Congress wished to provide a private damages remedy, it knew how to do so and did so expressly." *Id.* at 20-21; *see also DH2 v. Athanassiades*, 359 F. Supp. 2d 708, 714-15 (N.D. Ill. 2005) (finding no private right of action under Section 17(j) of the ICA).

### B. Allegedly Inappropriate "Distribution" Payments By The Funds To Third-Party Intermediaries Are Governed By ICA Section 12(b) And Are Not Actionable Under Section 36(b)

Plaintiffs also assert that Harris violated its fiduciary duties under Section 36(b) by allowing the Funds to make payments to third-party intermediaries, such as Schwab or Fidelity, supposedly in violation of Section 12(b) of the ICA. *See* Bullard Rep. ¶¶ 37-47.[7] Plaintiffs contend that these payments by the Funds in fact comprise illegal "distribution" payments under Section 12(b), which provides that payments of fund assets for the sale of fund shares may only

---

[7] These third-party intermediaries are entities that generally provide an integrated suite of services to their retail investor clients including, for example, investment and tax reporting and answering investors' questions. These services, if not performed by these intermediaries, would be performed instead by the Funds' transfer agent – for which the Funds would pay the transfer agent a fee. Accordingly, Harris and the Funds have arrangements whereby the Funds and Harris pay the intermediaries for performing these administrative services, with the Funds' payments limited to the amount they would otherwise pay the transfer agent.

be made pursuant to a formal "12b-1" plan approved by the trustees. *See* Bullard Rep. ¶¶ 42-47. The Funds' payments to these intermediaries, however, are irrelevant in determining whether the fees received by Harris are disproportionately excessive. Plaintiffs adduce no evidence or legal precedent that remotely suggests that the Funds' payment to intermediaries for administrative services equates to a violation of Section 36(b). Rather, plaintiffs' argument is an attempt to dress up a Section 12(b) argument as a Section 36(b) violation.

As a matter of law, plaintiffs' allegations of Section 12(b) violations cannot form the basis for a Section 36(b) claim. Under Section 36(b), the adviser is "deemed to have a fiduciary duty" only "with respect to the *receipt* of compensation ... or of payments" paid by the funds "*to such investment adviser* or any affiliated person of such investment adviser." 15 U.S.C. § 80a-35(b) (emphasis added). Plaintiffs have no basis to argue that Harris breached this duty by means of payments from the Funds to third parties, which have no connection to the fees received by Harris. *See In re Eaton Vance Mut. Funds Fee Litigation*, 380 F. Supp. 2d at 236 (§ 36(b) only applies to payments made to an affiliated person of the investment adviser); *In re Salomon Smith Barney Mut. Fund Fees Litigation*, ___ F. Supp. 2d ____, 2006 WL 2085979, at *15 (S.D.N.Y. Jul. 26, 2006) ("Payments to broker-dealers, however, fall outside of § 36(b)."). Plaintiffs have not suggested any way in which payments from the Funds to third parties reflect or contribute to allegedly excessive advisory fees being paid to Harris. *See Stegall v. Ladner*, 394 F. Supp. 2d 358, 375 (D. Mass. 2005) ("[A] claim under § 36(b) must connect itself in some reasonably direct way to the excessiveness of fees charged.").

Moreover, allegedly improper "distribution" payments are governed by Section 12(b) of the ICA – as to which there is no direct private right of action.[8] Courts uniformly refuse to read

---

[8] Rather, the section begins with the phrase "[i]t shall be unlawful . . . ." 15 U.S.C. § 80a-12(b). As the court observed in *Olmsted v. Pruco Life Ins. Co.*, 283 F.3d 429 (2d Cir. 2002), analyzing an identical

into Section 12(b) an implied private right of action. *See Strigliabotti v. Franklin Resources, Inc.*, No. C-04-00883-SI, 2005 WL 645529, at *5 (N.D. Cal. Mar. 7, 2005); *Gallus*, 370 F. Supp. 2d at 868.

