CERTIFIED COPY

FILED
AUG 18 2008 AEE
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

In the

# United States Court of Appeals
### For the Seventh Circuit

---

No. 07-1624

JERRY N. JONES, MARY F. JONES, and
ARLINE WINERMAN,

                            *Plaintiffs-Appellants,*

v.

HARRIS ASSOCIATES L.P.,

                            *Defendant-Appellee.*

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 8305—Charles P. Kocoras, *Judge.*

---

ARGUED SEPTEMBER 10, 2007—DECIDED MAY 19, 2008

---

Before EASTERBROOK, *Chief Judge,* and KANNE and EVANS, *Circuit Judges.*

EASTERBROOK, *Chief Judge.* Harris Associates advises the Oakmark complex of mutual funds. These open-end funds (an open-end fund is one that buys back its shares at current asset value) have grown in recent years because their net returns have exceeded the market average, and the investment adviser's compensation has grown apace. Plaintiffs, who own shares in several of the Oakmark funds, contend that the fees are too high and thus violate §36(b) of the Investment Company Act of

1940, 15 U.S.C. §80a–35(b), a provision added in 1970. The district court concluded that Harris Associates had not violated the Act and granted summary judgment in its favor. 2007 U.S. Dist. LEXIS 13352 (N.D. Ill. Feb. 27, 2007).

Plaintiffs rely on several sections of the Act in addition to §36(b), and we can make short work of these. The Act requires at least 40% of a mutual fund's trustees to be disinterested in the adviser, see 15 U.S.C. §80a–10(a), and obliges the fund to reveal the financial links between its trustees and the adviser, see 15 U.S.C. §80a–33(b). Compensation for the adviser is controlled by a majority of the disinterested trustees. 15 U.S.C. §80a–15(c). Plaintiffs say that the Oakmark funds have violated all of these rules. Because none of the funds is a party to this suit, an order directing the funds to comply is not available as relief. Plaintiffs say that the court could require Harris to return the compensation it has received, but such a penalty would be disproportionate to the wrong. That's not the only problem: although §36(b) creates a private right of action, the other sections we have mentioned do not. We need not decide whether a private right of action should be implied, see *Alexander v. Sandoval*, 532 U.S. 275 (2001), or whether a sensible remedy could be devised, as there has been no violation of §10(a) or §15(c).

Victor Morgenstern is among the funds' trustees. Until the end of 2000, when he retired, Morgenstern was a partner of Harris Associates and counted among the funds' "interested" trustees. Since his retirement, Morgenstern has been treated as a disinterested trustee and has voted at the special meetings that deal with the adviser's compensation. Plaintiffs insist that Morgenstern does not meet the statutory standards because Harris Associates bought out his partnership with a stream

of payments that can be deferred if Harris does not satisfy performance benchmarks in a given year. This makes the payments a form of profit sharing, plaintiffs contend, and because profit-sharing agreements are treated as "securities" under 15 U.S.C. §80a–2(a)(36), Morgenstern owns securities in Harris Associates and is not disinterested. 15 U.S.C. §80a–2(a)(19)(B)(iii). Moreover, plaintiffs continue, the Oakmark funds did not disclose these facts to the public and so are out of compliance with 15 U.S.C. §80a–33(b).

Harris Associates contends that payments fixed in amount are not "profit sharing" in the statutory sense just because the time of payment is uncertain. Let us assume (again without deciding) that Morgenstern held a "security" under the Act because he was exposed to the risk of business reverses at his old firm. Failure to disclose Morgenstern's post-retirement payments from Harris Associates might support an order directing the funds to correct their annual reports and other official disclosure documents but would not justify any relief against Harris Associates. To get anywhere, even with a private right of action, plaintiffs would have to show the sort of violation that knocks out any valid contract between Harris Associates and the funds. Only a violation of the 40%-independence rule or the approval-by-a-majority-of-disinterested-trustees rule could do that. Yet most of the funds' trustees are disinterested even if Morgenstern is treated as interested.

During the time covered by the suit, the funds had nine or ten trustees, at least seven of whom are independent even if we count Morgenstern as interested. That's comfortably over the statutory requirement that 40% of trustees be disinterested. And as the disinterested trustees

unanimously approved the contracts with Harris Associates, it makes no difference how Morgenstern is classified. Plaintiffs ask us to suppose that Morgenstern possessed some Svengali-like sway over the other trustees, so that his presence in the room was enough to spoil their decisions. But in 2000 and before, when Morgenstern had been treated as interested, the disinterested trustees met in his absence and approved Harris's compensation. More: although the disinterested directors initially meet separately, the whole board ultimately discusses and votes on the contract. 15 U.S.C. §80a–15(a)(2). Interested directors are not silenced. So it is impossible to see how Morgenstern's role from 2001 through 2004 can be treated as poisoning the deliberations.