### C. There Is No "Common Law" Excessive Fee Claim That Supplements The Statutory Claim Under Section 36(b) of the ICA

The expert report of Mr. Bullard suggests that a claim for a "common law" breach of fiduciary duty against a fund adviser for excessive fees exists separate and apart from a Section 36(b) claim. *See* Bullard Rep. ¶¶ 179-190. This novel theory has no legal basis. The fiduciary duty – and the attendant right of action to claim breach – created in Section 36(b) is a shareholder's *only* portal to asserting a claim of excessive fees against an investment adviser. *See Green*, 286 F.3d at 685 (contrasting Section 36(b) with common law doctrines and quoting S. Rep. No. 91-184 (1969), *reprinted* in 1970 U.S.C.C.A.N. 4897, 4898, 4903, "The unique structure of mutual funds has made it difficult for the courts to apply traditional fiduciary duty standards in considering questions concerning management fees," and § 36(b) was designed "to provide a means by which the Federal courts can effectively enforce the *federally-created fiduciary duty* with respect to management compensation" (emphasis added)). Plaintiffs, therefore, can point to no legal authority that creates a claim of breach of fiduciary duty for excessive fees in common law, and Mr. Bullard, who articulated this theory in his report, admitted as much at deposition. *See* Dep. Tr. of Mercer E. Bullard ("Bullard Dep."), attached as Ex. 30 to Blais Decl., at 17-22, ("I was asked [by plaintiffs' counsel] to imagine the world as if there was a Common Law fiduciary duty. . . . But, as I have testified today, the law is pretty

---

statutory phrase to determine whether Sections 26(f) and 27(i) of the ICA contain private rights of action, this language "only describes actions . . . that are prohibited; it does not mention investors such as plaintiffs." *Id.* at 433. The court continued: " 'Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons.' " *Id.* (quotations and internal punctuation omitted).

clear, it's the *Gartenberg* standard, not a fiduciary duty Common Law standard.").

**D. Plaintiffs' Challenge To The "Disinterested" Status Of Trustee Victor Morgenstern Is Not Actionable Under Section 36(b), As Trustee Approval Of Fees And Fund Board Composition Are Governed By ICA Sections 15(c) and 10(a)**

Section 10(a) of the ICA requires that at least 40% of a fund's trustees not be "interested persons" of the fund, while Section 15(c) requires that the advisory contract and fees be approved by a majority of the trustees who are not "interested persons" of the fund or adviser. *See* 15 U.S.C. §§ 80a-10(a), 80a-15(c). Section 2(a)(19) of the statute in turn defines who is an "interested person" of the fund or adviser. *See* 15 U.S.C. § 80a-2(a)(19). Through the expert reports of their three designated lawyer-experts, plaintiffs assert that one of the Oakmark Funds' former independent trustees, Victor Morgenstern, was in fact an "interested person" under the ICA because his prior employment by Harris and his receipt of deferred compensation from that employment during his tenure as a trustee rendered him incapable of being disinterested.[9] *See, e.g.*, Expert Report of Lyman Johnson ("Johnson Rep."), attached as Ex. 31 to Blais Decl., at 17-19.[10]

Plaintiffs cannot establish a breach of fiduciary duty under Section 36(b) through a

---

[9] The relevant facts regarding Mr. Morgenstern are not in dispute. During his tenure as an officer of Harris, Mr. Morgenstern served as a trustee of the Oakmark Funds, and was designated as an "interested" trustee under the ICA due to his employment with Harris. Upon his retirement from Harris on December 31, 2000, Mr. Morgenstern was elected by the independent or "disinterested" trustees to join them in that role, and indeed to serve as their chair. Mr. Morgenstern served as chair of the trustees until September 30, 2004, and continued as a member of the board until January 1, 2005. As a result of his prior employment with Harris, Mr. Morgenstern was entitled to receive deferred compensation from Harris for several years following his 2000 retirement – in an annual amount that was fixed unless Harris suffered a dramatic (50%+) drop in revenues in a given year.

[10] Plaintiffs are incorrect that Mr. Morgenstern is an "interested person" under the ICA. The only potential basis for Mr. Morgenstern being "interested" would be if he were an "affiliated person" of Harris under ICA § 2(a)(19)(B)(i). An "affiliated person" is defined in the ICA as "any person directly or indirectly controlling, controlled by, or under common control with such other person", 15 U.S.C. § 80a-2(a)(3)(C), and the statute specifically provides that "[a] natural person shall be *presumed* not to be a controlled person", 15 U.S.C. § 80a-2(a)(9) (emphasis added). Plaintiffs have adduced no evidence of any such "control" in Mr. Morgenstern's case in order to rebut this presumption – particularly in light of the active oversight and fee negotiations undertaken by the trustees under Mr. Morgenstern's leadership.

challenge to the disinterested status of a trustee. Section 36(b) is a narrow statutory remedy giving shareholders a direct right of action to recover excessive fees from the adviser. As discussed at length above, plaintiffs' burden here is to establish that the fees were so grossly out of proportion to the values of the services rendered that the fees could not be within the range of what would be negotiated at arm's-length. But plaintiffs draw no connection between Mr. Morgenstern's supposed lack of disinterestedness and the resulting fees. Indeed, as set forth in the Statement of Facts, the trustees in fact negotiated several new breakpoints in the Funds' fee schedules during Mr. Morgenstern's tenure as board chair. Plaintiffs can only meet their burden of proof and avoid summary judgment with evidence establishing the required disproportion.