Now for the main event: plaintiffs' contention that the adviser's fees are excessive. They rely on §36(b), which provides:

> For the purposes of this subsection, the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment adviser . . . . With respect to any such action the following provisions shall apply:
>
> > (1) It shall not be necessary to allege or prove that any defendant engaged in per-

> sonal misconduct, and the plaintiff shall have the burden of proving a breach of fiduciary duty.
>
> (2) In any such action approval by the board of directors of such investment company of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, and ratification or approval of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, by the shareholders of such investment company, shall be given such consideration by the court as is deemed appropriate under all the circumstances. . . .

The district court followed *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923 (2d Cir. 1982), and concluded that Harris Associates must prevail because its fees are ordinary. *Gartenberg* articulated two variations on a theme:

> [T]he test is essentially whether the fee schedule represents a charge within the range of what would have been negotiated at arm's-length in the light of all of the surrounding circumstances.

694 F.2d at 928. And

> [t]o be guilty of a violation of §36(b) . . . the adviser-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining.

*Ibid.* Oakmark Fund paid Harris Associates 1% (per year) of the first $2 billion of the fund's assets, 0.9% of the next $1 billion, 0.8% of the next $2 billion, and 0.75% of anything over $5 billion. The district court's opinion sets out the fees for the other funds; they are similar. It is undisputed that these fees are roughly the same (in both level and breakpoints) as those that other funds of similar size and investment goals pay their advisers, and that the fee structure is lawful under the Investment Advisers Act. See 15 U.S.C. §80b-5. The Oakmark funds have grown more than the norm for comparable pools, which implies that Harris Associates has delivered value for money.

Plaintiffs contend that we should not follow *Gartenberg*, for two principal reasons: first, that the second circuit relies too much on market prices as the benchmark of reasonable fees, which plaintiffs insist is inappropriate because fees are set incestuously rather than by competition; second, that if any market should be used as the benchmark, it is the market for advisory services to unaffiliated institutional clients. The first argument stems from the fact that investment advisers create mutual funds, which they dominate notwithstanding the statutory requirement that 40% of trustees be disinterested. Few mutual funds ever change advisers, and plaintiffs conclude from this that the market for advisers is not competitive. The second argument rests on the fact that Harris Associates, like many other investment advisers, has institutional clients (such as pension funds) that pay less. For a client with investment goals similar to Oakmark Fund, Harris Associates charges 0.75% of the first $15 million under management and 0.35% of the amount over $500 million, with intermediate break-

points. Plaintiffs maintain that a fiduciary may charge its controlled clients no more than its independent clients.

Like the plaintiffs, the second circuit in *Gartenberg* expressed some skepticism of competition's power to constrain investment advisers' fees.

> Competition between [mutual] funds for shareholder business does not support an inference that competition must therefore also exist between adviser-managers for fund business. The former may be vigorous even though the latter is virtually non-existent. Each is governed by different forces.

694 F.2d at 929. The second circuit did not explain *why* this is so, however. It was content to rely on the observation that mutual funds rarely advertise the level of their management fees, as distinct from the funds' total expenses as a percentage of assets (a widely publicized benchmark).

Holding costs down is vital in competition, when investors are seeking maximum return net of expenses—and as management fees are a substantial component of administrative costs, mutual funds have a powerful reason to keep them low unless higher fees are associated with higher return on investment. A difference of 0.1% per annum in total administrative expenses adds up by compounding over time and is enough to induce many investors to change mutual funds. That mutual funds are "captives" of investment advisers does not curtail this competition. An adviser can't make money from its captive fund if high fees drive investors away.