By challenging Mr. Morgenstern's disinterested status without reference to the negotiated fees that resulted during his tenure, plaintiffs are in effect asserting that alleged violations of Sections 10(a) and 15(c) comprise a *per se* breach of fiduciary duty under Section 36(b). But such an expansive reading of Section 36(b) would allow virtually any alleged violation of the ICA to be pled as a basis for a Section 36(b) fiduciary duty claim, and courts have repeatedly rejected this expansive view of the statute. *See, e.g.*, *Migdal*, 248 F.3d at 328 ("Allegations about the status of directors with whom fee negotiations took place relate too tangentially to the simple question of whether the investment advisers received excess compensation for the services the rendered."); *Strougo v. BEA Assocs.*, No. 98-CIV.-3725(RWS), 1999 WL 147737, at *4 (S.D.N.Y. Mar. 18, 1999).

Moreover, a challenge regarding compliance with Section 15(c) and Section 10(a) must be brought under Section 15(c) and Section 10(a), but there is no private right of action for such a challenge.[11] As discussed more fully above, the law is clear that Congress cannot be deemed to

---

[11] While the court in *Langner v. Brown*, 913 F. Supp. 260, 267 (S.D.N.Y. 1996), held that a private right of action may exist under Section 10(a), this decision is no longer good law. The Supreme Court's

have implied a private right of action to enforce provisions like Section 15(c) and 10(a), when it elected to create such an express right in another provision, Section 36(b), and did not follow suit here. *See Tarlov v. Paine Webber Cashfund, Inc.*, 559 F. Supp. 429, 437 (D. Conn. 1983) (refusing to imply private right of action under Section 15(c)); *Cohen v. Fund Asset Management, Inc.*, No. 79-Civ.-2512, 1980 WL 1488, at *3 (S.D.N.Y. Mar. 31, 1980) (same); *Halligan v. Standard & Poor's/Intercapital, Inc.*, 434 F. Supp. 1082, 1084 (E.D.N.Y. 1977). Accordingly, plaintiffs' claim here fails as a matter of law.

Finally, even if plaintiffs could raise their challenge to Mr. Morgenstern's disinterested status in this case, the undisputed facts demonstrate that the requirements of Sections 15(c) and 10(a) were satisfied even if Mr. Morgenstern is deemed to have been "interested." During the relevant time period, the statute required that no fewer than 40% of the trustees approving the advisory contracts must be disinterested. *See Burks v. Lasker*, 441 U.S. 471, 482 (1979) (citing 15 U.S.C. § 80a-10(a) (1976)); *Strougo*, 188 F. Supp. 2d at 379 (citing 15 U.S.C. § 80a-10(a)(2000)); *Krantz v. Prudential Invs. Fund Mgmt. LLC*, 77 F. Supp. 2d 559, 561 (D.N.J. 1999) (citing 15 U.S.C. § 80a-10(a) (1996)). As of the beginning of the relevant period, on August 16, 2003, the Oakmark board consisted of nine trustees, one of whom was disclosed as "interested." In the following fiscal year, the Oakmark board increased it ranks to ten by adding another "interested" trustee, who was an officer of Harris. Thus, even if Mr. Morgenstern is deemed to be interested during this period, the composition of the board would still reflect 77% disinterested trustees in the earlier period (7 of 9) and 70% in the later period (7 of 10) – easily

---

subsequent decision in *Alexander v. Sandoval*, 532 U.S. 275 (2001), clarified the very narrow circumstances in which private rights of action can be implied from Congressional silence. Following *Sandoval*, courts have repeatedly rejected earlier decisions finding implied rights of action in the ICA in the face of Congress' express creation of a private right under Section 36(b). *See, e.g., Forsythe*, 417 F. Supp. 2d at 107-08 (summarizing various cases that discount pre-*Sandoval* precedent regarding private rights of action under the ICA).

exceeding the 40% requirement. Mr. Morgenstern's status as interested vs. disinterested cannot tip the balance of the board under the relevant requirement, and therefore this dispute cannot create an issue of material fact preventing summary judgment.