So just as plaintiffs are skeptical of *Gartenberg* because it relies too heavily on markets, we are skeptical about *Gartenberg* because it relies too little on markets. And this is not the first time we have suggested that *Gartenberg*

is wanting. See *Green v. Nuveen Advisory Corp.*, 295 F.3d 738, 743 n.8 (7th Cir. 2002). Two courts of appeals (in addition to the second circuit) have addressed claims against the advisers of open-end mutual funds. One circuit has followed *Gartenberg*. See *Midgal v. Rowe Price–Fleming International, Inc.*, 248 F.3d 321 (4th Cir. 2001). The other has concluded that adherence to the statutory procedures, rather than the level of price, is the right way to understand the "fiduciary" obligation created by §36(b). See *Green v. Fund Asset Management, L.P.*, 286 F.3d 682 (3d Cir. 2002). Our own *Green* opinion, though it dealt with the obligations of advisers to closed-end funds, indicated sympathy for the third circuit's position.

Having had another chance to study this question, we now disapprove the *Gartenberg* approach. A fiduciary duty differs from rate regulation. A fiduciary must make full disclosure and play no tricks but is not subject to a cap on compensation. The trustees (and in the end investors, who vote with their feet and dollars), rather than a judge or jury, determine how much advisory services are worth.

Section 36(b) does not say that fees must be "reasonable" in relation to a judicially created standard. It says instead that the adviser has a fiduciary duty. That is a familiar word; to use it is to summon up the law of trusts. Cf. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989). And the rule in trust law is straightforward: A trustee owes an obligation of candor in negotiation, and honesty in performance, but may negotiate in his own interest and accept what the settlor or governance institution agrees to pay. *Restatement (Second) of Trusts* §242 & comment f. When the trust instrument is silent about compensation, the trustee may petition a court for an

award, and then the court will ask what is "reasonable"; but when the settlor or the persons charged with the trust's administration make a decision, it is conclusive. John H. Langbein, *The Contractarian Basis of the Law of Trusts*, 105 Yale L. J. 625 (1995). It is possible to imagine compensation so unusual that a court will infer that deceit must have occurred, or that the persons responsible for decision have abdicated—for example, if a university's board of trustees decides to pay the president $50 million a year, when no other president of a comparable institution receives more than $2 million—but no court would inquire whether a salary normal among similar institutions is excessive.

Things work the same way for business corporations, which though not trusts are managed by persons who owe fiduciary duties of loyalty to investors. This does not prevent them from demanding substantial compensation and bargaining hard to get it. Publicly traded corporations use the same basic procedures as mutual funds: a committee of independent directors sets the top managers' compensation. No court has held that this procedure implies judicial review for "reasonableness" of the resulting salary, bonus, and stock options. These are constrained by competition in several markets—firms that pay too much to managers have trouble raising money, because net profits available for distribution to investors are lower, and these firms also suffer in product markets because they must charge more and consumers turn elsewhere. Competitive processes are imperfect but remain superior to a "just price" system administered by the judiciary. However weak competition may be at weeding out errors, the judicial process is worse—for judges can't be turned out of office or have their salaries cut if they display poor business judgment.

Lawyers have fiduciary duties to their clients but are free to negotiate for high hourly wages or compensation from any judgment. Rates over $500 an hour and contingent fees exceeding a third of any recovery are common. The existence of the fiduciary duty does not imply judicial review for reasonableness; the question a court will ask, if the fee is contested, is whether the client made a voluntary choice *ex ante* with the benefit of adequate information. Competition rather than litigation determines the fee—and, when judges must set fees, they try to follow the market rather than demand that attorneys' compensation conform to the judges' preferences. See, e.g., *In re Synthroid Marketing Litigation*, 325 F.3d 974 (7th Cir. 2003); *In re Continental Illinois Securities Litigation*, 962 F.2d 566 (7th Cir. 1992). A lawyer cannot deceive his client or take strategic advantage of the dependence that develops once representation begins, but hard bargaining and seemingly steep rates are lawful.

The list could be extended, but the point has been made. Judicial price-setting does not accompany fiduciary duties. Section 36(b) does not call for a departure from this norm. Plaintiffs ask us to look beyond the statute's text to its legislative history, but that history, which *Gartenberg* explores, is like many legislative histories in containing expressions that seem to support every possible position. Some members of Congress equated fiduciary duty with review for reasonableness; others did not (language that would have authorized review of rates for reasonableness was voted down); the Senate committee report disclaimed any link between fiduciary duty and reasonableness of fees. See 694 F.2d at 928.

Statements made during the debates between 1968 and 1970 rest on beliefs about the structure of the mutual-

No. 07-1624 11

fund market at the time, and plaintiffs say that because many members of Congress deemed competition inadequate (and regulation essential) in 1970, we must act as if competition remains weak today. Why? Congress did not enact its members' *beliefs;* it enacted a text. A text authorizing the SEC or the judiciary to set rates would be binding no matter how market conditions change. Section 36(b) does not create a rate-regulation mechanism, and plaintiffs' proposal to create such a mechanism in 2008 cannot be justified by suppositions about the market conditions of 1970. A lot has happened in the last 38 years.