E.    **Plaintiffs' Assertion That The Remaining Disinterested Trustees Were Not Sufficiently "Independent" Has No Legal Basis And Is Irrelevant Under Section 36(b)**

It is undisputed that the independent trustees other than Mr. Morgenstern during the relevant time period were "disinterested" under the requirements of the ICA. Nevertheless, plaintiffs assert that these trustees were not sufficiently "independent" to negotiate advisory fees with Harris due to their personal investments and social relationships. Johnson Rep. at 4; Dep. Tr. of Lyman Johnson ("Johnson Dep."), attached as Ex. 32 to Blais Decl., at 94; Bullard Dep. at 260-261. While the "independence and conscientiousness" of trustees is one of the so-called *Gartenberg* factors, that factor is to be used as an aid in determining whether the ultimate standard is satisfied – that the fees are so out of proportion to the value of services rendered that the fees *could not* have been negotiated at arm's-length. Here, plaintiffs complain of a supposed lack of "independent" status without any reference to its impact on the resulting fees. *See* Johnson Dep. at 101-102 ("Q. In your opinion are the substantive decisions of the board and the procedural steps they took to get there irrelevant to independence if the board is comprised of people who are not independent by means of status? A. Yes...."). Evidence of a supposed lack of "independence" that fails to suggest any bearing on the resulting fees is irrelevant under Section 36(b) and cannot create an issue of material fact.

Moreover, there is no legal basis under Section 36(b) or elsewhere in the ICA for the distinction plaintiffs would draw between whether a trustee is "disinterested" and whether he or she is "independent." As discussed above, Sections 15(c) and 10(a) of the ICA require that fees be approved by a board with at least 40% disinterested members, as defined under Section

2(a)(19). 15 U.S.C. § 80a-15(c), § 80a-10(a), § 80a-2(a)(19). There is no separate analysis under the ICA for "independent" status once disinterestedness has been determined, and the Supreme Court's decisions have treated these terms as synonymous. *See, e.g., Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 93 (1991) (indicating that the "Act requires, *inter alia*, that at least 40% of the investment company's directors be financially *independent* of the investment adviser" and citing the ICA section on board composition (15 U.S.C. § 80a-10(a)) and the ICA definition on "interested person" (15 U.S.C. § 80a-2(19)(A)(iii)) (emphasis added)); *Burks*, 441 U.S. at 482 ("The cornerstone of the ICA's effort to control conflicts of interest within mutual funds is the requirement that at least 40% of a fund's board be composed of *independent* outside directors. 15 U.S.C. § 80a-10(a)." (emphasis added)). Thus, plaintiffs' argument that certain of the Oakmark Trustees are in effect "disinterested but not independent" is wholly without statutory basis – such a hybrid status simply does not exist.

Moreover, as discussed above vis-à-vis the arguments as to Mr. Morgenstern, to the extent plaintiffs argue that the trustees' status rendered their approval of the fees inadequate under the formal requirements of the statute, such a failing is not actionable under Section 36(b). Challenges under the formal requirements of Section 15(c) and 10(a) must be brought under those sections, and there is no direct private right of action for such challenges.

## CONCLUSION

For all of the foregoing reasons, Defendant respectfully requests that the Court grant its Motion for Summary Judgment.

Respectfully submitted,

HARRIS ASSOCIATES, L.P.


BY:  /s/ Brian R. Blais
      Gordon B. Nash, Jr.
      GARDNER CARTON & DOUGLAS LLP
      191 North Wacker Drive, Suite 3700
      Chicago, IL 60606-1698
      Telephone:  (312) 569-1421
      Facsimile:  (312) 569-3421


      John D. Donovan, Jr.
      Robert A. Skinner
      Brian R. Blais
      Patricia M. Festin
      ROPES & GRAY, LLP
      One International Place
      Boston, Massachusetts 02110
      Telephone:  (617) 951-7000
      Facsimile:  (617) 951-7050
      *Admitted pro hac vice*

Dated:  September 12, 2006

### Certificate of Service

I, Brian R. Blais, an attorney of record, certify that I caused a true and correct copy of the following documents to be served pursuant to ECF as to counsel listed below registered with ECF and by Federal Express and email as to the other counsel listed below today, September 12, 2006:

Memorandum of Law in Support of Defendant Harris Associates L.P.'s Motion for Summary Judgment

Counsel of record:

Michael Brickman (mbrickman@rpwb.com)
James Bradley (jbradley@rpwb.com)
Nina Fields (nfields@rpwb.com)
Richardson, Patrick, Westbrook & Brickman LLC
174 East Bay Street
Charleston, SC 29401

Guy Burns (Guyb@jpfirm.com)
Becky Ferrell-Anton (beckyf@jpfirm.com)
Johnson, Pope, Bokor, Ruppel & Burns, LLP
403 East Madison Street
Suite 400
Tampa, FL 33602

Kevin Flynn (kmflynn@interaccess.com)
Kevin M. Flynn & Associates
77 West Wacker Drive, Suite 4800
Chicago, IL 60601

Michael W. Coffield (mike@bigdoglaw.com)
Michael W. Coffield & Associates
77 West Wacker Drive, Ste. 4800
Chicago, IL 60601

Dated: September 12, 2006   /s/ Brian R. Blais_____
                                      Brian R. Blais