Today thousands of mutual funds compete. The pages of the *Wall Street Journal* teem with listings. People can search for and trade funds over the Internet, with negligible transactions costs. "At the end of World War II, there were 73 mutual funds registered with the Securities and Exchange Commission holding $1.2 billion in assets. By the end of 2002, over 8,000 mutual funds held more than $6 trillion in assets." Paul G. Mahoney, *Manager-Investor Conflicts in Mutual Funds*, 18 J. Econ. Perspectives 162, 162 (Spring 2004). Some mutual funds, such as those that track market indexes, do not have investment advisers and thus avoid all advisory fees. (Total expenses of the Vanguard 500 Index Fund, for example, are under 0.10% of assets; the same figure for the Oakmark Fund in 2007 was 1.01%.) Mutual funds rarely fire their investment advisers, but investors can and do "fire" advisers cheaply and easily by moving their money elsewhere. Investors do this not when the advisers' fees are "too high" in the abstract, but when they are excessive in relation to the results—and what is "excessive" depends on the results available from other investment vehicles, rather than any absolute level of compensation.

New entry is common, and funds can attract money only by offering a combination of service and management that investors value, at a price they are willing to pay. Mutual funds come much closer to the model of atomistic competition than do most other markets. Judges would not dream of regulating the price of automobiles, which are produced by roughly a dozen large firms; why then should 8,000 mutual funds seem "too few" to put competitive pressure on advisory fees? A recent, careful study concludes that thousands of mutual funds are plenty, that investors can and do protect their interests by shopping, and that regulating advisory fees through litigation is unlikely to do more good than harm. See John C. Coates & R. Glenn Hubbard, *Competition in the Mutual Fund Industry: Evidence and Implications for Policy*, 33 Iowa J. Corp. L. 151 (2007).

It won't do to reply that most investors are unsophisticated and don't compare prices. The sophisticated investors who do shop create a competitive pressure that protects the rest. See Alan Schwartz & Louis Wilde, *Imperfect Information in Markets for Contract Terms*, 69 Va. L. Rev. 1387 (1983). As it happens, the most substantial and sophisticated investors choose to pay substantially more for investment advice than advisers subject to §36(b) receive. A fund that allows only "accredited investors" (i.e., the wealthy) to own non-redeemable shares is exempt from the Investment Company Act. See 15 U.S.C. §80a–6(a)(5)(A)(iii). Investment pools that take advantage of this exemption, commonly called hedge funds, regularly pay their advisers more than 1% of the pool's asset value, plus a substantial portion of any gains from successful strategies. See René M. Stulz, *Hedge Funds: Past, Present, and Future*, 21 J. Econ. Perspectives 175 (Spring

2007). See also Joseph Golec & Laura Starks, *Performance fee contract change and mutual fund risk*, 73 J. Fin. Econ. 93 (2004). When persons who have the most to invest, and who act through professional advisers, place their assets in pools whose managers receive more than Harris Associates, it is hard to conclude that Harris's fees must be excessive.

Harris Associates charges a lower percentage of assets to other clients, but this does not imply that it must be charging too much to the Oakmark funds. Different clients call for different commitments of time. Pension funds have low (and predictable) turnover of assets. Mutual funds may grow or shrink quickly and must hold some assets in high-liquidity instruments to facilitate redemptions. That complicates an adviser's task. Joint costs likewise make it hard to draw inferences from fee levels. Some tasks in research, valuation, and portfolio design will have benefits for several clients. In competition those joint costs are apportioned among paying customers according to their elasticity of demand, not according to any rule of equal treatment.

Federal securities laws, of which the Investment Company Act is one component, work largely by requiring disclosure and then allowing price to be set by competition in which investors make their own choices. Plaintiffs do not contend that Harris Associates pulled the wool over the eyes of the disinterested trustees or otherwise hindered their ability to negotiate a favorable price for advisory services. The fees are not hidden from investors—and the Oakmark funds' net return has attracted new investment rather than driving investors away. As §36(b) does not make the federal judiciary a rate regulator, after the fashion of the Federal Energy

14                                      No. 07-1624

Regulatory Commission, the judgment of the district court is affirmed.

USCA-02-C-0072—5-19-08